**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| WANDA E. DAUMONT COLON<br><br>**PLAINTIFF**<br><br>VS.<br><br>COOPERATIVA DE AHORRO Y CREDITO DE CAGUAS; IRMA HILERIO ARROYO AS OFFICER AND IN HER PERSONAL CAPACITY<br><br>**DEFENDANTS** | **Civil No.:** 15-3120 (CVR) |

<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**TO THE HONORABLE COURT:**

COME NOW, defendants, Cooperativa de Ahorro y Credito de Caguas ("CaguasCoop"); and Irma Hilerio Arroyo ("Hilerio"), through their undersigned attorney, and very respectfully states and prays as follows:

**I.    <u>Introduction</u>:**

On December 23rd, 2015, Plaintiff, Wanda E. Daumont Colon ("Daumont") filed the instant action claiming her employment with Caguas Coop was allegedly terminated because of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621 et seq.  Additionally, Daumont avers supplemental state claims under Law 100-1959, ("Law 100") 29 Laws of P.R Anno. 146 et seq; and Law 80-1974, ("Law 80") 29 Laws of P.R. Anno. 185 (a) et seq.

## II.  **Summary of Arguments:**

Defendants respectfully move this Honorable Court to dismiss all claims of the Complaint insofar as summary judgment must be entered on behalf of them as a matter of law under Fed. R. Civ. P. 56(c).  First, the allegations in the complaint and the record developed in the discovery process are in no sense discriminatory nor are demonstrative that age was the motivating fact for which Daumont no longer works at Caguas Coop.  Second, even if this Court was to assume that a *prima facie* case has been established for the specific purpose of ruling our motion for summary judgment under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805, (1973), there is an absence of evidence to support the claims of age discrimination and unjust termination.  *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576-581 (1st Cir. 1994)

The rule is simply that an ADEA plaintiff "… must prove by a preponderance of the evidence … that age was the 'but-for' cause of the challenge employer decision." *Reeves v. Sandderson Plumbing Products, Inc.*, 530 U.S. 133, 141-143 (2000)

On summary judgment the ultimate question in an ADEA claim "is whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable fact finder to conclude that [s]he was fired… "because of her age  *Velez v. Thermo King de Puerto Rico, Inc.* 585 F.3d 441, 425 (1st Cir. 2009).

Coupled with this motion we have filed the <u>Statement of Uncontested Facts in Support of Defendants' Motion for Summary Judgment</u> ("SUF") in compliance with FRCP 56 and Local Rule 56.  The SUF is duly supported by specific references to admissible evidence on the record.

## III.  **Summary of Factual Background:**

Daumont worked for Caguas Coop and was terminated in her employment for just cause. Thus, she has no remedy under applicable federal and local law. At the time of termination

Daumont was a Branch Manager (SUF, ¶. 2).  Thus, was fully aware of the rules of conduct in the workplace, Cooperativa de Ahorro y Crédito de Caguas, ("Caguas Coop"). (Exhibit 27 – Daumont's Continuation of Depo. pp. 9-16; 18-20) (SUF ¶¶ 64-66)  Still, she violated them.

Among others, she incurred in prohibited conflict of interests by participating in banking transactions involving her consensual partner. (SUF, ¶¶ 5-39)  She ordered one of the employees she supervised to process a disbursement from her consensual partner's line of credit without the required authorization from a Caguas Coop official. (SUF, ¶¶ 7, 11, 34)  Plaintiff was not an authorized signatory in the credit line account and her consensual partner did not sign the required withdrawal form. (SUF, ¶¶ 12-24) Plaintiff signed the withdrawal form with her consensual partner's name. (SUF, ¶¶ 11, 12, 13)  Put simply, she forged her partner's signature. (SUF, ¶¶ 26-28)  She had priorly been admonished not to realize transactions in conflict of interests since 2012 when she was admonished for having intervened in a transaction of the cashing of a check for her daughter.  At that time she was warned that future violations would follow by disciplinary actions, including dismissal of employment. (SUF, ¶¶53-58)  Yet, she did so, at least, on seven (7) additional instances afterwards (included the February 20th, 2015). (SUF, ¶¶ 36-37)  Also, in January 30th, 2015 plaintiff authorized a person to withdraw the sum of $18,795.43 from a corporate account (Damart Development) without the required authorization from the corporate entity. (SUF, ¶¶ 40-52)  It was a substantial withdrawal from the account of a corporate entity to issue Manager Checks to the Secretary of Treasury to solve (during an amnesty) the tax problems of one of the individual officers of said corporate entity. (SUF, ¶¶ 40-49)  The transaction was not for the corporation's benefit but for the benefit of one of its officers. (SUF, ¶ 45)

Once Caguas Coop became aware Daumont's objectable conduct in relation to the credit line account of her consensual partner, an investigation was conducted and the following objectable transactions were discovered, among others: there were numerous withdrawals without the member's signature, without the member's name; and with a signature that did not match the one on file. (SUF, ¶ 5-39) The investigation of the January 30th, 2015 (Damart Development's account) was on going when the February 20th, 2015 (under Daumont's consensual partner) transaction came under scrutiny. (SUF, ¶ 49-51)

Daumont did approve her performance evaluations.  Nevertheless, the termination was due to plaintiff's failure to abide by the rules and regulations of Caguas Coop.  Defendant, Irma Hilerio Arroyo, is sixty four (64) years of age. She was the person who took the termination decision.  Thus, is older than plaintiff.  Age was not a factor in the decision to terminate plaintiff. (SUF, ¶¶ 59-66)

Based on said uncontested facts summary judgment dismissing the action follows as a matter of law and we hereby move the Court to so rule.

**IV.    UNCONTESTED FACTS**

1.      Plaintiff, Wanda E. Daumont Colón ("Daumont") was born on July 2nd, 1954.  At the time of her discharge from the Cooperativa de Ahorro y Credito de Caguas ("Caguas Coop") she was age 60 years. (Complaint, par. 8.; Answer to Complaint, par. 8) (SUF ¶ 1)

2.      Daumont held the position of Branch Manager in Caguas Coop, as such, her duties included: service and attention to clients; supervision of the branch employees and personnel; to promote the branch services, to solve clients' problems and situations; to solve problems and situations related with equipment and physical facilities of the branch; to prepare working plans; to balance the cashiers; the vault and ATM machine; the supervision of cashiers

and officers; to prepare reports and other related duties. (Complaint, par. 10; Answer to Complaint, par. 10) (SUF ¶ 2)

3.      On the year 2012, co-defendant, Irma Hilerio Arroyo ("Hilerio") was hired as Executive President of Caguas Coop. (Complaint, par. 13; Answer to Complaint, par. 13) (SUF ¶ 3)

4.      On March 10, 2015 Daumont was discharge from her employment at Caguas Coop (Complaint, par. 18; Answer to Complaint, par. 18) (SUF ¶ 4)

**The February 20th, 2015 Transaction (Re: Unauthorized Withdrawal from Tirado's Line of Credit/ Conflict of Interest Transactions/Signature Forgery)**

5.      On February 20th, 2015 Daumont received a call from her consensual partner, Jose Tirado ("Tirado"), (Exhibit 1, Daumont's Depo. pag. 14), requesting her to make a withdrawal of $80.00 from his line of credit to be transferred to his checking account. (Exhibit 1, Daumont's Depo, pages 8-9) At that point in time Daumont was the Branch Manager of a of the branches of Caguas Coop. (Exhibit 1, Daumont's Depo, p. 10)  (SUF ¶ 5)

6.      The transaction was done at the branch in which Daumont was the Branch Manager. (Gautier Benitez Avenue Branch) (Exhibit 1, Daumont's Depo, at p. 10) (SUF ¶ 6)

7.      The teller involved in the transaction was Mr. Norberto Santos ("Santos") whose direct supervisor was Mrs. Joany Torres ("Torres"). Torres reported to Daumont. (Id, pp. 10-11) (SUF ¶ 7)

8.      Daumont did not ask Torres to authorize her transaction. (Id, pp. 12-13) (SUF ¶ 8)

9.      Mr. Ramon Adorno ("Adorno"), was the Caguas Coop's Operation Vice-president (Exhibit 5, Jessybell Matos Depo, at p. 50). Daumont did not ask Adorno to authorize

the transaction.  Adorno had authority to authorize the transaction. (Exhibit 1, Daumont's Depo, p. 12-13) (SUF ¶ 9)

10.     Daumont did not ask Wilma Rivera ("Rivera") for authorization, Credit Vice-president. (Id, p. 13) (SUF ¶ 10)

11.     The documents of the transaction that Daumont handed to Santos were prepared by Daumont (in her own handwriting). (Id, p.14) (SUF ¶ 11)

12.     Exhibit 2 are the withdrawal documents for the transaction concerning Tirado's line of credit.  They were duly authenticated by Daumont in her deposition. (Exhibit 1, Daumont Depo, at p. 15) (Exhibit 2-Withdrawal documents) (SUF ¶ 12)

13.     Daumont admitted to having signed "Jose Tirado" in the signature of the member line. (Exhibit 1, Daumont Depo., p. 16) (SUF ¶ 13)

14.     Tirado already had his line of credit with Caguas Coop when his relationship with Daumont started. (Exhibit 1, Daumont Depo, at p. 18) Daumont never went with Tirado to Caguas Coop to modify said line of credit. (Exhibit 1, Daumont's Depo. p. 19) (SUF ¶ 14)

15.     Daumont never signed any documents at Caguas Coop in order to be a party responsible for Tirado's line of credit. (Exhibit 1, Daumont's Depo, p. 20) (SUF ¶ 15)

16.     Tirado never went to Caguas Coop to convey that Daumont was authorized to make withdrawals from his line of credit. (Exhibit 1, Daumont's Depo, pp 21-22) (SUF ¶ 16)

17.     Exhibit 3 and 4 are authorizations by Tirado for Daumont to do transactions in his savings account, duly authenticated by Daumont in her deposition. (Exhibit 1, Daumont's Depo, pp. 32-33)  These documents was executed on February 25th, 2015, in other word <u>five (5) days after the February 20th, 2015 transaction</u>.  Daumont and Tirado did not sign up to authorize

Daumont to do transaction in Tirado's checking account. (Exhibit 1, Daumont's Depo at p. 33) (Exhibits 3 and 4) (SUF ¶ 17)

18.     Exhibit 3 and 4 are the only documents that Daumont and Tirado signed to update Tirado's account after the February 20th, 2015 transaction. (Exhibit 1, Daumont's Depo, pp. 32-33) (SUF ¶ 18)

19.     Jessybel Alexandra Matos ("Matos") was Caguas Coop's Compliance Officer in the summer of 2012 (Exhibit 5, Matos' Depo, p. 20) Matos was involved in the investigation of Daumont's February 20th, 2015 transaction. (Exhibit 5, Matos' Depo, pp. 55-57) (SUF ¶ 19)

20.     It was brought to Matos's attention a transaction with a line of credit where Daumont signed on behalf of some other person. (Exhibit 5, Matos' Depo, p. 57) (SUF ¶ 20)

21.     The matter was brought to Matos by Torres, Cashier Supervisor or Head Teller. (Exhibit 5, Matos's Depo, p. 50) (SUF ¶ 21)

22.     The transaction was a withdrawal from a line of credit in the amount of $80.00 and the deposit of that same amount in an account of the same client. (Exhibit 5, Matos's Depo, at p. 58) (SUF ¶ 22)

23.     For said transaction Daumont needed authorization from Adorno, her supervisor, Operations Vice-President. (Exhibit 5, Matos's Dep. Pp. 59-60) (SUF ¶ 23)

24.     The Financial and Human Resources Vice-President in CaguasCoop is Mrs. Lourdes Rodriguez Flores ("Rodriguez").  (Exhibit 10, Rodriguez' Depo, p. 19) (SUF ¶ 24)

25.     From the standpoint of compliance, it is a big offense for a Branch Manager to forge the signature of a member. (Exhibit 5, Matos's Depo p. 7) (SUF ¶ 25)

26.     Also, a Branch Manager is expected to set an example. (Id. pp 107-110) (SUF ¶ 26)

27.     There are no documents authorizing Daumont to do transaction in Tirado's line of credit. (Exhibit 5, Matos' Depo at 111)  A line of credit is in the nature of a loan and only to debtor himself can draw from said line (Exhibit 10 , Rodriguez' Depo., p. 50) (SUF ¶ 27)

28.     As per Caguas Coop's Compliance Officer nothing authorizes the forgery of anybody's signature in a Caguas Coop's transaction. (Exhibit 5, Matos's Depo, p. 112) (SUF ¶ 28)

29.     When Matos brought her findings to Adorno's attention, it was explained to him that she had concluded that Daumont forged Tirado's signature. (Exhibit 5, Matos's Depo at p. 12) (SUF ¶ 29)

30.     Damaris Jimenez ("Jimenez") was Caguas Coop's Representative for Customers Services. (Exhibit 6, Jimenez' Depo at p. 8) (SUF ¶ 30)

31.     As per Jimenez, Tirado had not authorized Daumont to act on his behalf for all products and services provided by Caguas Coop. (Exhibit 6, Jimenez' Depo, p. 50) (SUF ¶ 31)

32.     The screen of the Helvetia systems in Caguas Coop (Exhibit 7) shows that Daumont is an authorized relative of Tirado. Yet, it does not authorize Daumont to do neither line of credits transactions nor to sign on behalf of Tirado. (Exhibit 6, Jimenez' Depo, pp. 44-46, 50-51) (SUF ¶ 32)

33.     Adorno carried out the investigation of Daumont's withdrawal from Tirado's line of credit once the matter was disclosed by the Head Teller, Torres. (Exhibit 8, Adorno's Depo., p. 32)  Torres informed the situation to the Compliance Officer, who in turn brought it to Adorno's attention (Id, p. 32)  Adorno saw the transaction document and it was not authorized by an officer.  He interviewed the Teller who told him that the owner of the account was not present in the transaction. (Id., p. 33) (SUF ¶ 33)

34. Adorno verified the account's file. The signature in the transaction slip was not that of the owner. (Id, p. 33)  He so informed to Hilero, Caguas Coop's President, who ordered a deeper investigation. (Id, pp. 33-34) (SUF ¶ 34)

35. The Teller was Santos, who informed Adorno that he did the transaction without authorization because Daumont was his boss. (Id, p. 34) (SUF ¶ 35)

36. Adorno investigated whether this transaction represented a pattern and said pattern was confirmed. (Exhibit 8, Adorno's Dep., p. 37-38; 40) (SUF ¶ 36)

37. Daumont admitted in deposition having signed for Tirado in the following transactions:

Withdrawal of Credit Line belonging to Tirado from 12/18/2014 (Exhibit 9-A);

Withdrawal of Credit Line belonging to Tirado from Dec/4/2014 (Exhibit 9-B);

Withdrawal of Credit Line belonging to Tirado from Dec/2/2014 (Exhibit 9-C);

Withdrawal of Credit Line belonging to Tirado from Nov/21/2014 (Exhibit 9-D);

Withdrawal of Credit Line belonging to Tirado from Sept/26/2014 (Exhibit 9-E);

Withdrawal of Credit Line belonging to Tirado from Sept/18/2014 (Exhibit 9-F);

Withdrawal of Credit Line belonging to Tirado from July/10/2014 (Exhibit 9-G);

(Exhibit 9) (SUF ¶ 37)

38. During the investigation Daumont admitted to Adorno having done all of these transactions. (Exhibit 8, Adorno's Depo., p. 41) (SUF ¶ 38)

39. Once Hilero saw the transaction documents and was advised that the person signing for the client was actually and employee she decided to consult her attorney. (Exhibit 11, Hilero's Depo, at. P 77) (SUF ¶ 39)

40.     The February 20th, 2015 was one of the main reason for Hilero to decide to terminate Daumont in her employment at Caguas Coop. (Exhibit 12, Hilero's Depo, Part 2, p. 13) (SUF ¶ 40)

**The Damart Development Transaction (Unauthorized withdrawal of $18,794.43 from a Corporate Account to purchase six (6) Manager's Checks for the benefit of a Corporate officer to resolve a personal taxper problem in an amnesty)**

41.     The Darmar Development transaction was another main reason for the decision to terminate Daumont in her employment at Caguas Coop. (Exhibit 12, Hilero's Depo, Part. 2, pp. 13-14) (SUF V 41)

42.     The transaction was documented in a <u>Request for Monetary Instrument</u> (Exhibit 13) As per said document the person who did the transaction was Maria T. Ayala de Martinez ("Ayala"). The following Manager's Checks were issued for the Secretary of the Treasury for a total amount of $18,794.43:

1) Check for $2,670.58 issued to the Secretary of Treasury;

2) Check for $418.06 issued to the Secretary of Treasury;

3) Check for $6,700.36 issued to the Secretary of Treasury;

4) Check for $2,678.58 issued to the Secretary of Treasury;

5) Check for $418.06 issued to the Secretary of Treasury;

6) Check for $2,670.58 issued to the Secretary of Treasury.

(SUF ¶ 42)

43.     Ayala is married to Damian Martinez. ("Martinez") (Exhibit 14, Martinez' Depo., at p. 3) (SUF ¶ 43)

44.     Damart Development is a company duly registered to do business in Puerto Rico to deal with properties. (Exhibit 14, Martinez Depo at p. 3) (SUF ¶ 44)

45.     Martinez is the authorized signature as representative of Damart with Caguas Coop. (Martinez' Depo, pp. 3-4) (Exhibit 15) (Exhibit 16, Ayala's Depo. at p. 9) (SUF ¶ 45)

46.     The transactions related to the purchase of six (6) Manager's Checks for a total of $18,794.43 was not related to Damart.  Martinez for his personal benefit was making the transaction for Damart's funds to solve a personal taxpayer situation in an amnesty. (Exhibit 14, Martinez' Depo., pp 5-6) (SUF ¶ 46)

47.     No Corporate Resolution was done by Darmar to authorize the purchase of the Manager's Checks to the Secretary of the Treasury to deal with Martinez' personal tax situation. (Exhibit 14, Martinez' Depo, at p. 7) (SUF ¶ 47)

48.     Ayala's signature is not authorized in Caguas Coop to do transactions for Damar. (Exhibit 16, Ayala's Depo, at p. 7) (Exhibits 15, 17, 18) (Exhibit 16, Ayala's Depo at p. 8) (SUF ¶ 48)

49.     Martinez wrote a handwritten document authorizing Ayala to do the January 31st, 2015 transaction: a withdrawal of $18,795.43 from Damart's corporate account to purchase six (6) Manger's Checks to the Secretary of the Treasury (Exhibit 16, Ayala's Depo, p. 10) (Exhibits 12;18) (SUF ¶ 49)

50.     The transaction was investigated as part of the ordinary duties of the Compliance Officer (Exhibit 8, Adorno's Depo, at 47-48) (SUF ¶ 50)

51.     There was no Corporate Resolution by Damart authorizing the transaction (Exhibit 8, Adorno's Depo. at 48-49) (SUF ¶ 51)

52.     The conclusion was that the transaction had been done by a person without authorization according to Caguas Coop's files (Exhibit 8, Adorno's Depo at 48-50) (SUF ¶ 52)

53.     There was a withdrawal that was done without authorization of the corporate entity, so that could be a violation to the regulations and practices of Caguas Coop and also a violation of the bank Security Act. (Exhibit 8, Adorno's Depo., at pp 50-51) (SUF ¶ 53)

**Conflict of Interests Transaction/Daumont's involvement in her Branch in a transaction concerning her daughter cashing a check for $5,229.74**

54.     As per letter from Hilero to Daumont dated June 27th, 2012 (received by Daumont in June 29th, 2012) Daumont was warned that if a similar situation (one related to involvement in a Caguas Coop's transaction for the benefit of a relative representing a conflict of interest) came up she would be subject to disciplinary action including termination of employment. (Exhibit 1, Daumont's Depo at p. 39, 47) (Exhibit 20) (SUF ¶ 54)

55.     The situation concerned a check issued to the order of Daumont's daughter, Viviana E. Solá Daumont. Daumont intervened in the transaction for the cashing of the check issued by Association of Government Employees for $5,229.74 to her daughter. (Exhibit 21) (SUF ¶ 55)

56.     Daumont did not consult the transaction of the cashing of the check issued to her daughter with any person of a higher position than her in Caguas Coop. (Exhibit 1, Daumont's Depo, at p. 56) (SUF ¶ 56)

57.     Daumont admitted in her deposition that she was advised to the effect that if a similar situation happened again she could be terminated. (Exhibit 1, Daumont's Depo., at p. 47) (SUF ¶ 57)

58.     In said instance, Hilero reminded Daumont of the Operation Policy of the Cashier Area, Article VI, E, 8 to the effect that all transaction related to personal or relatives' account need to be worked out by another officer. (Exhibit 20) (Exhibit 21) Hilerio issued two (2) letters to Daumont on the matter. (Exhibit 20)(Exhibit 21)  Daumont responded to one to them (Exhibit 22) (SUF  ¶ 58)

59.     This transaction was investigated by the Compliance Officers. (Exhibit 5, Matos's Depo., 116-119) (SUF ¶ 59)

**<u>Termination</u>**

60.     Hilero was the person that decided to terminate Daumont. She did no after having met with her staff. (Exhibit 12, Hilero's Depo, Part 2, p. 15) (SUF ¶ 60)

61.     Daumont's Age was not a factor considered by Hilero (Exhibit 12, Hilero's Depo, Part 2, pp. 15-16) (SUF ¶ 61)

62.     Hilero is 64 years of age. Thus, older that Daumont. (Exhibit 12 Hilerio's Depo. Part I, p. 5) (SUF ¶ 62)

63.     The termination letter is included in the record. (Exhibit 23) (SUF ¶ 63)

64.     Hilero's grounds to terminate Daumont were:

A.     The "Código de Normas de Conducta y Disciplina Progresiva Supervision" (May, 2013)  , Sec. V, p. 19 Table 7, defines the acts or conduct considered Fraud; and p. 22, Table 9, defines the acts or conduct considered Conflicts of Interest:

**"Forge or alter reports or documents of the Credit Union or its clients, partners or depositors."**

**"Approve or process transactions, overdrafts or authorize or accept checks without checking account funds belonging to employees, directors, friends, clients, partners, depositors or relatives, of any degree of consanguinity or affinity, of their own or of employees or directors without the authorization of the Executive President."**

The "Código de Normas de Conducta y Disciplina Progresiva", Sec. V, pp. 19 Table 7 and p. 22, Table 9, states that the first infraction for incurring in such conduct entails **termination**.

(Exhibit 24)

B.      Código de Etica", p. 3, section B, Duties and Responsibilities:

Plaintiff's action also breached the Code of Ethics as follows:

Any member of a governing body, official or employee shall refrain from carrying out activities or actions that result or the appearance that:
c)      He/she is making decisions without following the established procedures or obtaining the required authorization for it…

C.       "Código de Ética" p. 9, part VI, Disciplinary process (A and B);

"Any violation of  any rule of the Code of Conduct by any Official(s) or employee(s) will entail the imposition of sanctions and/or actions which may include verbal reprimand, written reprimand, temporary or permanent suspension of the position, suspension of employment and salary or dismissal depending on the severity of the violation and how often the same was carried.

Depending on the violation(s) the sanction and the disciplinary action, the matter may entail reporting the situation to the relevant regulatory agencies for the corresponding administrative or judicial action. In the imposition of sanctions and/or disciplinary actions against officers and employees for violation of the Code of Ethics it shall be taken into consideration as aggravating or mitigating, whichever is the case, aside from the offense committed, the position of the offender, the risk of loss or damage to the Cooperative and the existence of previous faults."

(Exhibit 25)

D.      "Manual de Servicio al Socio y Política de Servicio al Socio", sec. 2.1.3.2.2.

2.1.3.2.2 Corporate Resolution: (A) It shall be required, of a corporation that has a Board of Directors, an agreement of the members authorizing the persons who appear to the Cooperative to perform transactions and sign them in representation of the corporation.

(Exhibit 26) (SUF ¶ 64)

65.     The following are rules and regulations in place in Caguas Coop. when Daumont was terminated:

A.      The "Código de Normas de Conducta y Disciplina Progresiva Supervision" (May, 2013)  , Sec. V, p. 19 Table 7, defines the acts or conduct considered Fraud; and p. 22, Table 9, defines the acts or conduct considered Conflicts of Interest:

**"Forge or alter reports or documents of the Credit Union or its clients, partners or depositors."**

**"Approve or process transactions, overdrafts or authorize or accept checks without checking account funds belonging to employees, directors, friends, clients, partners, depositors or relatives, of any degree of consanguinity or affinity, of their own or of employees or directors without the authorization of the Executive President."**

The "Código de Normas de Conducta y Disciplina Progresiva", Sec. V, pp. 19 Table 7 and p. 22, Table 9, states that the first infraction for incurring in such conduct entails **termination**.

(Exhibit 24)

B.      Código de Etica", p. 3, section B, Duties and Responsibilities:

Plaintiff's action also breached the Code of Ethics as follows:

Any member of a governing body, official or employee shall refrain from carrying out activities or actions that result or the appearance that:
        c)      He/she is making decisions without following the established procedures or obtaining the required authorization for it…

C.       "Código de Ética" p. 9, part VI, Disciplinary process (A and B);

"Any violation of  any rule of the Code of Conduct by any Official(s) or employee(s) will entail the imposition of sanctions and/or actions which may include verbal reprimand, written reprimand, temporary or permanent suspension of the position, suspension of employment and salary or dismissal depending on the severity of the violation and how often the same was carried.

 Depending on the violation(s) the sanction and the disciplinary action, the matter may entail reporting the situation to the relevant regulatory agencies for the corresponding administrative or judicial action. In the imposition of sanctions and/or disciplinary actions against officers and employees for violation of the Code of Ethics it shall be taken into consideration as aggravating or mitigating, whichever is the case, aside from the offense committed, the position of the offender, the risk of loss or damage to the Cooperative and the existence of previous faults."

(Exhibit 25)

D.      "Manual de Servicio al Socio y Política de Servicio al Socio", sec. 2.1.3.2.2.

2.1.3.2.2 Corporate Resolution: (A) It shall be required, of a corporation that has a Board of Directors, an agreement of the members authorizing the persons who appear to the Cooperative to perform transactions and sign them in representation of the corporation.

(Exhibit 26)

66.      Hilero considered Daumont's violations as a trust factor. (Exhibit 11, Hilero's Depo, Part 2, p. 14) (SUF ¶ 66)

67.      The termination letter state the grounds for termination. Said was signed by Hilero. The grounds were, among others:

A.      To carry out transactions, favors or concessions that are outside the norms that regulate the healthy administration in favor of any partner, client, sponsor, depositor, provider, consultant, etc. (Page 5 "Código de Normas de Conducta y Disciplina Progresiva".

B.      To violate or instigate other employees to violate established operating methods, norms and/or politics of the Credit Union or the verbal instructions from the Supervision. (Table 4 – "Actos constitutivos de Violación contra las Políticas Institucionales")

C.      To offer false information in any application or document in which any right, obligation or interest is created, transferred, terminated or affected or give false information intentionally on any credit application, promissory note or other document. (Table 1: "Actos constitutivos de Violación contra la Honestidad) When Daumont signed as if she was her husband and without being her signature authorized in the account, Daumont offered false information in an official document of the Credit Union.

D.      To cause a subordinate employee to fail to comply with the conflict of interest policy of the Credit Union.

E.      To induce the Credit Union to error by indicating that she was an authorized firm in Tirado's line of credit.

F. Forging the signature of her husband.

G.      Having signed seven (7) line of credit Withdrawals since July 10, 2014 against the Norms of Conduct of Constitutive Acts of Violations against Honesty.

F .To authorize a person without authorization to withdraw $18,795.43 from a Comercial Check Account.

(Exhibit 23) (Exhibit 27 – Daumont's Continuation of Depo., pp. 9-16; 18-20) (SUF ¶ 67)

### V.    <u>Summary Judgment Standard</u>:

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. The rule states, in pertinent part, that a court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also <u>Santiago–Ramos v. Centennial P.R. Wireless Corp.,</u> 217 F.3d 46, 52 (1st Cir.2000)*. The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*.

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the Court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See <u>Suarez v. Pueblo Int'l., Inc.,</u> 229 F.3d 49, 53 (1st Cir.2000)*.

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine." Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a

reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* supra. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994).

In making this assessment, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

## VI.   Age Discrimination:

In ADEA discriminations lawsuits, plaintiff bears the ultimate burden of proving that his age was the determinative factor in his discharge, "that is, that he would not have been fired but for his age". *LeBlanc v. Great Am. Ins. Co.,* 6 F. 3d 836 (1st Cir. 1993), cert. denied, 114 S. Ct. 1398, 128 L. Ed 2d 72 (1994). At least where there is little overt evidence of age discrimination, the case usually follows the "ritualized burden- shifting paradigm" presented in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 1824-26, 36 L. Ed 2d 668 (1973); *Goldman v. First Nat'l Bank of Boston*, 985 F. 2d 1113, 1117 (1st Cir. 1993); *Lawrence v. Northrop Corp.,* 980 f. 2d 66, 68, (1st Cir. 1992).

Under the _McDonnell Douglas_ test, plaintiff must open with a prima facie showing of certain standarized elements suggestive of possible discrimination. _Leblanc, supra_., 6 F. 3d at 842.

Establishing a prima facie case generates a rebuttable presumption of discrimination. While the burden of persuasion remains at all times with the plaintiff, the prima facie case shifts the burden of production to the employer, who must then <u>articulate</u> a legitimate nondiscriminatory reason for the adverse employment action. This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times. _Texas Dept. of Community Affairs v. Burdine_, 450 U.S. 248, 253 (1981).

If the employer meets this limited burden, the presumption vanishes and the plaintiff must adduce sufficient evidence to demonstrate that age was a motivation factor in the challenged employment action. _Zapata-Matos v. Reckitt& Coleman, Inc_., 277 F. 3d 40, 45 (1st Cir. 2002). To do so, plaintiff must show that the proffered reason is pretextual such that discriminatory animus can be inferred. _González v. El Dia, Inc_., 304 F. 3d 63, 69 (1st Cir. 2002). "It is not enough for a plaintiff to merely impugn the veracity of the employer's justification, he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive, age discrimination." _Mesnick v. General Electric_, Co., 950 F. 2d816 (1st Cir. 1991)

For the exclusive purposes of this dispositive motion we are assuming (without admitting so beyond the summary judgment stage) that Daumont has established a _prima facie_ case of age discrimination.

In turn, there is no genuine issue that Caguas Coop has articulated a non-discriminatory reason for terminating Daumont.   Daumont was terminated for violation to the rules and

regulations of Caguas Coop. (SUF ¶¶ 60-67) Thus, Defendants have met their corresponding burden.

The record is devoid of any evidence that could save the day for Daumont at the summary judgment stage.

It is incumbent then upon Daumont (who bears the final burden of persuasion) to show by a preponderance of the evidence (or at the very least to create a factual controversy) to the effect that the reason offered by Defendants is merely a pretext and the real motivation for the adverse job action was age discriminatory. *Woodman v. Haemonetics, Corp*., 51 F.3d 1087, 1091-1092 (1st Cir. 1995); *Velazquez Fernandez v. NCE*, 476 F. 3d 6) (1st Cir. 2007).

Finally, "[a]lthough the summary judgment standard requires that evidence of record be viewed in the light most favorable to the nonmoving party, it does not require that all bald assertions, opinion, or even genuinely held beliefs asserted by the nonmoving party be adopted wholeheartedly by a court." *Diaz v. Mitchell's Salon and Day Spa, Inc.,* 2011 WL 379097, at 7 (S.D. Ohio 2011).

We need go no further. The First Circuit has "consistently stated that mere questions regarding the employer's business judgment are insufficient to raise a triable issue as to pretext." *Acevedo-Parrilla*, 696 F.3d at 140 (citing Webber v. Int'l Paper co., 417 F.3d 229, 238 (1st Cir. 2005)). "more than a simple disagreement with the correctness of [Defendant's decisions," such as "evidence sufficient to raise an issue of fact as to whether [Defendant] … truly believed [Plaintiff's] performance was unsatisfactory", merits denial of summary judgment. *Acevedo-Parrilla*, 696 F.3d at 140. Whether an employer's perceptions are accurate or not, "so long as they are not discriminatory it is beyond the province of the court to act as a 'super personnel department [],' second-guessing the process by which the decisionmaker has arrived at her

conclusion…" *Benefont-Igaravidez*, 659 F.3d at 126 (quoting *Bennett v. Saint-Gobain Corp.,* 507 F.3d 23, 32 (1st Cir. 2007)). Furthermore, "poor performance in a job is a conventional business motive" for termination, "not age discriminatory…" *Cameron*, 685 F.3d at 48.

**VII.   Beyond the *Prima Facie* Case:**

As priorly stated, for the exclusive purpose of this dispositive motion we had taken for granted (without admitting so beyond the summary judgment stage) that Daumont has established a *prima facie* case of age discrimination.

Thus, it is incumbent upon the employer to <u>articulate</u> a legitimate non discriminatory reason for the adverse employment action taken against Daumont.  As we have previously demonstrated, ei is quite clear that Caguas Coop has articulated a legitimate, non discriminatory reason for Daumont's termination.

In *Davila v. Corporación de Puerto Rico para la Difusión Pública*, 498 F.3d 9, 16-18 (1st Cir. 2007) instruct on balancing meritorious age discrimination claims against merely unwise or unfair employment decision. <u>See also,</u> *Alvarez v. Shinsecki,* 2013 WL 1446157 (D. Puerto Rico); *Ferrer-Ferrer v. Bermudez, Longo, Diaz-Masso, S.E,* 2013 WL 5348530 (D. Puerto Rico, 2013)

On the one hand, Daumont's violations are quite supported by the record. On the other hand, Daumont centers her age discrimination claim against Hilero's decision.  Hilero is certainly older than Daumont. In addition, the probe leading to the dismissal was triggered by employees other than Hilero (the Compliance Officer was auditing the Damar transaction and the Head Teller was the one that escalated the Tirado's transaction) with virtually no evidence pointing to age as a factor and none indicating that the investigations were fabricated by Caguas Coop officials to conceal other motives.  A reasonable jury could not entirely reject Caguas Coop

abundant evidence that the termination stemmed, however, unwisely or not from the investigation *Ronda-Perez v. Banco Bilbao Vizcaya Argentaria Puerto Rico*, *Baralt v. Nationwide Mutual insurance Co.,* 251 F.3d 10 (1st Cir. 2001) .

**VII.**   **Supplemental Claims:**

**Laws 100 & 80**

Law 80 provides relief for unjust dismissal. See P.R.  Laws Ann. Tit. 29 § 185b. This statute allows termination for a number of reasons related to the employees' job performance, including employee's improper and disorderly conduct, negligent attitude towards her work and violations of the employer's policies. See *Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co.*, 152 F.3d 17, 28 (1st Cir. 1998). It is the employer that bears the ultimate burden to prove that it had just cause to terminate the employee. See P.R. Laws Annn. Tit. 29 § 185k; *Alvarez-Fonseca,* 152 F.3d at 28.  As stated before, Daumont's termination was due to her repeated violation with the Company's rules and procedures.  Thus, any Law 80 claim should be DISMISSED.

Law 100 is Puerto Rico's anti-discrimination statute. See P.R. Laws Ann tit. 29 § 146. The analysis used under the ADEA and the one for Law 100 is practically the same. See, *Mojica v. El Conquistador Resort and Golden Door Spa*, 714 f. Supp. 2s 241, 2623 (D.P.R. 2010). "as applied to age discrimination, [Law 100] differs from the ADEA only with respect to how the burden-shifting framework operates". See, *Dávila v. Corporación de Puerto Rico para la Difusión Publica, supra* at p. 18 (1st Cir. 2007) (Citing *Cardona Jiménez v. Bancomerico de P.R.* 174 F.3d 36, 42 (1st Cir. 1999))). Under Law 100, plaintiff must establish a *prima facie* case, demonstrating an actual or constructive discharge brought forth by an allegation that the decision to discharge was bases on a discriminatory animus. *Hoyos v. Telecorp Communications, Inc.* 488 F3d 1, 6 (1st Cir. 2007) (citations omitted). As with her ADEA claim, Daumont fails to prove (or

at least create a factual controversy) that her termination was due to her age. Therefore, her Law 100 claim should be DISMISSED.

## **CONCLUSION**

Based on the above, we hereby move the Court to enter summary judgment in this matter dismissing with prejudice the actions brought under the ADEA and Puerto Rico Laws 80 and 100.

RESPECTFULLY SUBMITTED.

IT IS HEREBY CERTIFIED that the foregoing document has been electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

In San Juan, Puerto Rico, this 31st day of August, 2017.

s/ *Enrique J. Mendoza Méndez*
Enrique J. Mendoza Mendez
USDC-PR 202804

***MENDOZA LAW OFFICES***
P.O. Box 9282
San Juan, P.R. 00908-0282
Tel. (787) 722-5522; 722-5530; 722-5540
Fax. (787) 723-7057
E-mail: mendozalo@yahoo.com