IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| WANDA E. DAUMONT COLON<br><br>**PLAINTIFF**<br><br>VS.<br><br>COOPERATIVA DE AHORRO Y CREDITO DE CAGUAS; IRMA HILERIO ARROYO AS OFFICER AND IN HER PERSONAL CAPACITY<br><br>**DEFENDANTS** | Civil No.: 15-3120 (CVR) |

**STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

COME NOW, defendants, Cooperativa de Ahorro y Crédito de Caguas ("Caguas Coop"); and Irma Hilerio Arroyo ("Hilerio"), through the undersigned attorney, and most respectfully submit and file their Statement of Uncontested Facts in Support to its Motion for Summary Judgment and Memorandum of Law in Support ("SUF") thereto, pursuant to FRCP 56 and Local Rule 56:

**UNCONTESTED FACTS**

1.  Plaintiff, Wanda E. Daumont Colón ("Daumont") was born on July 2nd, 1954. At the time of her discharge from the Cooperativa de Ahorro y Crédito de Caguas ("Caguas Coop") she was age 60 years. (Complaint, par. 8.; Answer to Complaint, par. 8)

2.  Daumont held the position of Branch Manager in Caguas Coop, as such, her duties included: service and attention to clients; supervision of the branch employees and personnel; to promote the branch services, to solve clients' problems and situations; to solve

problems and situations related with equipment and physical facilities of the branch; to prepare working plans; to balance the cashiers; the vault and ATM machine; the supervision of cashiers and officers; to prepare reports and other related duties. (Complaint, par. 10; Answer to Complaint, par. 10)

3. On the year 2012, co-defendant, Irma Hilerio Arroyo ("Hilerio") was hired as Executive President of Caguas Coop. (Complaint, par. 13; Answer to Complaint, par. 13)

4. On March 10, 2015 Daumont was discharge from her employment at Caguas Coop (Complaint, par. 18; Answer to Complaint, par. 18)

**The February 20th, 2015 Transaction (Re: Unauthorized Withdrawal from Tirado's Line of Credit/ Conflict of Interest Transactions/Signature Forgery)**

5. On February 20th, 2015 Daumont received a call from her consensual partner, Jose Tirado ("Tirado"), (Exhibit 1, Daumont's Depo. pag. 14), requesting her to make a withdrawal of $80.00 from his line of credit to be transferred to his checking account. (Exhibit 1, Daumont's Depo, pages 8-9) At that point in time Daumont was the Branch Manager of a of the branches of Caguas Coop. (Exhibit 1, Daumont's Depo, p. 10)

6. The transaction was done at the branch in which Daumont was the Branch Manager. (Gautier Benitez Avenue Branch) (Exhibit 1, Daumont's Depo, at p. 10)

7. The teller involved in the transaction was Mr. Norberto Santos ("Santos") whose direct supervisor was Mrs. Joany Torres ("Torres"). Torres reported to Daumont. (Id, pp. 10-11)

8. Daumont did not ask Torres to authorize her transaction. (Id, pp. 12-13)

9. Mr. Ramon Adorno ("Adorno"), was the Caguas Coop's Operation Vice-president (Exhibit 5, Jessybell Matos Depo, at p. 50). Daumont did not ask Adorno to authorize

the transaction. Adorno had authority to authorize the transaction. (Exhibit 1, Daumont's Depo, p. 12-13).

10. Daumont did not ask Wilma Rivera ("Rivera") for authorization, Credit Vice-president. (Id, p. 13)

11. The documents of the transaction that Daumont handed to Santos were prepared by Daumont (in her own handwriting). (Id, p.14)

12. Exhibit 2 are the withdrawal documents for the transaction concerning Tirado's line of credit. They were duly authenticated by Daumont in her deposition. (Exhibit 1, Daumont Depo, at p. 15) (Exhibit 2-Withdrawal documents)

13. Daumont admitted to having signed "Jose Tirado" in the signature of the member line. (Exhibit 1, Daumont Depo., p. 16)

14. Tirado already had his line of credit with Caguas Coop when his relationship with Daumont started. (Exhibit 1, Daumont Depo, at p. 18) Daumont never went with Tirado to Caguas Coop to modify said line of credit. (Exhibit 1, Daumont's Depo. p. 19)

15. Daumont never signed any documents at Caguas Coop in order to be a party responsible for Tirado's line of credit. (Exhibit 1, Daumont's Depo, p. 20)

16. Tirado never went to Caguas Coop to convey that Daumont was authorized to make withdrawals from his line of credit. (Exhibit 1, Daumont's Depo, pp 21-22)

17. Exhibit 3 and 4 are authorizations by Tirado for Daumont to do transactions in his savings account, duly authenticated by Daumont in her deposition. (Exhibit 1, Daumont's Depo, pp. 32-33) These documents was executed on February 25th, 2015, in other word <u>five (5) days after the February 20th, 2015 transaction</u>. Daumont and Tirado did not sign up to authorize

Daumont to do transaction in Tirado's checking account. (Exhibit 1, Daumont's Depo at p. 33) (Exhibits 3 and 4)

18. Exhibit 3 and 4 are the only documents that Daumont and Tirado signed to update Tirado's account after the February 20th, 2015 transaction. (Exhibit 1, Daumont's Depo, pp. 32-33)

19. Jessybel Alexandra Matos ("Matos") was Caguas Coop's Compliance Officer in the summer of 2012 (Exhibit 5, Matos' Depo, p. 20) Matos was involved in the investigation of Daumont's February 20th, 2015 transaction. (Exhibit 5, Matos' Depo, pp. 55-57)

20. It was brought to Matos's attention a transaction with a line of credit where Daumont signed on behalf of some other person. (Exhibit 5, Matos' Depo, p. 57)

21. The matter was brought to Matos by Torres, Cashier Supervisor or Head Teller. (Exhibit 5, Matos's Depo, p. 50)

22. The transaction was a withdrawal from a line of credit in the amount of $80.00 and the deposit of that same amount in an account of the same client. (Exhibit 5, Matos's Depo, at p. 58)

23. For said transaction Daumont needed authorization from Adorno, her supervisor, Operations Vice-President. (Exhibit 5, Matos's Dep. Pp. 59-60)

24. The Financial and Human Resources Vice-President in CaguasCoop is Mrs. Lourdes Rodriguez Flores ("Rodriguez"). (Exhibit 10, Rodriguez' Depo, p. 19)

25. From the standpoint of compliance, it is a big offense for a Branch Manager to forge the signature of a member. (Exhibit 5, Matos's Depo p. 7)

26. Also, a Branch Manager is expected to set an example. (Id. pp 107-110).

27.     There are no documents authorizing Daumont to do transaction in Tirado's line of credit. (Exhibit 5, Matos' Depo at 111)  A line of credit is in the nature of a loan and only to debtor himself can draw from said line (Exhibit 10 , Rodriguez' Depo., p. 50)

28.     As per Caguas Coop's Compliance Officer nothing authorizes the forgery of anybody's signature in a Caguas Coop's transaction. (Exhibit 5, Matos's Depo, p. 112)

29.     When Matos brought her findings to Adorno's attention, it was explained to him that she had concluded that Daumont forged Tirado's signature. (Exhibit 5, Matos's Depo at p. 12)

30.     Damartis Jimenez ("Jimenez") was Caguas Coop's Representative for Customers Services. (Exhibit 6, Jimenez' Depo at p. 8)

31.     As per Jimenez, Tirado had not authorized Daumont to act on his behalf for all products and services provided by Caguas Coop. (Exhibit 6, Jimenez' Depo, p. 50)

32.     The screen of the Helvetia systems in Caguas Coop (Exhibit 7) shows that Daumont is an authorized relative of Tirado. Yet, it does not authorize Daumont to do neither line of credits transactions nor to sign on behalf of Tirado. (Exhibit 6, Jimenez' Depo, pp. 44-46, 50-51)

33.     Adorno carried out the investigation of Daumont's withdrawal from Tirado's line of credit once the matter was disclosed by the Head Teller, Torres. (Exhibit 8, Adorno's Depo., p. 32)  Torres informed the situation to the Compliance Officer, who in turn brought it to Adorno's attention (Id, p. 32)  Adorno saw the transaction document and it was not authorized by an officer.  He interviewed the Teller who told him that the owner of the account was not present in the transaction. (Id., p. 33)

34. Adorno verified the account's file. The signature in the transaction slip was not that of the owner. (Id, p. 33)  He so informed to Hilero, Caguas Coop's President, who ordered a deeper investigation. (Id, pp. 33-34)

35. The Teller was Santos, who informed Adorno that he did the transaction without authorization because Daumont was his boss. (Id, p. 34)

36. Adorno investigated whether this transaction represented a pattern and said pattern was confirmed. (Exhibit 8, Adorno's Dep., p. 37-38; 40)

37. Daumont admitted in deposition having signed for Tirado in the following transactions:

Withdrawal of Credit Line belonging to Tirado from 12/18/2014 (Exhibit 9-A);

Withdrawal of Credit Line belonging to Tirado from Dec/4/2014 (Exhibit 9-B);

Withdrawal of Credit Line belonging to Tirado from Dec/2/2014 (Exhibit 9-C);

Withdrawal of Credit Line belonging to Tirado from Nov/21/2014 (Exhibit 9-D);

Withdrawal of Credit Line belonging to Tirado from Sept/26/2014 (Exhibit 9-E);

Withdrawal of Credit Line belonging to Tirado from Sept/18/2014 (Exhibit 9-F);

Withdrawal of Credit Line belonging to Tirado from July/10/2014 (Exhibit 9-G);

(Exhibit 9)

38. During the investigation Daumont admitted to Adorno having done all of these transactions. (Exhibit 8, Adorno's Depo., p. 41)

39. Once Hilero saw the transaction documents and was advised that the person signing for the client was actually and employee she decided to consult her attorney. (Exhibit 11, Hilero's Depo, at. P 77)

40. The February 20th, 2015 was one of the main reason for Hilero to decide to terminate Daumont in her employment at Caguas Coop. (Exhibit 12, Hilero's Depo, Part 2, p. 13)

**The Damart Development Transaction (Unauthorized withdrawal of $18,794.43 from a Corporate Account to purchase six (6) Manager's Checks for the benefit of a Corporate officer to resolve a personal taxper problem in an amnesty)**

41. The Damart Development transaction was another main reason for the decision to terminate Daumont in her employment at Caguas Coop. (Exhibit 12, Hilero's Depo, Part. 2, pp. 13-14)

42. The transaction was documented in a <u>Request for Monetary Instrument</u> (Exhibit 13) As per said document the person who did the transaction was Maria T. Ayala de Martinez ("Ayala"). The following Manager's Checks were issued for the Secretary of the Treasury for a total amount of $18,794.43:

    1) Check for $2,670.58 issued to the Secretary of Treasury;

    2) Check for $418.06 issued to the Secretary of Treasury;

    3) Check for $6,700.36 issued to the Secretary of Treasury;

    4) Check for $2,678.58 issued to the Secretary of Treasury;

    5) Check for $418.06 issued to the Secretary of Treasury;

    6) Check for $2,670.58 issued to the Secretary of Treasury.

43. Ayala is married to Damian Martinez. ("Martinez") (Exhibit 14, Martinez' Depo., at p. 3)

44. Damart Development is a company duly registered to do business in Puerto Rico to deal with properties. (Exhibit 14, Martinez Depo at p. 3)

45. Martinez is the authorized signature as representative of Damart with Caguas Coop. (Martinez' Depo, pp. 3-4) (Exhibit 15) (Exhibit 16, Ayala's Depo. at p. 9) (Exhibit 17) (Exhibit 18)

46. The transactions related to the purchase of six (6) Manager's Checks for a total of $18,794.43 was not related to Damart. Martinez for his personal benefit was making the transaction for Damart's funds to solve a personal taxpayer situation in an amnesty. (Exhibit 14, Martinez' Depo., pp 5-6)

47. No Corporate Resolution was done by Damart to authorize the purchase of the Manager's Checks to the Secretary of the Treasury to deal with Martinez' personal tax situation. (Exhibit 14, Martinez' Depo, at p. 7)

48. Ayala's signature is not authorized in Caguas Coop to do transactions for Damart. (Exhibit 16, Ayala's Depo, at p. 7) (Exhibits 15, 17, 18) (Exhibit 16, Ayala's Depo at p. 8)

49. Martinez wrote a handwritten document authorizing Ayala to do the January 31st, 2015 transaction: a withdrawal of $18,795.43 from Damart's corporate account to purchase six (6) Manger's Checks to the Secretary of the Treasury (Exhibit 16, Ayala's Depo, p. 10) (Exhibits 12;18)

50. The transaction was investigated as part of the ordinary duties of the Compliance Officer (Exhibit 8, Adorno's Depo, at 47-48)

51. There was no Corporate Resolution by Damart authorizing the transaction (Exhibit 8, Adorno's Depo. at 48-49)

52. The conclusion was that the transaction had been done by a person without authorization according to Caguas Coop's files (Exhibit 8, Adorno's Depo at 48-50).

53. There was a withdrawal that was done without authorization of the corporate entity, so that could be a violation to the regulations and practices of Caguas Coop and also a violation of the bank Security Act. (Exhibit 8, Adorno's Depo., at pp 50-51)

**Conflict of Interests Transaction/Daumont's involvement in her Branch in a transaction concerning her daughter cashing a check for $5,229.74**

54. As per letter from Hilero to Daumont dated June 27th, 2012 (received by Daumont in June 29th, 2012) Daumont was warned that if a similar situation (one related to involvement in a Caguas Coop's transaction for the benefit of a relative representing a conflict of interest) came up she would be subject to disciplinary action including termination of employment. (Exhibit 1, Daumont's Depo at p. 39, 47) (Exhibit 20)

55. The situation concerned a check issued to the order of Daumont's daughter, Viviana E. Solá Daumont. Daumont intervened in the transaction for the cashing of the check issued by Association of Government Employees for $5,229.74 to her daughter. (Exhibit 21)

56. Daumont did not consult the transaction of the cashing of the check issued to her daughter with any person of a higher position than her in Caguas Coop. (Exhibit 1, Daumont's Depo, at p. 56)

57. Daumont admitted in her deposition that she was advised to the effect that if a similar situation happened again she could be terminated. (Exhibit 1, Daumont's Depo., at p. 47)

58. In said instance, Hilero reminded Daumont of the Operation Policy of the Cashier Area, Article VI, E, 8 to the effect that all transaction related to personal or relatives' account need to be worked out by another officer. (Exhibit 20) (Exhibit 21) Hilerio issued two (2) letters to Daumont on the matter. (Exhibit 20)(Exhibit 21)  Daumont responded to one to them (Exhibit 22)

59.   This transaction was investigated by the Compliance Officers. (Exhibit 5, Matos's Depo., 116-119)

**<u>Termination</u>**

60.   Hilero was the person that decided to terminate Daumont. She did no after having met with her staff. (Exhibit 12, Hilero's Depo, Part 2, p. 15)

61.   Daumont's Age was not a factor considered by Hilero (Exhibit 12, Hilero's Depo, Part 2, pp. 15-16)

62.   Hilero is 64 years of age. Thus, older that Daumont. (Exhibit 12 Hilerio's Depo. Part I, p. 5)

63.   The termination letter is included in the record. (Exhibit 23)

64.   Hilero's grounds to terminate Daumont were:

A.   The "Código de Normas de Conducta y Disciplina Progresiva Supervision" (May, 2013) , Sec. V, p. 19 Table 7, defines the acts or conduct considered Fraud; and p. 22, Table 9, defines the acts or conduct considered Conflicts of Interest:

**"Forge or alter reports or documents of the Credit Union or its clients, partners or depositors."**

**"Approve or process transactions, overdrafts or authorize or accept checks without checking account funds belonging to employees, directors, friends, clients, partners, depositors or relatives, of any degree of consanguinity or affinity, of their own or of employees or directors without the authorization of the Executive President."**

The "Código de Normas de Conducta y Disciplina Progresiva", Sec. V, pp. 19 Table 7 and p. 22, Table 9, states that the first infraction for incurring in such conduct entails **termination**.

(Exhibit 24) (Exhibit 27 – Daumont's Continuation of Depo., pp. 9-10)

B.   Código de Etica", p. 3, section B, Duties and Responsibilities:

Plaintiff's action also breached the Code of Ethics as follows:

Any member of a governing body, official or employee shall refrain from carrying out activities or actions that result or the appearance that:

        c)      He/she is making decisions without following the established procedures or obtaining the required authorization for it…

    C.      "Código de Ética" p. 9, part VI, Disciplinary process (A and B);

"Any violation of any rule of the Code of Conduct by any Official(s) or employee(s) will entail the imposition of sanctions and/or actions which may include verbal reprimand, written reprimand, temporary or permanent suspension of the position, suspension of employment and salary or dismissal depending on the severity of the violation and how often the same was carried.

Depending on the violation(s) the sanction and the disciplinary action, the matter may entail reporting the situation to the relevant regulatory agencies for the corresponding administrative or judicial action. In the imposition of sanctions and/or disciplinary actions against officers and employees for violation of the Code of Ethics it shall be taken into consideration as aggravating or mitigating, whichever is the case, aside from the offense committed, the position of the offender, the risk of loss or damage to the Cooperative and the existence of previous faults."

(Exhibit 25) (Exhibit 27 – Daumont's Continuation of Depo., pp. 13-14)

    D.      "Manual de Servicio al Socio y Política de Servicio al Socio", sec. 2.1.3.2.2.

2.1.3.2.2 Corporate Resolution: (A) It shall be required, of a corporation that has a Board of Directors, an agreement of the members authorizing the persons who appear to the Cooperative to perform transactions and sign them in representation of the corporation.

(Exhibit 26) (Exhibit 27 – Daumont's Continuation of Depo., p. 15)

    65.      The following are rules and regulations in place in Caguas Coop. when Daumont was terminated:

    A.      The "Código de Normas de Conducta y Disciplina Progresiva Supervision" (May, 2013) , Sec. V, p. 19 Table 7, defines the acts or conduct considered Fraud; and p. 22, Table 9, defines the acts or conduct considered Conflicts of Interest:

**"Forge or alter reports or documents of the Credit Union or its clients, partners or depositors."**

**"Approve or process transactions, overdrafts or authorize or accept checks without checking account funds belonging to employees, directors, friends, clients, partners,**

**depositors or relatives, of any degree of consanguinity or affinity, of their own or of employees or directors without the authorization of the Executive President."**

The "Código de Normas de Conducta y Disciplina Progresiva", Sec. V, pp. 19 Table 7 and p. 22, Table 9, states that the first infraction for incurring in such conduct entails **termination**.

(Exhibit 24) (Exhibit 27 – Daumont's Continuation of Depo., pp. 9-10)

B.      Código de Etica", p. 3, section B, Duties and Responsibilities:

Plaintiff's action also breached the Code of Ethics as follows:

    Any member of a governing body, official or employee shall refrain from carrying out activities or actions that result or the appearance that:
    c)      He/she is making decisions without following the established procedures or obtaining the required authorization for it…

C.      "Código de Ética" p. 9, part VI, Disciplinary process (A and B);

    "Any violation of any rule of the Code of Conduct by any Official(s) or employee(s) will entail the imposition of sanctions and/or actions which may include verbal reprimand, written reprimand, temporary or permanent suspension of the position, suspension of employment and salary or dismissal depending on the severity of the violation and how often the same was carried.

   Depending on the violation(s) the sanction and the disciplinary action, the matter may entail reporting the situation to the relevant regulatory agencies for the corresponding administrative or judicial action. In the imposition of sanctions and/or disciplinary actions against officers and employees for violation of the Code of Ethics it shall be taken into consideration as aggravating or mitigating, whichever is the case, aside from the offense committed, the position of the offender, the risk of loss or damage to the Cooperative and the existence of previous faults."

(Exhibit 25) (Exhibit 27 – Daumont's Continuation of Depo., pp. 13-14)


D.      "Manual de Servicio al Socio y Política de Servicio al Socio", sec. 2.1.3.2.2.

    2.1.3.2.2 Corporate Resolution: (A) It shall be required, of a corporation that has a Board of Directors, an agreement of the members authorizing the persons who appear to the Cooperative to perform transactions and sign them in representation of the corporation.

(Exhibit 26) (Exhibit 27 – Daumont's Continuation of Depo., p. 15)

66.     Hilero considered Daumont's violations as a trust factor. (Exhibit 11, Hilero's Depo, Part 2, p. 14)

67.     The termination letter state the grounds for termination. Said was signed by Hilero. The grounds were, among others:

A.      To carry out transactions, favors or concessions that are outside the norms that regulate the healthy administration in favor of any partner, client, sponsor, depositor, provider, consultant, etc. (Page 5 "Código de Normas de Conducta y Disciplina Progresiva".

B.      To violate or instigate other employees to violate established operating methods, norms and/or politics of the Credit Union or the verbal instructions from the Supervision. (Table 4 – "Actos constitutivos de Violación contra las Políticas Institucionales")

C.      To offer false information in any application or document in which any right, obligation or interest is created, transferred, terminated or affected or give false information intentionally on any credit application, promissory note or other document. (Table 1: "Actos constitutivos de Violación contra la Honestidad) When Daumont signed as if she was her husband and without being her signature authorized in the account, Daumont offered false information in an official document of the Credit Union.

D.      To cause a subordinate employee to fail to comply with the conflict of interest policy of the Credit Union.

E.      To induce the Credit Union to error by indicating that she was an authorized firm in Tirado's line of credit.

F.      Forging the signature of her husband.

G.      Having signed seven (7) line of credit Withdrawals since July 10, 2014 against the Norms of Conduct of Constitutive Acts of Violations against Honesty.

F       .To authorize a person without authorization to withdraw $18,795.43 from a Comercial Check Account.

(Exhibit 23) (Exhibit 27 – Daumont's Continuation of Depo., pp. 9-16; 18-20)

**RESPECTFULLY SUBMITTED.**

**IT IS HEREBY CERTIFIED** that the foregoing document has been electronically filed

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

In San Juan, Puerto Rico, this 31st day of August, 2017.

                                 s/ *Enrique J. Mendoza Méndez*
                                 Enrique J. Mendoza Mendez
                                 USDC-PR 202804

                                 ***MENDOZA LAW OFFICES***
                                 P.O. Box 9282
                                 San Juan, P.R. 00908-0282
                                 Tel. (787) 722-5522; 722-5530; 722-5540
                                 Fax. (787) 723-7057
                                 E-mail: mendozalo@yahoo.com