# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WANDA DAUMONT COLÓN                    CIVIL NO.:  15-3120

     Plaintiff

       V.                             AGE DISCRIMINATION

COOPERATIVA DE AHORRO Y
CRÉDITO DE CAGUAS

     Defendant

TAKING OF DEPOSITION OF MRS. WANDA DAUMONT-COLÓN

DATE      :   January 19th, 2017

TIME      :   2:30 p.m.

OFFICE    :   MENDOZA LAW OFFICES

ADDRESS   :   Centro de Seguros Building, Suite 312
              701 Ponce de Leon Avenue
              San Juan, Puerto Rico

APPEARANCES

ON BEHALF OF PLAINTIFF:

    Erickson Sánchez-Preks, Esq.

ON BEHALF OF DEFENDANT:

    Enrique J. Mendoza-Méndez, Esq.
    Otto Muller, Esq.

NOTARY PUBLIC:

    Otto Muller, Esq.



**Caribbean Reporting Group**

*Taquígrafos de Récord / Court Reporters*
P.O. Box 191328, San Juan, P.R. 00919-1328
Tels. (787) 753-2688  (787) 753-2630 - Email: crgroup27@yahoo.com



1    Daumont in this deposition?

2         A    Yes.

3         Q    Very well. I did not mention when I gave some

4    preliminary matters concerning this deposition off the

5    record to you with your counsel, that if at any point in

6    time you need to stop, to take care of a telephone call or

7    go to the service room, or have some water, you are

8    allowed and free to do so, and we'll accommodate you.

9    MR. SÁNCHEZ:

10        You understand the explanation?

11   DEPONENT:

12        Yes.

13   MR. SÁNCHEZ:

14        Okay. Remember to answer verbally, all your answers.

15   DEPONENT:

16        Yes.

17   MR. MENDOZA:

18        Q    Okay. Very good. I will take you now to February

19   20th of the year 2015. In that day, you made a transaction

20   at one of the branches of Caguas Coop, concerning the

21   account of Mr. José Tirado. Correct?

22   DEPONENT:

23        A    Could you clarify? Because I personally, did not

24   carry out the transaction.

25        Q    Very well. You remember that day, that specific

1    day, and what happened?

2           A    Yes. Correct.

3           Q    Okay.

4    MR. SÁNCHEZ:

5           For the record, attorney Erickson Sánchez. Just to

6    clarify your question. When you said "what happened",

7    you're referring to the event regarding the transaction

8    you made referenced in the prior question?

9    MR. MENDOZA:

10          Q    Okay. When you say "yes", that you remember what

11   happened, you were meaning to a transaction related to the

12   account of José Tirado?

13   DEPONENT:

14          A    Yes.

15          Q    Okay. This is what I need from you now. I want

16   you to tell me what happened, concerning that transaction,

17   and try to do it in order, how it happened. Please.

18          A    My husband called me to the office, because he

19   has a line of credit and I am personally authorized,

20   because it is his account. He needed to withdraw eighty

21   dollars, from the line of credit to be transferred to his

22   checking account.

23          I went ahead and prepared the document and the

24   deposit for the account, the checking account, and I went

25   to the teller area, where these types of transactions are

1    conducted. When I gave the sheets to the teller, I told

2    him had to get the signature of the authorized person in

3    that area... in charge of that area. Later I went to my

4    office.

5         Q    Anything else?

6         A    No. That is all.

7         Q    At that point in time, what was the position you

8    held at Caguas Coop?

9         A    Branch Manager.

10        Q    Of which branch?

11        A    The central branch, that is located at Gautier

12   Benítez Avenue, in Caguas.

13        Q    And the transaction was done or took effect at

14   the branch, in which you were the manager?

15        A    Yes.

16        Q    And the documents of the transaction, you

17   tendered them to whom?

18        A    To the teller, Mr. Norberto Santos.

19        Q    To whom does Mr. Santos reported in that point

20   in time?

21        A    He could have reported to the supervisor of the

22   teller area.

23        Q    Who was him or her?

24        A    At that time, it was Ms. Joany Torres, yes.

25        Q    To whom did Ms. Torres reported to?

11

1      A    Ms. Torres reported to me.

2      Q    Do you remember what day of the week, was

3  February 20th, 2015?

4      A    Could you please repeat the question?

5      Q    Yes. Do you remember what day of the week, or

6  more specifically, do you remember whether it was or not

7  a Saturday?

8      A    No, it was not a Saturday.

9      Q    Do you remember what day it was?

10     A    Like Friday.

11 MR. MENDOZA:

12     Okay. Lets go off the record for a minute, to clarify

13 that and have the exact day of the week, because it is

14 important for us now.

15 MR. SÁNCHEZ:

16     No problem.

17                  OFF THE RECORD

18 MR. MENDOZA:

19     Off the record, everybody here made efforts one way

20 or the other to pinpoint, and we have come to the

21 conclusion that it was a Friday. Correct, brother counsel?

22 MR. SÁNCHEZ:

23     That's correct.

24 MR. MENDOZA:

25     Q    Okay. So it was a Friday. Correct?

1    DEPONENT:

2         A    Correct.

3         Q    Do you have any recollection as to whether Mrs.

4    Joany Torres was present, or not, in the branch that day?

5         A    At the branch? Yes.

6         Q    And was she present all day?

7         A    Correct.

8         Q    So, if I ask you whether she was out on a leave

9    or not, your answer would be "No, she was not on a leave,

10   she was present at work".

11        A    She was at work.

12        Q    Did you, Mrs. Daumont, ask Mrs. Joany Torres, to

13   authorize the transaction on that February 20th, 2015? Yes

14   or no?

15        A    No.

16        Q    Aside from Mrs. Joany Torres, who could... who

17   has the authority, also, to authorize that transaction?

18        A    Mr. Ramón Adorno.

19        Q    What was his position at that time?

20        A    VP of Operations.

21        Q    Did you ask him for authorization for that

22   transaction, on February 20th, 2015?

23        A    No.

24        Q    Who else, if anybody else, could have authorized

25   such a transaction?

13

1      A    Mrs. Jonanny Torres.

2      Q    Okay. We already know that. And we know that

3  Joany Torres, as per your testimony, had the faculty of

4  authorizing that transaction. Correct?

5      A    Yes.

6      Q    And also, Mr. Adorno has that authorization.

7      A    Yes.

8      Q    Anybody else, aside from Mrs. Torres and Mr.

9  Adorno, has that authorization, has that faculty to

10 provide such authorization?

11     A    Well, at that branch it could be the Credit Vice

12 President, Mrs. Wilma Rivera.

13     Q    Was Mrs. Wilma Rivera present on February 20th,

14 2015?

15     A    Correct.

16     Q    Did you ask her for such authorization?

17     A    No.

18     Q    Was Mr. Adorno present in his job on February

19 20th, 2015?

20     A    Could you please repeat the question, so I may

21 explain, if you allow me?

22     Q    What did you... did not understand from my

23 question? I will clarify.

24     A    "Usted dijo que si el Sr. Adorno se

25 encontraba... fue a traba... estaba trabajando ese día".

14

1    Q    Correct, I asked you that.

2    A    Yes. He was working on that day.

3    Q    Did you ask him to authorize the transaction of

4    Mr. Tirado?

5    MR. SÁNCHEZ:

6        Objection. Repetitive. Already answered.

7    DEPONENT:

8        No.

9    MR. MENDOZA:

10   Q    When you mentioned that Mr. José Tirado is your

11   husband, the fact is that you are not married. Correct?

12   DEPONENT:

13   A    Legally not.

14   Q    But you have a consensual relationship, as if

15   you were married.

16   A    Correct.

17   Q    Since when, more or less?

18   A    Since, more or less, 1999.

19   Q    Okay. The documents for the transaction that you

20   handed to Mr. Norberto Santos, you prepared them yourself.

21   A    Correct.

22   Q    With your own handwriting.

23   A    Correct.

24   MR. MENDOZA:

25       Vamos fuera de récord un momentito.

15

1              OFF THE RECORD

2    MR. MENDOZA:

3         Lets mark the following document as Exhibit 1 of this

4    deposition, please.

5         Off the record, in conversation with brother counsel

6    Sánchez, we edited the documents so it only portrayed the

7    last four digits of the social security number of the

8    concerned party. Very well.

9         Q    Can you explain what this document is?

10   DEPONENT:

11        A    That document is the paper that is used for

12   withdrawals from the line of credit.

13        Q    And the owner of the line of credit, who is he

14   or she?

15        A    Mr. José A. Tirado.

16        Q    And you already told us that you filled out this

17   form with your handwriting.

18        A    Correct.

19        Q    And what it says the signature of the member,

20   meaning the member of the Cooperative or Credit Union, it

21   said José A. Tirado, but it was you who signed it.

22   MR. SÁNCHEZ:

23        Incorrect. I think that that was not the question.

24   MR. MENDOZA:

25        I'll make the question again. I'll make the question

1      again, so we don't have problems with this.

2          Q    I'm going to take you where the document said

3      "signature of the member". What does it says?

4      DEPONENT:

5          A    Excuse me. I do not understand the question.

6          Q    Please look where it says, "signature of the

7      member".

8          A    Correct.

9          Q    And it is signed.

10         A    It is signed.

11         Q    What name does it say there?

12         A    Jose A. Tirado.

13         Q    And who signed that name in that document?

14         A    I did.

15         Q    Okay. Thank you. When a member of Caguas Coop

16     has a line of credit, what he has to do to open it and to

17     have it authorized?

18     MR. SÁNCHEZ:

19         I think question began "to open it".

20     MR. MENDOZA:

21         Yes. I'll make the question again. No problem.

22         Q    In order to open up a line of credit, what does

23     a member have to do?

24     DEPONENT:

25         A    To get a line of credit?

1      A     The requirements? Be a member of the credit

2    union, your ability to pay, your credit references, and

3    that it be approved by the Credit Committee.

4      Q     And your testimony is that Mr. José Tirado,

5    satisfied all those requirements.

6    MR. SÁNCHEZ:

7         Objection to the question, apparently this is

8    incorrect, since she was not answering, that Mr. José

9    Tirado is particularly had those requirements. He was

10   answering what were the requirements to obtain a line of

11   credit.

12   MR. MENDOZA:

13     Q     Did Mr. Tirado fail to satisfy any of the

14   requirements that you mentioned to obtain a line of

15   credit?

16   DEPONENT:

17     A     I do not know. Because when I started with Mr.

18   José Tirado, he already had his line of credit.

19     Q     Was that line of credit ever modified, after you

20   started your relationship with Mr. Tirado?

21   MR. SÁNCHEZ:

22        Objection to the question. What do you mean by the

23   line of credit? You mean the requirements or other things?

24   Clarify that.

25

19

MR. MENDOZA:

That's a speaking objection. I'll make another question. But please don't make speaking objections.

MR. SÁNCHEZ:

I'm trying to clarify the question, because...

MR. MNDOZA:

But that's not the way to clarify. You have an objection to the question, it's not clear, we deal with it.

MR. SÁNCHEZ:

Okay.

MR. MENDOZA:

But that's a speaking objection.

MR. SÁNCHEZ:

Okay. "Perfecto".

MR. MENDOZA:

Q   After you started your relationship with Mr. Tirado, did you go with him to Caguas Coop to modify in any way the line of credit he already had?

DEPONENT:

A   The line of credit? No, I don't know, no. If it was modified.

Q   But that's not my question. My question is whether you went with him to modify it.

A   No.

1       Q    Did at any point in time, after you started your

2 relationship with Mr. Tirado, did you sign documents at

3 Caguas Coop, in order to be a party responsible for the

4 line of credit?

5       A    No.

6       Q    How were you authorized to make withdrawals from

7 Mr. José Tirado's line of credit with Caguas Coop?

8       A    Excuse me. Could you please repeat the question?

9       Q    How was you authorized to make withdrawals from

10 Mr. Tirado's line of credit with Caguas Coop?

11       A    Because he authorized me. He called me to

12 authorize me. In fact, he even went to the credit union to

13 authorize me.

14       Q    I'm talking now specifically about the line of

15 credit. When was it that he authorized you, to make

16 withdrawals from his line of credit?

17       A    Me, because he called me, a transfer that would

18 be done to his checking account, his account.

19       Q    How did Mr. José Tirado authorize you before

20 Caguas Coop, not to you in the forms, before Caguas Coop

21 to make withdrawals from his line of credit?

22       A    I do not understand the question.

23       Q    You already told us, when I asked you how you

24 were authorized to make withdrawals from Mr. Tirado's line

25 of credit, you told us that Mr. Tirado called you and

1    authorized you to do so. Correct?

2         A    Correct.

3         Q    That's not what I'm asking now. What I'm asking

4    now is, how Mr. Tirado, before Caguas Coop, informed them

5    that you were authorized to make withdrawals from his line

6    of credit?

7         A    Well, because that line of credit, was his. That

8    line of credit had money that had already been approved

9    that was his.

10        Q    So the fact is that Mr. José Tirado never went

11   to Caguas Coop to inform them and document that you were

12   authorized to make withdrawals from his line of credit.

13   Correct?

14        A    No, because I was already authorized in the

15   account.

16        Q    So, to have this clear. You're saying that you

17   have authorization to make transaction of his account, but

18   you're telling me that you did not have authorization to

19   make transaction from his line of credit. Is that your

20   testimony?

21        A    No.

22        Q    Are you authorized to make withdrawals from his

23   line of credit, yes or no?

24        A    Authorized by him.

25        Q    But Mr. José Tirado never went to Caguas Coop to

22

1    convey to them that you were so authorized.

2        A    No.

3    MR. MENDOZA:

4        Okay. Vamos fuera de récord un momento.

5                    OFF THE RECORD

6    MR. MENDOZA:

7        We are handing to the deponent, and we did so already

8    off the record to brother counsel for examination and for

9    the deponent, what have to mark as Exhibit 2 and Exhibit

10   2A, concerns some documents from Mr. José A. Tirado

11   Meléndez's account. And we edited them for protection, his

12   social security number and the number of the account.

13   Brother counsel Sánchez requested that we produce the

14   originals without editing, he may consult with Mr. Tirado,

15   in order to do his due diligence, concerning this

16   document.

17       We went off the record. He did so verify them with

18   Mr. Tirado. Correct Mr. Sánchez?

19   MR. SÁNCHEZ:

20       That is correct.

21   MR. MENDOZA:

22       Q    Okay. Very well. Mrs. Daumont, would you please,

23   you already examined this document. Correct?

24   DEPONENT:

25       A    Correct.

32

1   Caguas Coop?

2        A     Under ████████, that was the account, the checking

3   account. That is the question? He had checking account.

4        Q     Anything else but checking account?

5        A     Savings account, he also had. If I recall

6   correctly, mortgage loan and a line of credit.

7        Q     So, and your testimony is that the documents

8   that were prepared to register yourself as an authorized

9   person in Mr. Tirado's account on February 28th, 2015, was

10  to update what Caguas Coop already had. That's your

11  testimony?

12       A     Correct.

13       Q     I'm going to show you Exhibit 2A, and ask you

14  whether it states that that authorization is for the

15  savings account. Correct? Yes or no?

16  MR. SÁNCHEZ:

17       Do you have another copy? Just to check it at the

18  same time.

19  MR. MENDOZA:

20       Q     "Sí. Tengo la que no está editada".

21  DEPONENT:

22       A     Correct.

23       Q     Okay. Thank you. You did not sign, you and Mr.

24  Tirado, an authorization to do transaction in the checking

25  account. Yes or no?

33

1      A    Please, repeat the question.

2      Q    You did not, and Mr. Tirado neither, sign up to

3 authorize you to do transaction in the checking account.

4 Yes  or  no?  Please,  answer  yes  or  no.  I  need  no

5 explanation.

6      A    No.

7      Q    Your answer is no.

8      A    No, with an explanation.

9      Q    Okay. And there is not an authorization, signed

10 by you and Mr. Tirado, to do transactions in the credit

11 line. Yes or no?

12      A    No, with an explanation.

13      Q    Okay. So Exhibit 2 and Exhibit A were the only

14 documents that you and Mr. Tirado signed with Caguas Coop

15 on February 28th, 2015 to update the information, that as

16 per your testimony, Caguas Coop already had.

17      A    Correct.

18      Q    Very good. Examine what has been marked as

19 Exhibit 3, it consists of two pages. Can you identify that

20 document?

21      A    Correct.

22      Q    Okay. What is this document?

23      A    It is in the "Visuales" system, where it showed

24 that I was an authorized signature.

25      Q    At  page  2,  what  does  it  say  where  I  am

1          Q    So   a   person   that   is   authorized   to   do

2     transactions in a savings account, can really sign his or

3     her name, and identify he or herself with the teller, and

4     the   teller   checks   the   documents,   sees   that   is   an

5     authorized signature, and can approve the transaction.

6          A    Correct.

7          Q    I'm going to show you what has been marked as

8     Exhibit 4-A. And don't forget that you already examined

9     this group of documents. Correct?

10         A    Correct.

11         Q    Okay. What was this transaction documented in

12    Exhibit 4-A? What transaction that document reflect?

13         A    It is a withdrawal from the line of credit, to

14    a checking account, belonging to Mr. Jose Tirado. It's the

15    same account, a withdrawal from the line of credit to the

16    checking account, belonging to Mr. Jose Tirado.

17         Q    Okay.   It's   not   signed   by   anybody   as   the

18    signature of the member.

19         A    No.

20         Q    Okay. And Exhibit 4-B, what transaction does it

21    reflect?

22         A    A withdrawal from the line of credit.

23         Q    Who signed this document?

24         A    Below in the signature or in the authorization?

25         Q    In the signature.

36

1      A      This is my handwriting, I put his name.

2      Q      Mr. Tirado's name.

3      A      Correct.

4      Q      What transaction does Exhibit 4-C reflect?

5      A      A withdrawal from a line of credit.

6      Q      Where it says signature of the member, what

7   names appear?

8      A      The name that appears is Jose A. Tirado and my

9   initials next to it.

10     Q      Who wrote that entry?

11   MR. SÁNCHEZ:

12        The signature entry?

13   MR. MENDOZA:

14        Yeah.

15   DEPONENT:

16        I don't understand the question.

17   MR. MENDOZA:

18     Q      Where it says signature of the member, who wrote

19   the names that appear there?

20   DEPONENT:

21     A      I did.

22     Q      I going to show you now, Exhibit 4-D.

23   MR. SÁNCHEZ:

24        She wants to make a question, but I told him that I

25   cannot talk to her.

37

1    MR. MENDOZA:

2         Okay, okay.

3         Q    What transaction it documents?

4    DEPONENT:

5         A    Withdrawal from a line of credit.

6         Q    And in the signature member entry, who wrote

7    that there?

8         A    I did. My initials are next to it.

9         Q    And what does it says, in signature of member?

10        A    Jose A. Tirado.

11        Q    And we'll show you now what has been marked as

12   Exhibit 4-E, and ask you what transaction it shows.

13        A    Withdrawal from the line of credit.

14        Q    And where it says signature of the member, what

15   does it say?

16        A    Jose A. Tirado and my initials next to it.

17        Q    And who wrote that?

18        A    I did, Wanda.

19        Q    I'm going to show you now what has been marked

20   Exhibit 4-F. And what transaction does it document?

21        A    Withdrawal from a line of credit.

22        Q    Where it says signature of the member, what does

23   it say?

24        A    Jose A. Tirado and my initials next to it.

25        Q    And who signed that?

38

1          A    Me, Wanda Daumont.

2          Q    And what has been marked as Exhibit 4-G, can you

3    tell me what it shows or documents?

4          A    Withdrawal from a line of credit.

5          Q    And in the members signature, what does it show?

6          A    The name of Jose A. Tirado Meléndez.

7          Q    And who wrote that in?

8          A    I did.

9    MR. MENDOZA:

10         "Vamos fuera de récord un momento".

11                         OFF THE RECORD

12   MR. MENDOZA:

13         Q    On  June  27th,  2012,  you  were  notified  a

14   reprimand by Mrs. Irma Hilerio Arroyo. Correct?

15   DEPONENT:

16         A    No.

17         Q    Okay.  Can  you  mark  this  as  the  next  exhibit

18   please?

19   MR. SÁNCHEZ:

20         ¿Hilerio, verdad?

21   INTERPRETER:

22         Hilerio.

23   MR. MENDOZA:

24         Please examine what has been marked as Exhibit 5 of

25   this deposition.

39

1      Q      Have you examined it?

2      DEPONENT:

3      A      Correct.

4      Q      Have you seen this document before?

5      A      Correct.

6      Q      Is your signature the one that is at the bottom

7      of the document?

8      A      Correct. My initials.

9      Q      Can you read out loud the last paragraph?

10     A      This one?

11     Q      Yes.

12     A      "You are warned that if a situation similar to

13     the ones previously described, come up and according to

14     the  authorization  I  have  of  imposing  disciplinary

15     measures, you could be subject to measures that could be

16     up to your dismissal".

17     Q      And  do  you  consider  this  or  not  to  be  a

18     disciplinary measure?

19     A      No.

20     Q      Why not?

21     A      Because if you see in the bottom part, I signed

22     "I read this but I do not agree with it".

23     Q      So,  for  a  memo  to  be  considered...  No.  It's

24     okay. Strike the question.

25            The  fact  is  that  in  June  16th,  2012  you  authorized

1    MR. SÁNCHEZ:

2        Yes. Asked and answered. She answered.

3    MR. MENDOZA:

4        But that's... Very well. Go ahead, give me your...

5    MR. SÁNCHEZ:

6        You can answer the question. The objection still

7    remains.

8    DEPONENT:

9        I am not understanding.

10    MR. MENDOZA:

11        Q   This is very clear. Does the letter tell you

12    that you could be terminated. Yes or no?

13    DEPONENT:

14        A   Yes, if a similar situation happened again.

15        Q   You responded to that letter. Yes or no?

16        A   Yes.

17    MR. MENDOZA:

18        Mark this as the next exhibit.

19    MR. SÁNCHEZ:

20        ¿Qué va a ser el exhibit? ¿Seis?

21    MR. MENDOZA:

22        Seis. Exhibit 6.

23    MR. MULLER:

24        Here is for counselor.

25

56

1    MR. MENDOZA:

2         She said so.

3    MR. SÁNCHEZ:

4         Okay.

5    MR. MENDOZA:

6         I have no problem.

7         Q    You put your initials there, before or after the

8    check was cashed? And please answer telling me, before or

9    after it was cashed.

10   DEPONENT:

11        A    Before.

12        Q    Did you consult the transaction of the cashing

13   of the check issued to your daughter with any person with

14   a higher position than yours in Caguas Coop? And please...

15        A    No.

16        Q    Okay.

17        A    No.

18        Q    Okay.

19   MR. SÁNCHEZ:

20        Can we go off the record?

21   MR. MENDOZA:

22        Yeah. Let's go off the record.

23                        OFF THE RECORD

24   MR. MENDOZA:

25        I have been meeting with Mr. Mueller and Mr. Sánchez

59

```
1    DATE      :  January 19, 2017

2    TIME      :  2:30 p.m.

3    CIVIL NO. :  15-3120

4    DEPONENT  :  Mrs. Wanda Daumont Colón

5

6

7                COURT REPORTER'S CERTIFICATION

8

9        I, EILEEN CASIANO, Court Reporter, do hereby certify:

10   That the foregoing transcript is a full, true and correct

11   record  of  the  deposition  taken  to  Mrs.  Wanda  Daumont

12   Colón.

13       That I am not in any way involved or interested in

14   the outcome of said action.

15       WITNESS my hand this 17th day of March, 2017, in San

16   Juan, Puerto Rico.

17

18

19

20                                    EILEEN  CASIANO

21                                    Court Reporter

22

23

24

25
```

Caribbean Reporting Group
Taquígrafos de Récord/Court Reporters
P.O. Box 191328 San Juan, P.R. 00919-1328
Tels.: (787) 753-2688/2630 E.mail: crgroup27@yahoo.com

# EXHIBIT 2



COOPER.    DE AHORRO Y CREDITO
**CAGUAS**
APARTADO 1252
CAGUAS P.R. 00726

JA DE DESEMBOLSO
LINEA DE CREDITO
TEL. 746-9595

HOJA DE DESEMBOLSO LINEA DE CREDITO

| NUMERO DE SOCIO | NOMBRE DEL SOCIO | FECHA | AUTORIZACION |
|---|---|---|---|
| | | MES DIA AÑO | |

CANTIDAD A CARGARSE A LA LINEA DE CREDITO ARRIBA MENCIONADA

INICIALES CAJERO   NUMERO DE SEGURO SOCIAL

FEB 20 2015

AUTORIZO SE CARGUE A MI LINEA DE CREDITO EL IMPORTE AQUI ESTIPULADO

FIRMA DEL SOCIO

SOCIO PROTEGE TU CREDITO. PAGA PUNTUALMENTE TUS OBLIGACIONES

ANEJO 12

# EXHIBIT 3



# CAGUAS COOP
**Sucursal Central**
Avenida José Gautier Benítez Carr # 1 Km 37.5 Caguas, PR 00726-1252
**Sucursal Pueblo**
Avenida Muñoz Rivera Esquina Lope Flores Caguas, PR 00726-1252

## SOLICITUD DE AUTORIZACIÓN DE PERSONAS A REALIZAR TRANSACCIONES
### (ANEJO A)

### Información de Dueño de la Cuenta

| Núm Cuenta: ███████ | Nombre: JOSE A TIRADO MELENDEZ |
|---|---|

| Licencia: CONDUCTOR | Emisión: 28/9/2010 | Expiración: 14/8/2016 | Seguro Social: ███████ |
|---|---|---|---|

Número: 713378

Firma Dueño o Titular de la Cuenta

28 de febrero de 2015
Fecha:

### Información de Persona Autorizada I

| Nombre: WANDA E DAUMONT COLON | Sexo: F | Seguro Social: ███████ | Estado Civil: NO CASADO | Dependientes: 0 |
|---|---|---|---|---|

| Tipo ID: Licencia | ID#: 0710003 | Emisión: PR | Expiración: 07/02/2020 |
|---|---|---|---|

| Fecha Nacido: 07/02/1954 | Idioma: | Email: |
|---|---|---|

| Dirección Residencial: URB NOTRE DAME B16 CALLE SAN BARTOLOME  CAGUAS PR,PR 00725  CAGUAS PR,PR 00725 | Dirección Postal: URB NOTRE DAME B16 CALLE SAN BARTOLOME  CAGUAS PR 00725-0000  00725-0000 |
|---|---|

| Teléfono: ( )- - | Teléfono Celular: (787)-214-1860 |
|---|---|

| Lugar de Trabajo: CAGUASCOOP  Ingreso Mensual: $3,400.00  Ocupación: Gerente Sucursal Cooperativa | Teléfono Trabajo: (787)-746-9595  Ext:  Supervisor Inmediato: RAMON ADORNO |
|---|---|

Banda de Riesgo: L

Firma Persona Autorizada

28 de febrero de 2015
Fecha:

### PARA USO DE LA COOPERATIVA

OFAC REVISADO POR: DJ

FIRMA Y FOTO: N/A

PREPARADO POR: DAMARIS JIMENEZ JIMENEZ    FECHA: 28 de febrero de 2015

REVISADO POR: _____    FECHA: 3/10/15

*** Sus acciones y depósitos están asegurados hasta $250,000 por COSSEC ***

# EXHIBIT 4



**CAGUAS COOP**
*mejor servicio, mas beneficios*

Nombre: <u>JOSE A TIRADO MELENDEZ</u>

Caguas Coop Central     ☒
Caguas Coop Pueblo      ☐

## Solicitud de Autorización de Personas a Realizar Transacciones

Yo,   <u>JOSE A TIRADO MELENDEZ</u> autorizo a la siguiente(s) persona(s) en la cuenta

de | AHORROS |   con el número de cuenta | ▓▓▓▓ |   en el día de hoy
28 de febrero de 2015.
Informo además, que de entender necesario el realizar algún cambio de firma(s) autorizada(s)
tengo la obligación de visitar la Cooperativa de Caguas Coop para  enmendar nuevamente la
autorización de firma o firmas en mi cuenta | ▓▓▓▓ |
Menciono que la(s) persona(s) autorizada(s) con dirección postal: <u>URB NOTRE DAME B16</u>
<u>CALLE SAN BARTOLOME CAGUAS PR 007250000</u> y la dirección física:  <u>URB NOTRE</u>
<u>DAME B16 CALLE SAN BARTOLOME CAGUAS PR.PR 00725</u> con el número de teléfono:(
)- - y su identificación es el número: <u>0710003</u> que corresponde a la identificación de: <u>Licencia.</u>

☒Autorizo a que se le provea información por teléfono del balance actual de la cuenta antes
mencionada a la(s) persona(s) aquí autorizada(s). Esta autorización revoca el inciso (1) del
documento Autorización para Proveer Información Financiera por Teléfono.

Firmando hoy <u>28 de febrero de 2015</u> en Caguas Coop.

_____
JOSE A TIRADO MELENDEZ
Firma Dueño Cuenta

_____
WANDA E DAUMONT COLON
Persona Autorizada

Rev. 6/2013

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| WANDA E. DAUMONT COLÓN | * | CIVIL NO.: 15-3120 |
| | * | |
| Plaintiff, | * | |
| | * | |
| Vs. | * | AGE DISCRIMINATION IN |
| | * | EMPLOYMENT ACT (ADEA), |
| COOPERATIVA DE AHORRO Y CRÉDITO DE | * | PUERTO RICO LAW 100, 29 |
| DE CAGUAS; IRMA HILERIO ARROYO AS | * | L.P.R.A., 146, LAW 80, 29 |
| OFFICER AND IN HER PERSONAL | * | L.P.R.A., § 185 |
| CAPACITY | * | |
| | * | Jury Trial Requested |
| Defendants | * | |

***********************************

DEPOSITION OF MS. JESSYBEL ALEXANDRA MATOS AYALA

DATE     :     May 24, 2017

TIME     :     9:55 A.M.

CLIENT   :     ALDARONDO GIRALD LAW P.S.C.

ADDRESS  :     2 Vela Street, Esquire Building
               Seventh Floor, Suite 701
               San Juan, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

    Ericson Sánchez Preks, Esq.

FOR DEFENDANTS:

    Enrique J. Mendoza Méndez, Esq.
    Otto Y. Müller Vázquez, Esq.

NOTARY PUBLIC:

    Ericson Sánchez Preks, Esq.

1    during this day, that could affect in any way the
2    understanding that you could have regarding anything
3    that I ask during the process, or to answer, or that
4    could affect any answer that you can provide during the
5    process?
6         A    No.
7         Q    Apparently you can understand English.
8         A    Mmhm.
9         Q    Am I right?
10        A    Yes.   Quite a lot.
11        Q    And another detail.   Everything -- any answer
12   that you provide must be in words, you have to answer
13   verbally, because gestures and signs cannot be recorded.
14        A    Recorded.   I know.
15        Q    Okay.   So, if anyone -- the interpreter,
16   myself, Atty. Mendoza, Atty. Müller, the court reporter
17   make you any gesture, so you can speak, don't be mad or
18   something--
19        A    No.   I know, I know.
20        Q    Okay.
21        A    I know the process.
22        Q    Okay.   Have you been in a deposition
23   previously?
24        A    Not as a deponent.
25        Q    Okay.   Have you been present in any other

1      Q      Were you member of any other association

2      related with Compliance Officers--

3      A      No.

4      Q      --or compliance?

5      A      No.

6      Q      Do you recall when you began to be a member of

7      the Compliance Officers Association, more or less?

8      A      June or July of 2012.

9      Q      In the summer.

10     A      Yes.

11     Q      When you began to work at the Cooperativa?

12     A      February 2010.

13     Q      You began as a service representative.

14     A      Yes.

15     Q      For how long you worked as a service

16     representative of the Cooperativa de Caguas?

17     A      I don't remember, I worked there for a while,

18     and I served on many positions, so I don't recall the

19     exact time frame for each one of those positions.

20     Q      Okay.   The first position was service

21     representative.

22     A      Receptionist/Customer Service.

23     Q      And when you say "receptionist," you mean that

24     was the first position you began to work at the

25     Cooperativa, or it's one of the positions?

55

1   competency of Human Resources, and I was not part of
2   Human Resources. At the time, I was in Compliance.
3       Q    Okay, but my question was, what was your
4   participation, if any, in the termination of Ms. Wanda
5   Daumont?
6       A    None.
7       Q    Did you participate in the investigation of
8   the reasons to discharge Ms. Wanda Daumont?
9       A    If the question is, whether or not I was
10  involved in any investigation regarding an event
11  involving Ms. Daumont, the answer would be "yes."
12      Q    In the investigation related to, or was
13  related to the reasons to terminate Ms. Wanda Daumont?
14      A    As I told you before, I am not part of the
15  Human Resources area, so I am not aware whether or not
16  that was part of the basis for the termination of Mrs.
17  Daumont.
18      Q    When was that investigation took place?
19      A    When? Well, that investigation emerged after
20  a certain event that was brought to my attention, but I
21  did not participate directly in that investigation; I
22  only participated indirectly, as was required of me.
23      Q    But the question was, when?
24      A    Yes, I know "when?" but by "when?" do you mean
25  -- I mean, an exact date? I don't have an exact date.

1       Q      In what year you made that investigation, or
2    you participated in that investigation?
3       A      If memory serves me well, 2014, 2015 -- 2015.
4       Q      Was that around March, February 2015?
5       A      If you're talking about the last event
6    involving Ms. Daumont, it should've been around those
7    months.
8       Q      Okay.  I am asking about the investigation
9    that you participated, or the process that you
10   participated, not directly, but indirectly, regarding
11   the matters you investigated.  Because you have not
12   stated what was the matter.
13          So I am asking you when it happened, and you
14   stated -- I asked the year--
15      A      Yes.
16      Q      --and now I'm asking regarding that
17   investigation that you described, if it could have been
18   on March, February of 2015.
19      A      Yes, I'm making reference to the last
20   investigation, and the dates, because you have not
21   established exactly the events that you're referring to,
22   because obviously I worked with several situations.
23          If you're referring to the last event,
24   regarding Ms. Daumont, those are the dates; February or
25   March of 2015.

1          Q    And just to be clear with your statement --
2     and let me clarify this:  My question was related, when
3     was the event of the investigation that you
4     participated, and that was related in any manner with
5     Ms. Wanda Daumont's termination?  Ms. Wanda Daumont was
6     terminated around March 2015.
7          A    Mmhm.  Yes.
8          Q    Okay.  And I am being very specific because
9     the defendant has stated under oath that no other event
10    was considered.
11         A    For that, no.
12         Q    That's the information I want.
13         A    Okay.
14         Q    So, my questions are related precisely to Ms.
15    Daumont's termination.
16         A    Okay.
17         Q    Okay.  And the beginning of the question was
18    regarding what events, what participation you had.  And
19    so I am asking you:  What was the event that was
20    addressed to you that you participated in an indirect
21    manner?
22         A    Well, what was brought to my attention was a
23    transaction with a line of credit, where Ms. Daumont
24    signed on behalf of some other person, and said
25    authorization was not duly authorized.

58

    1        Q      And when you say "it was not duly authorized,"
    2    you mean it was not authorized by the person in charge
    3    to authorize that kind of transaction?
    4        A      Exactly.
    5        Q      And who brought you that information, who
    6    brought you that situation?
    7        A      The cashier supervisor at the time.
    8        Q      And who was the cashier supervisor?
    9        A      Joanny Torres.
   10        Q      Ms. Joanny Torres.
   11        A      Yes.
   12        Q      Okay.  And Joanny Torres, to the best of my
   13    knowledge, she brought you a slip or document--
   14        A      Mmhm.
   15        Q      --and the transaction was a withdrawal from
   16    the credit line in the amount of $80, and the deposit of
   17    that same amount in an account of the same client.
   18        A      The transaction that she brought me up was the
   19    withdrawal slip for the line of credit, for an amount
   20    that I cannot recall; that was the only thing that she
   21    brought me, because that's the only one that requires
   22    authorization.
   23        Q      And that document had to be authorized by
   24    whom?
   25        A      In the case of Wanda Daumont?

59

```
 1        Q    In the case that you have described, of the
 2   event that was brought to you.
 3        A    It's supposed to be by the supervisor of the
 4   person.
 5        Q    And who was the supervisor of the person?
 6        A    Ramón Adorno.
 7        Q    Ramón Adorno.
 8        A    Mmhm.
 9        Q    And who was the person who had to obtain that
10   authorization?
11        A    I believe that would be Ms. Daumont.
12        Q    But isn't it a fact that Ms. Daumont cannot
13   participate in any way in the transactions related to
14   herself, or one person directly involved with her, at
15   the Cooperativa?
16        A    Well, what she would be doing is -- what she
17   would be asking for would be the authorization, she
18   would not becoming involved, or given the authorization
19   in order to carry out the transaction.
20        Q    Okay.  Isn't it a fact that the person that
21   received the transaction is the cashier?
22        A    Yes.
23        Q    And the cashier has to hand that document to
24   obtain authorization from the cashier's supervisor?
25        A    Yes.
```

1      Q      And the cashier's supervisor, wouldn't it be

2   fair to say that had to verify if there is another

3   authorization to be obtained?

4      A      Can you please repeat the question?

5      Q      Wouldn't it be fair to say that the

6   supervisor, in that line of procedure--

7      A      Mmhm?

8      Q      --the cashier, the cashier to the cashier

9   supervisor, and the cashier supervisor should have been

10   the person, if any other authorization was required, to

11   obtain that authorization?

12      A      According to the manual for the cashier area,

13   in the case of a managerial employee, it is the

14   managerial employee that should request the

15   authorization, to the best of my recollection.

16      Q      Okay.  So, to the best of your recollection,

17   Ms. Wanda Daumont could have requested the authorization

18   to her supervisor, in that case, to the best of your

19   recollection, would be Mr. Ramón Adorno, the V.P., the

20   Operations V.P., in a transaction where she was involved

21   directly, or indirectly.  Is that correct?

22      A      That is correct.  And in the case of the

23   cashier who receives the slip, not having the

24   authorization, he would have -- and the supervisor not

25   being there -- he would have to ask higher-up, and

1       A     Mmhm?

2       Q     --how serious is a situation in which it is

3    determined that a branch manager falsified the signature

4    of a member?

5       A     From the standpoint of compliance, it's a big

6    offense because, first of all, it is a crime that is

7    typified in the criminal court of Puerto Rico.

8             Second, among the things that are dealt with

9    in money-laundering, one of the modalities that are

10   discussed in regards to money-laundering is fraud, and

11   within fraud there is the forfeiture of signatures and

12   identity theft.

13            So, the forfeiture of signatures or fraud can

14   be identified as identity theft, and it falls within the

15   modalities of money-laundering.

16            And here we have a person who is supposed to

17   be an example to be followed by her coworkers in the

18   area of the cashiers, and the entire branch, who is in

19   violation of both the policies and procedures

20   established both in the Compliance Program and the

21   internal policies of the Credit Union.

22            And it could be understood that even a crime,

23   that is typified under the Criminal Code of Puerto Rico,

24   is being committed.  So it's something that's serious.

25

1   MR. MENDOZA:

2       I would like to discuss with the interpreter.

3   THE INTERPRETER:

4       Yes.

5   MR. MENDOZA:

6       Because I believe "forfeiture"--

7   THE INTERPRETER:

8       Mmhm?

9   MR. MENDOZA:

10      --is not the right translation, where

11  "falsification" was to "falsify."

12  THE INTERPRETER:

13      Okay.

14  MR. MENDOZA:

15      "Falsification."

16  THE INTERPRETER:

17      Mmhm.  Oh, Gawd, yes, actually, yes, you're right.

18  Actually the word that I would use is "forged."

19  MR. MENDOZA:

20      Okay.

21  THE INTERPRETER:

22      So, do you want me to do the whole thing, or just

23  stipulate that where I said "forfeiture," we were

24  talking about "forgery" and "forged."

25

109

1    MR. MENDOZA:

2        If it is okay with Counselor, with that correcting

3    note, I can live with that.

4    MR. SÁNCHEZ:

5        If that is the opinion of the interpreter, that

6    "forfeiture" or "forged" is the proper--

7    THE INTERPRETER:

8        "Forged, forged" and "forgery."  To "forged" and

9    "forgery."

10   MR. SÁNCHEZ:

11       We agree on that.

12   THE INTERPRETER:

13       I apologize--

14   MR. MENDOZA:

15       No problem.

16   THE INTERPRETER:

17       --and I agree with you.

18   MR. MENDOZA:

19       So the witness' testimony stands corrected as far

20   as that word is concerned.  Correct?

21   THE INTERPRETER:

22       Yes.

23   MR. MENDOZA:

24       Counsel, that is the stipulation?

25

110

```
 1    THE INTERPRETER:

 2         "The forgery of a signature..."

 3    MR. SÁNCHEZ:

 4         Yes.

 5    MR. MENDOZA:

 6         Okay, very well.  And I would like to ask the

 7    deponent whether she was finished with her answer, when

 8    she stopped to allow the interpreter to do his job.

 9    THE DEPONENT:

10         Yes, I finished.

11    MR. MENDOZA:

12         Okay.  Very well.

13         Can the following document be marked as the next

14    exhibit in this deposition?

15    COURT REPORTER:

16         Exhibit 4.

17         (Whereupon, the above-referenced document was

18    marked for identification as Exhibit 4 of the

19    deposition.)

20    BY MR. MENDOZA:

21         Q    Please examine what has been marked as Exhibit

22    4, and let us know when you have done so.

23                    (Deponent reviews document.)

24         A    Yeah.

25         Q    Exhibit 4 has been dealt with in this case as
```

111

1    the image in the system Visuales, in which, in the

2    account of Mr. José A. Tirado, Mrs. Daumont, in the

3    section of "relatives," is included, and it said

4    "authorized signature."  Correct?

5         A    Correct.

6         Q    Okay.  And that was the document that you were

7    referring to in your testimony this morning, when you

8    said that you checked the file itself, of the account of

9    Mr. Tirado, and you found no authorization for Mrs.

10   Daumont, but when you checked the system, this is what

11   it showed.

12        A    Correct.

13        Q    Okay.  And the fact is that that authorization

14   does not authorize Mrs. Daumont to forge the signature

15   of Mr. Tirado in the transactions done in these accounts

16   of Mr. Tirado.

17        A    This authorization does not authorize her to

18   carry out any transactions, neither in Mr. Tirado's

19   account, nor in Mr. Tirado's credit line.

20        Q    Nor from Caguas Coop's point of view

21   authorized her to forge Mr. Tirado's signature.

22   MR. SÁNCHEZ:

23        Objection to the question.

24   MR. MENDOZA:

25        Very well.

112

1    THE DEPONENT:

2         Of course not.

3    BY MR. MENDOZA:

4         Q    And from the point of view of a compliance

5    officer, when you were such, it does not.

6         A    Of course not.  Nothing authorizes the forgery

7    of anybody's signature.

8         Q    When you were asked certain questions

9    concerning exceptions to certain procedures concerning--

10        A    Mmhm?

11        Q    --authorization of transactions, a reference

12   was made to certain testimony from Mrs. Irma Hilerio, as

13   to exceptions.

14             You said that if she did so, it was her

15   responsibility.  Correct?

16        A    Correct.

17        Q    So, if Mrs. Wanda Daumont did some exceptions,

18   she did so at her responsibility.

19        A    Yes.

20        Q    Okay.  Based on your participations in the

21   event of the cashing of the manager's check, that was

22   done in late January 2015, early February 2015, did at

23   any point in time it show that Mrs. Daumont consulted

24   the transaction that she was about to authorize with any

25   official of Caguas Coop of the highest hierarchy that

116

1        Q     So, actually, as per the documents, the person
2     doing the transaction is María T. Ayala de Martínez, and
3     based on your testimony, and the information here, she
4     was duly identified.

5        A     Yes.

6        Q     It mentions the documents, and her license,
7     and her personal circumstances--

8        A     Correct.

9        Q     --so the issue was not whether Mrs. Ayala de
10    Martínez was whom she represented to be.  There was no
11    issue with that.

12       A     No.

13       Q     Okay.  The issue was whether the person for
14    whom she was doing the transaction, a corporate entity
15    by the name of Damart Development Management had
16    effectively, or actually, authorized her to do so.

17       A     Correct.

18       Q     Okay.  (Pause.)  You were asked about your
19    intervention, if any, in the investigation, or
20    consideration, of the transaction done by Mrs. Daumont,
21    first, the one concerning the withdrawal of the credit
22    line of Mr. Tirado, and, two, this transaction of this
23    corporate entity Damart, correct?

24       A     Correct.

25       Q     Okay.  Aside from those two, were there any

1    other instances or situations in which you came to be

2    involved concerning any issues with Mrs. Daumont not

3    following Caguas Coop policies, procedures, and rules?

4    MR. SÁNCHEZ:

5        Objection to the questions.  First, this was not

6    part of the deposition's interrogatory, because of

7    information provided by the defendant.  And now the

8    defendant wants to open the situation to other matters

9    outside those two events.

10   MR. MENDOZA:

11       Counselor, this is discovery.  I'm not limited by

12   that.

13   MR. SÁNCHEZ:

14       I know it's discovery.

15   MR. MENDOZA:

16       It is discovery.

17   MR. SÁNCHEZ:

18       I know it is discovery, but I am asking the

19   question, and presenting the objection, because of

20   defendant's position that there were only two matters

21   that were took into considerations for the termination,

22   were those two events.  Just that.

23   MR. MENDOZA:

24       I'm not going to argue whether that is so, or--

25

1    MR. SÁNCHEZ:

2        That's the--

3    MR. MENDOZA:

4        --or whether--

5    MR. SÁNCHEZ:

6        --the objection, please note it.

7    MR. MENDOZA:

8        But let me -- are you done, Counsel?

9    MR. SÁNCHEZ:

10       Yes.

11   BY MR. MENDOZA:

12       Okay.  I am not posing my position here whether you

13   are correct or not, okay, or whether your objection

14   stands or not.  Your objection is noted, I think it's

15   fair game in discovery, but why we are here as to those

16   other arguments, the deposition is not the place to make

17   them.

18       Q    Please answer the question.

19       A    Yes.  I was involved in an investigation

20   involving Ms. Daumont.

21       Q    And what it relates to?

22       A    To the best of my recollection, it had to do

23   with a transaction with a check in the name of Ms.

24   Daumont's daughter, that she authorized when the funds

25   are not available in the account.

119

1        Q      And what were your findings concerning that
2   situation?

3        A      I found that Mrs. Daumont had been involved in
4   a transaction with a check belonging to her daughter --
5   and this is against the policies and procedures of the
6   institution -- because there would be conflict of
7   interest given her position as, their relationship as
8   mother and daughter.  That would be the first point.

9               The second point is that there were no
10  available funds to cover the check that she authorized.

11       Q      And based on your recollection, was there any
12  disciplinary action resulting from your findings?

13       A      Yes.  I do know that in that occasion, I did
14  meet with Ms. Daumont, and Lourdes Rodriguez from Human
15  Resources, a meeting where the findings about this
16  situation were discussed.

17              But as I have stated before, as a compliance
18  officer, I'm not from the area of Human Resources, and
19  it is Human Resources that makes a determination as to
20  whether or not any disciplinary action is to be taken.

21              So, in this case, I did not -- I was not
22  informed of such a decision.

23       Q      Very well.  Thank you.

24              Those are my questions for now, Counselor.

25

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WANDA E. DAUMONT COLÓN        * CIVIL NO.: 15-3120(GAG/CVR)
                                  *
    Plaintiff                      *
                                  *
       Vs.               * AGE DISCRIMINATION IN
                                * EMPLOYMENT ACT (ADEA);
COOPERATIVA DE AHORRO Y CRÉDITO * PUERTO RICO LAW 100, 29;
DE CAGUAS; IRMA HILERIO ARROYO * L.P.R.A., 146, LAW 80,29
AS OFFICER AND IN HER PERSONAL * L.P.R.A. § 185
CAPACITY                          *
                                * Jury trial requested
    Defendants.                *
                                *
*********************************

DEPOSITION OF MS. DAMARIS JIMÉNEZ JIMÉNEZ

DATE      :    April 28, 2017

TIME      :    9:41 A.M.

CLIENT    :    ALDARONDO GIRALD LAW P.S.C.

ADDRESS   :    2 Vela Street, Esquire Building
                 Seventh Floor, Suite 701
                 San Juan, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

    Ericson Sánchez Preks, Esq.

FOR DEFENDANTS:

    Enrique J. Mendoza Méndez, Esq.
    Otto Y. Müller Vázquez, Esq.

NOTARY PUBLIC:

    Ericson Sánchez Preks, Esq.

8

1      A    I think about a year.

2      Q    Therefore, you began to work as an employee of

3   the around, more or less, 2001?

4      A    I think so.

5      Q    Yes.  Just to clarify:  When one of us makes

6   this gesture, in moving the hands, it's for you to tell

7   because you are just making a gesture, or moving your

8   head, or saying "mmhm."

9      A    I didn't realize it.

10     Q    I know.  That's why we are telling you so.

11   Don't be offended if we do that.  Okay.  You stated that

12   you, after concluding your Professional services at the

13   Cooperativa, you began to work at the Customer Service

14   Department.

15     A    That's correct.

16     Q    What was your position?

17     A    Customer service.

18     Q    Is that a position in fact, or it is the name

19   of the department?

20     A    They've changed the name.  Before, if I'm not

21   mistaken, it was called "Platform Officer."

22     Q    And what is the actual name at the present?

23     A    Representative for Cooperative Services.

24     Q    Since when, more or less, you have that

25   particular title?--Representative of Cooperative

44

```
 1        Q     No yellow cards.

 2        A     No.

 3        Q     Is that an area that you work with?

 4        A     I don't work in the register area.

 5        Q     Do you have knowledge as to whether there are

 6   yellow cards for checking accounts, and also yellow

 7   cards for saving accounts?  Or you are not knowledgeable

 8   about that?

 9        A     Savings accounts do not have cards.

10        Q     So your testimony is that Exhibit 2 and 3, by

11   virtue of those, Mr. Tirado Meléndez was authorizing

12   Mrs. Daumont Colón to do transactions in which accounts?

13        A     In the savings.

14        Q     And that's why Exhibit 3 says "savings."

15        A     Yes.

16        Q     And this Exhibit 2 and 3, my question is

17   whether they were done to update what was already in the

18   Visuales system.

19        A     Yes.

20        Q     Does Exhibit 1, which is the print screen from

21   Visuales, and Exhibit 2 and 3, that are the two

22   documents of the authorization given on February 28,

23   2015, do those documents authorize Mrs. Daumont to take

24   a mortgage loan on behalf of Mr. Tirado?

25        A     No.
```

45

1          Q     Does it authorize Mrs. Daumont to take a

2     personal loan on behalf of Mr. Tirado?

3          A     No.

4          Q     Does it authorize Mrs. Daumont to activate any

5     credit line given by Caguas Coop to Mr. Tirado?

6          A     No.

7          Q     Does any of these three documents authorize

8     Mrs. Wanda Daumont to make transactions in Caguas Coop

9     in any of the accounts of Mr. Tirado, signing herself as

10    if, with the name "José Tirado"?  Using the signature

11    José Tirado.

12         A     No.

13         Q     Okay.  Thank you.

14    MR. MENDOZA:

15         Counselor...?

16    MR. SÁNCHEZ:

17         You're finished?

18    MR. MENDOZA:

19         For the moment, yes.

20    MR. SÁNCHEZ:

21         Okay.

22                    REDIRECT EXAMINATION

23    BY MR. SÁNCHEZ:

24         Q     Continuing with the last question, regarding

25    the Exhibit No. 2, 3, and 1 that Mr. Mendoza already

1    showed you, and that we have been using during this
2    deposition.
3         To take a loan is something new for the members,
4    so, to take a loan is not an authorization, it's not an
5    update, it's just like to open a request to the credit
6    union.  Or requesting something new to the Cooperativa.
7         A    Of a loan?
8         Q    Yes.
9         A    Yes.
10        Q    Okay.  It's the same for, when you take a
11   mortgage loan.  It's something new for the member, of
12   the clients, for the Cooperativa.
13        A    Yes.
14        Q    It's not the same as to request or make an
15   update of an authorization.
16        A    No, it's not the same.
17        Q    Okay.  The same, to activate a credit line is
18   a new request by the member, or the client, to the
19   credit union.
20   MR. MENDOZA:
21        I have an objection, because it is misleading.
22   "Activate" doesn't mean "a new."  I just want to note
23   that.
24   MR. SÁNCHEZ:
25        Okay.  Let's rephrase the question.

1        A       Yes.

2        Q       Therefore, and Mr. Tirado and Ms. Daumont

3    signed the document, which we have identified as Exhibit

4    No. 4 (sic) -- as Exhibit No. 2; sorry.  Am I correct?

5        A       Yes.

6        Q       Okay.  And later, the system print Exhibit No.

7    3, automatically, and they sign it.

8        A       Yes.

9        Q       Okay.  But Mr. Tirado was basing the signature

10   in Exhibit No. 3 in the information he already signed in

11   Exhibit No. 2.

12       A       Yes.

13   MR. SÁNCHEZ:

14           No further questions.

15   MR. MENDOZA:

16           This is Enrique José Mendoza Méndez.

17                       RECROSS EXAMINATION

18   BY MR. MENDOZA:

19       Q       Please tell me if it is correct to conclude,

20   from your testimony, that Exhibit 1, 2, and 3 do not

21   authorize Mrs. Daumont to act on behalf of Mr. Tirado

22   Meléndez for all products and services provided by

23   Caguas Coop?

24       A       No, she is not authorized on everything.

25       Q       Okay.  Now, please tell me, from Exhibit 1, 2,

51

1    and 3, which -- if any -- authorizes Mrs. Wanda Daumont

2    to go to a teller and make a withdrawal from Mr.

3    Tirado's line of credit and to, with the withdrawal

4    slip, she herself signed José Tirado?

5         A    If in any of the documents?  No.

6         Q    Tell me, if at any point time, either/or both,

7    or any of them individually, Mr. Tirado Meléndez and

8    Mrs. Daumont asked you to prepare documents to authorize

9    Mrs. Daumont to sign, as if she was José Tirado, in any

10   of his accounts?

11        A    No, they did not authorize me.

12        Q    Okay, thank you.

13                  FURTHER REDIRECT EXAMINATION

14   BY MR. SÁNCHEZ:

15        Q    Do you know whether Mr. José Tirado authorized

16   Ms. Daumont to prepare as a withdrawal from the credit

17   line, and to sign his name in the document?

18        A    No.

19        Q    Isn't it a fact that in the credit union, that

20   a member can call any of the officers and tell him,

21   "Make a withdrawal for my account and place it in my --

22   from my credit line--" sorry "--and to deposit in my

23   checking or savings account"?

24        A    No.

25        Q    Do you know?

# EXHIBIT 7



# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| WANDA E. DAUMONT COLÓN | * | CIVIL NO.: 15-3120(GAG-CVR) |
| | * | |
| Plaintiff | * | |
| | * | AGE DISCRIMINATION IN |
| vs. | * | EMPLOYMENT ACT (ADEA), |
| | * | PUERTO RICO LAW 100, 29 |
| COOPERATIVA DE AHORRO Y CRÉDITO | * | L.P.R.A., 146, LAW 80, 29 |
| DE CAGUAS; IRMA HILERIO ARROYO | * | L.P.R.A., §185 |
| AS OFFICER AND IN HER PERSONAL | * | |
| CAPACITY | * | JURY TRIAL REQUESTED |
| | * | |
| Defendants | * | |
| | * | |

----------------------------------

DEPOSITION OF MR. RAMÓN ADORNO RIVERA

DATE        :    June 9, 2017

TIME        :    9:40 a.m.

CLIENT      :    ALDARONDO-GIRALD LAW PSC

ADDRESS     :    2 Vela Street, Esquire Building
                 Seventh Floor, Suite 701
                 San Juan, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

      Ericson Sánchez Preks, Esq.

FOR DEFENDANTS:

      Enrique José Mendoza Mendez, Esq.
      Otto Y Müller Vázquez, Esq.

NOTARY PUBLIC:

      Ericson Sánchez Preks, Esq.


Crespo
Rodríguez, Inc.
Taquígrafos de Récord
PO Box 29002 San Juan, Puerto Rico 00929-0002
Tel. (787) 706-5930 • Fax: (787) 706-8217 • Cel. (787) 449-1965 (24 horas)
www.crespordriguez.com • e-mail: crespoyrodriguez@hotmail.com

33

1    Q    What documents was provided to you?

2    A    The withdrawal slip from the credit line.

3    Q    Anything else?

4    A    No.

5    Q    Okay.  Once you received that withdrawal, what

6    step you took or what kind investigation you performed?

7    A    When I saw that the slip was not signed by an

8    authorized or authorized by an officer, I interviewed the

9    teller that carried out the transaction.   When I

10   interviewed him he told me that the owner of the account

11   had not been present...

12   MR. MENDOZA:

13       "Of the line", not the...

14   INTERPRETER:

15       Correction, "that the owner of the credit line had

16   not been present..."

17   DEPONENT:

18   A    And, so I then verified the files to see, to

19   verify the signature, to see if it was the client's or

20   not.  When I saw that, that was not signature of the owner

21   of the account, I proceeded to notify the Executive

22   President, Irma Hilerio.

23   Q    What happened then?

24   A    When I notified her of this, she instructed me

25   to carry out a deeper investigation or a more profound

34

1  investigation.

2      Q    What's the name of the, I think you said,

3  "teller", that you interviewed?

4      A    Norberto Santos.

5      Q    When you met with Mr. Norberto Santos?

6      A    I do not recall the specific date, but it was

7  after February 20th, I think it was the day after, but I

8  don't recall exactly.

9      Q    What else Mr. Norberto Santos told you about

10  that transaction, the withdrawal of the credit line?

11      A    He first told me that the person had not been

12  present.  He told me that he had done without the

13  authorization, and he had done it because Wanda was his

14  boss.

15      Q    What else he told you?

16      A    Nothing else, that was just at the beginning of

17  the investigation.

18      Q    So, to the best of your recollection, you're

19  stating that Mr. Norberto Santos told you that he

20  performed the transaction because Ms. Daumont was his

21  supervisor, nothing else?

22      A    That's correct.

23      Q    Mr. Norberto Santos... strike the question.  Was

24  that transaction or Mr. Norberto Santos handed that

25  transaction to any supervisor, the cashier's supervisor or

35

1    any other officer?

2        A    He brought that transaction to the head teller,

3    Joany  Torres,  so  that  she  would  authorized  that

4    transaction.

5    MR. MENDOZA:

6        "One day after..."

7    INTERPRETER:

8        "One day after the transaction."

9    MR. SÁNCHEZ:

10       Q    Why he had to bring that transaction to Ms.

11   Joany Torres?

12       A    Because, the application for withdrawal from the

13   credit  line  requires  the  authorized  signature  of  an

14   officer.

15       Q    Okay.   And, why... you asked Mr. Norberto

16   Santos, why he brought that transaction the day after, as

17   you stated?

18       A    I didn't ask him.

19       Q    Did you ask Mr. Norberto Santos why he did not

20   obtain the authorization of the officer or his supervisor

21   or anyone else when he performed that transaction?

22       A    No, he didn't tell me.

23       Q    You asked him?

24       A    No, I didn't ask him.

25       Q    In addition to meeting with Mr. Norberto Santos,



1      Q    Okay.  And, after that initial investigation...
2    strike that question.  That initial investigation then
3    included the verification of the initial withdrawal slip
4    that you stated and the verification of the other slip,
5    withdrawal slip that Ms. Joany Torres brought by your
6    request?  Am I correct?
7      A    Joany Torres brought me the first slip.
8      Q    And, brought you the other slips?
9      A    Jesibel Matos is the person who helped me
10   because it was a joint effort.
11     Q    So, let me just clarify the record.  So, Ms.
12   Joany Torres, Joany Torres brought the first slip.
13     A    That's correct.
14     Q    And, then she brought the other withdrawal
15   slip... no, and then you asked Ms. Jesibel Matos to bring
16   or to verify other slips?
17     A    It was a joint effort because she went with me
18   to look in the other...
19     Q    Okay, let's go off the record.
20                    OFF THE RECORD
21   BY MR. SÁNCHEZ:
22     We have been out of the record trying to obtain the
23   correct translation for the phrase, 'el cuadre de caja' in
24   Spanish.  The interpreter considered that the proper
25   translation would be, cashier tally.



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

1    INTERPRETER:

2         No, the tally of the...

3    MR. SÁNCHEZ:

4         The tally of the balance?

5    INTERPRETER:

6         Of the balance.

7    MR. SÁNCHEZ:

8         Any other...

9    MR. MENDOZA:

10        That's good, we know what it means.

11   INTERPRETER:

12        Okay, I'll take it from the top then.

13   MR. SÁNCHEZ:

14        Okay, we have agreed in tally of the balance...

15   INTERPRETER:

16        For 'cuadre de caja'.

17   MR. SÁNCHEZ:

18        ...for 'cuadre' of the 'caja', okay.

19   INTERPRETER:

20        I'll take it from the top.  "She helped me carry out

21   the investigation, it was a joint effort.  We went to

22   investigate the tally of the balance between the two of us

23   to look for the other slips."

24   MR. SÁNCHEZ:

25        Q    Okay, Mr. Adorno, okay, and that process was,

41

1    took place more or less around February 24, 2015?

2         A    That's correct.

3         Q    And, for how long was the meeting with Ms. Wanda

4    Daumont in that occasion, February 24, 2015?

5         A    No longer than 20 minutes.

6         Q    And, what happened in that meeting?

7         A    In  that  meeting  I  told  her  that  I  was

8    investigating and looking into the withdrawals from the

9    credit line and she said in that meeting, she admitted

10   that she usually carried out those withdrawals, that she

11   was authorized in the account.

12        Q    What else she told you?

13        A    That she was authorized and that she usually

14   carried out those withdrawals.

15        Q    Anything else she told you?

16        A    That I can recall right now?  No.

17        Q    In  addition  of  telling  her  that  you  were

18   performing a verification or investigation regarding the

19   withdrawal of the credit line, you asked her anything

20   else?

21        A    When she told me that she was authorized in the

22   account, I told her that I had verified the file and that

23   she was not authorized in the account.

24        Q    Apart  from  that,  what  is  the  record  you

25   verified, to be sure?

42

```
1        A     In Mr. Tirado's file, the application for the
2    line of credit.
3        Q     Anything else that you verified?
4        A     I verified the I.D.s in order to verify the
5    signatures.
6        Q     What signature?
7        A     Mr. José Tirado's signature.
8        Q     In the slip or in the record?
9        A     We're talking about the file.  I was verifying
10   the signature on file to check it against the signature on
11   the credit line withdrawal slips.
12       Q     Okay, but my question was, when you said, "To
13   verify, I checked the driver's license, to verify the
14   signature", I asked what verification?  The record or the
15   slip?  You verified the signature in the driver's license
16   to verify the signature in the record or the signature in
17   (sic) the slip?
18   MR. MENDOZA:
19       I  have  an  objection.    To  me  it's  confusing,
20   Counselor.  So, I object to form of the question, for me
21   it's confusing.
22   MR. SÁNCHEZ:
23       Q     I will rephrase it.  You said, that you verified
24   the driver's license to verify the signature?
25       A     That's correct.
```



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

48

1    Q    And, when she brought that to your attention?

2    A    Early   February,   when   she   noticed   it,   she

3    notified me.

4    Q    And, what document she brought to you?

5    A    The   application   for   the   purchase   of   the

6    manager's checks and a letter of authorization.

7    Q    That letter of authorization is the one that you

8    previously testified that you saw when the investigation

9    was performed?

10    A    Which investigation?

11    Q    The   one   that   we   have   been   talking,   the

12    investigation related to the withdrawal of the manager's

13    checks.

14    A    That's correct.

15    Q    And, once the Ms. Jesibel Matos brought those

16    two documents to your attention, what you did?

17    A    I instructed her to continue the investigation.

18    Q    And, do you know what was the investigation that

19    she performed?

20    A    She verified in the file whether or not there

21    was a corporate resolution that authorized the person who

22    carried out that transaction to carry it out.

23    Q    What else she did?  If you know.

24    A    Just part of the investigation.

25    Q    But, you didn't know what else she performed,

49

1    what other steps she took to make that investigation that

2    you requested?

3         A    No.

4         Q    Did you ask her what she did?

5         A    She went and look into the file to see whether

6    there was corporate resolution authorizing the person to

7    carry out the transaction and given that there was none,

8    she concluded that it was an unauthorized transaction.

9         Q    Okay.  And, for how long she investigated that

10   particular  that  transaction,  the  one  related  to  the

11   withdrawal the manager's checks?

12        A    About a week more or less.

13        Q    And, when she met with you, after concluding

14   that intervention, what she told you, what she brought to

15   you?  And, when I say, "she", I mean Ms. Jesibel Matos.

16        A    When she brought to me what she had done in her

17   intervention,  what  she  had  concluded,  I  gave  her

18   instructions to inform Ms. Irma Hilario, the Executive

19   President about it.

20        Q    And, when Ms. Jesibel Matos met with you, what

21   was her, what she told you, specifically?

22        A    She told me that the investigation pointed to

23   the fact that the transaction had been carried out by a

24   person without an authorization according to the file.

25        Q    Anything else she told you?



50

1      A     No.

2      Q     She   made   any   conclusion   regarding   that
3    transaction?

4      A     That   it   was   a   transaction   that   was   not
5    authorized by the corporation, by the owner.

6      Q     Okay.   Apart   from   the   information   that   Ms.
7    Jesibel Matos brought you, you perform any additional test
8    to verify or to verify the information or the transaction?

9      A     No.

10     Q     Do you know what Ms. Jesibel Matos told Ms. Irma
11   Hilario?

12     A     No.

13     Q     Did you ask or met with Ms. Jesibel Matos after
14   she spoke with Ms. Irma Hilario?

15     A     No.

16     Q     Okay. At any time, you asked Ms. Jesibel Matos
17   what was, what conversation she had or what did she inform
18   Ms.   Irma   Hilario   about   the   transaction   related   to   the
19   manager's checks?

20     A     No.

21     Q     Okay.   Ms.   Jesibel   Matos   told   you   anything
22   related to any particular violation that transaction, the
23   one related to the manager's checks, could involve?

24     A     Yes.

25     Q     What she told you?



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

1      A      As I said before, there was a withdrawal that

2   was done without the authorization of the corporation, so

3   that could be a violation to the regulations and practices

4   of the Credit Union and also a violation of the Bank

5   Security Act by providing information of an account to a

6   third party.

7      Q      Anything else?

8      A      Not that I recall.

9      Q      Okay.  At any time you met with Mr. José Tirado

10  to verify the information or verify whether he has

11  authorized Ms. Wanda Daumont to make the withdrawal

12  regarding or related to the credit line?

13     A      No.

14     Q      Did you ask Ms. Wanda Daumont any time whether

15  Mr. José Tirado authorized her to make the withdrawal from

16  the credit line?

17     A      When I met with her and I indicated to her that

18  she was not authorized in the credit line.

19     Q      But, my question was whether you asked

20  specifically, Ms. Wanda Daumont whether Mr. José Tirado

21  authorized her to make that transaction, the one related

22  to the withdrawal from the credit line?

23     A      No.

24     Q      Do you know whether Ms. Joany Torres and/or Ms.

25  Jesibel Matos met or asked Ms. Wanda Daumont regarding

52

1   whether she was authorized by Mr. José Tirado to make the
2   withdrawal from the credit line?
3       A    No, the question was not necessary.
4       Q    At any time, to the best of your knowledge, Ms.
5   Jesibel Matos met or contacted Mr. José Tirado to verify
6   whether he had authorized Ms. Wanda Daumont in the, to
7   make the withdrawal from the credit line?
8       A    No.
9       Q    You stated that regarding the withdrawal from or
10  related to the manager's checks, you were handed an
11  authorization letter.
12      A    It was attached to the application, yes.
13      Q    And, you said that, that authorization letter
14  was signed by the person who is authorized in the account
15  of Damar Management.
16      A    That's correct.
17      Q    Do you know the name of that person?
18      A    I don't recall it right now.
19      Q    I will tell you a name, you tell me whether you
20  recognize that name.  The name Danny Martínez appeal to
21  you regarding the account or the person that is authorized
22  in the account of Damar Management?
23      A    Yes.
24      Q    Did you know Mr. Danny Martínez?
25      A    No.

# EXHIBIT 9

Hablo con Martin por teléfono

**COOPER, DE AHORRO Y CREDITO**
**CAGUAS**
APARTADO 1252
CAGUAS P.R. 00726

A DE DESEMBOLSO
LINEA DE CREDITO
TEL. 746-9595

HOJA DE DESEMBOLSO LINEA DE CREDITO

| NUMERO DE SOCIO | NOMBRE DEL SOCIO | FECHA | AUTORIZACION |
|---|---|---|---|
| ▬▬▬▬ | Jose A. Arroyo Melendez | MES 12 DIA 18 AÑO 14 | |

CANTIDAD A CARGARSE A LA LINEA DE CREDITO ARRIBA MENCIONADA

cuatrocientos cincuenta —————— 00/100        450.00

| INICIALES CAJERO | NUMERO DE SEGURO SOCIAL | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

AUTORIZO SE CARGUE A MI
LINEA DE CREDITO EL IMPORTE
AQUI ESTIPULADO

_____
FIRMA DEL SOCIO

**SOCIO: PROTEGE TU CREDITO. PAGA PUNTUALMENTE TUS OBLIGACIONES**

---

*Depósito a Cuenta de Cheques*

**CAGUAS COOP**
P.O. Box 1252 • Caguas, P.R. 00726
Tel. 746-9595

Efectivo/Cash

Cheque/Checks

Fecha 15-16-15

Nombre Jose A. Arroyo Melendez

Dirección Caguas P.R.

Zip 00-

Número de Cuenta / Account Number

Número de Socio ▬▬▬▬▬

CAGUAS COOP
DEC 18 2014
CAJERO 175

$ 450.00

**ANEJO 13**



COOPERA___  DE AHORRO Y CREDITO
**CAGUAS**
APARTADO 1252
CAGUAS P.R. 00726

___A DE DESEMBOLSO
LINEA DE CREDITO
TEL. 746-9595

HOJA DE DESEMBOLSO LINEA DE CREDITO

| NUMERO DE SOCIO | NOMBRE DEL SOCIO | FECHA | AUTORIZACION |
|---|---|---|---|
| ~~~~~~~ | | MES DIA AÑO | |
| | | DEC 04 20__ | 60.00 |

CANTIDAD A CARGARSE A LA LINEA DE CREDITO ARRIBA MENCIONADA

| INICIALES CAJERO | NUMERO DE SEGURO SOCIAL | | |
|---|---|---|---|
| | ~~~~~~~~~~ | — | 99 13 |

AUTORIZO SE CARGUE A MI
LINEA DE CREDITO EL IMPORTE
AQUI ESTIPULADO

FIRMA DEL SOCIO

**SOCIO: PROTEGE TU CREDITO. PAGA PUNTUALMENTE TUS OBLIGACIONES**

ANEJO 14

4-C



COOPER    DE AHORRO Y CREDITO        JA DE DESEMBOLSO
**CAGUAS**                                LINEA DE CREDITO
APARTADO 1252                             TEL. 746-9595
CAGUAS P.R. 00726

Caguas Coop.

DEC 0 2 2014

| NUMERO DE SOCIO | NOMBRE DEL SOCIO | FECHA | | | AUTORIZACION |
|---|---|---|---|---|---|
| | | MES | DIA | AÑO | |

CANTIDAD A CARGARSE A LA LINEA DE CREDITO ARRIBA MENCIONADA

| INICIALES CAJERO | NUMERO DE SEGURO SOCIAL | - 1991 |
|---|---|---|
| | AUTORIZO SE CARGUE A MI LINEA DE CREDITO EL IMPORTE AQUI ESTIPULADO | FIRMA DEL SOCIO |

**SOCIO: PROTEGE TU CREDITO. PAGA PUNTUALMENTE TUS OBLIGACIONES**

HOJA DE DESEMBOLSO LINEA DE CREDITO

ANEJO 15



**COOPERATIVA DE AHORRO Y CREDITO**
**CAGUA.**
APARTADO 1252
CAGUAS P.R. 00726

F   A DE DESEMBOLSO
.NEA DE CREDITO
TEL 746-9595

| NUMERO DE SOCIO | NOMBRE DEL SOCIO | FECHA | AUTORIZACION |
|---|---|---|---|

MES    DIA    AÑO

CANTIDAD A CARGARSE A LA LINEA DE CREDITO ARRIBA MENCIONADA

INICIALES CAJERO    NUMERO DE SEGURO SOCIAL

AUTORIZO SE CARGUE A MI
LINEA DE CREDITO EL IMPORTE
AQUI ESTIPULADO

FIRMA DEL SOCIO

**SOCIO: PROTEGE TU CREDITO. PAGA PUNTUALMENTE TUS OBLIGACIONES**

HOJA DE DESEMBOLSO LINEA DE CREDITO

ANEJO 16

4 - 2

**CAGUAS COOP**

COOPER... DE AHORRO Y CREDITO
CAGUAS
APARTADO 1252
CAGUAS P.R. 00726

...A DE DESEMBOLSO
LINEA DE CREDITO
TEL. 746-9595

HOJA DE DESEMBOLSO LINEA DE CREDITO

| NUMERO DE SOCIO | NOMBRE DEL SOCIO | FECHA | | | AUTORIZACION |
|---|---|---|---|---|---|
| | | MES | DIA | AÑO | |

CANTIDAD A CARGARSE A LA LINEA DE CREDITO ARRIBA MENCIONADA

SEP.

1,000

| INICIALES CAJERO | NUMERO DE SEGURO SOCIAL | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

AUTORIZO SE CARGUE A MI
LINEA DE CREDITO EL IMPORTE
AQUI ESTIPULADO

FIRMA DEL SOCIO

**SOCIO: PROTEGE TU CREDITO, PAGA PUNTUALMENTE TUS OBLIGACIONES**

ANEJO 17

4- E



COOPERAT... DE AHORRO Y CREDITO
CAGUA...
APARTADO 1252
CAGUAS P.R. 00726

A DE DESEMBOLSO
LINEA DE CREDITO
TEL. 746-9595

**HOJA DE DESEMBOLSO LINEA DE CREDITO**

| NUMERO DE SOCIO | NOMBRE DEL SOCIO | FECHA | AUTORIZACION |
|---|---|---|---|
| ▬▬▬ | José Gonzales | MES DIA AÑO | |

CANTIDAD A CARGARSE A LA LINEA DE CREDITO ARRIBA MENCIONADA

Mil con — 00/uc          1000 .M

| INICIALES CAJERO | NUMERO DE SEGURO SOCIAL |
|---|---|

AUTORIZO SE CARGUE A MI
LINEA DE CREDITO EL IMPORTE
AQUI ESTIPULADO

FIRMA DEL SOCIO

SOCIO: PROTEGE TU CREDITO. PAGA PUNTUALMENTE TUS OBLIGACIONES

ANEJO 18

4 - 4

COOPERA____ DE AHORRO Y CREDITO
**CAGUAS**
APARTADO 1252
CAGUAS P.R. 00726

Caguas Coop

____A DE DESEMBOLSO
LINEA DE CREDITO
TEL. 746-9595

HOJA DE DESEMBOLSO LINEA DE CREDITO

| NUMERO DE SOCIO | NOMBRE DEL SOCIO | FECHA | | | AUTORIZACION |
|---|---|---|---|---|---|
| | | MES | DIA | AÑO | |
| | | 7 | 01 | 14 | |

CANTIDAD A CARGARSE A LA LINEA DE CREDITO ARRIBA MENCIONADA

$500 00

INICIALES CAJERO

Caguas Coop

JUL 1

NUMERO DE
SEGURO SOCIAL

- 199 13

AUTORIZO SE CARGUE A MI
LINEA DE CREDITO EL IMPORTE
AQUI ESTIPULADO

FIRMA DEL SOCIO

SOCIO PROTEGE TU CREDITO. PAGA PUNTUALMENTE TUS OBLIGACIONES

ANEJO 19

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| WANDA E. DAUMONT COLÓN | * CIVIL NO.: 15-3120(GAG/CVR) |
| | * |
| Plaintiff | * |
| | * |
| Vs. | * AGE DISCRIMINATION IN |
| | * EMPLOYMENT ACT (ADEA); |
| COOPERATIVA DE AHORRO Y CRÉDITO | * PUERTO RICO LAW 100, 29; |
| DE CAGUAS; IRMA HILERIO ARROYO | * L.P.R.A., 146, LAW 80, 29 |
| AS OFFICER AND IN HER PERSONAL | * L.P.R.A. § 185 |
| CAPACITY | * |
| | * |
| Defendants. | * Jury Trial Requested |
| | * |

********************************

DEPOSITION OF MS. LOURDES RODRÍGUEZ FLORES

DATE        :    May 4, 2017

TIME        :    9:37 A.M.

CLIENT      :    ALDARONDO GIRALD LAW P.S.C.

ADDRESS     :    2 Vela Street, Esquire Building
                 Seventh Floor, Suite 701
                 San Juan, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

        Ericson Sánchez Preks, Esq.

FOR DEFENDANTS:

        Enrique J. Mendoza Méndez, Esq.
        Otto Y. Müller Vázquez, Esq.

NOTARY PUBLIC:

        Ericson Sánchez Preks, Esq.

19

1    credit unions Human Resources director and/or employees?

2    Or it applies to any Human Resources director or

3    employees?

4         A     Only credit unions.

5         Q     Okay, when you began to work for the

6    Cooperativa de Credito de Caguas in the year 2011, what

7    was your first position there?

8         A     Only the vice president of finance.

9         Q     And later, what position were you appointed

10   to?

11        A     Then it was added the duties of Human

12   Resources, because that position was empty.

13   MR. SÁNCHEZ:

14        I think that the answer was "that the position

15   became empty or vacant."

16   THE INTERPRETER:

17        Correction to the translation.

18   BY MR. SÁNCHEZ:

19        Q     And what -- at the present, what is your

20   position?

21        A     Vice president of Finance and Human Resources.

22        Q     Therefore, I must -- would it be fair to say

23   that when the position of Finance V.P. was added the

24   duties of Human Resources, you have continued in that

25   same position up to the present.

50

1    that you should verify the "Visuales" system?

2         A    I don't recall that.

3         Q    Okay.  Do you know whether you, or Mr. Ramón

4    Adorno, or any other person verified whether Ms. Daumont

5    was an authorized person in Mr. José Tirado's account,

6    in the Visuales system?

7         A    I understand that they were going through that

8    process.

9         Q    But do you know whether they made the

10   verification?

11        A    They should have.  I recall seeing a document.

12   I could take under consideration, in this situation,

13   because the credit line don't have any document where

14   they give somebody else an authorization.  I understand

15   that credit lines do not have that consideration.

16        Q    You are stating that a withdrawal from a

17   credit line is the same as a loan?

18        A    It's a loan, because everything that is

19   withdrawn from the credit line, is going to advance, and

20   it would increase the amount to be paid.

21        Q    Therefore, when you do a withdrawal from a

22   credit line, you apply all the procedures that are

23   related to a loan?  Is that what you're saying?

24        A    A credit line works the same as a credit card.

25   The amount that you withdraw and use should be the

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WANDA E. DAUMONT COLÓN              * CIVIL NO.: 15-3120
                                    *
      Plaintiff                     *
                                    *
             Vs.                    * AGE DISCRIMINATION IN
                                    * EMPLOYMENT ACT (ADEA);
COOPERATIVA DE AHORRO Y CRÉDITO     * PUERTO RICO LAW 100,
DE CAGUAS; IRMA HILERIO ARROYO AS   * 29 L.P.R.A., 146, LAW
OFFICER AND IN HER PERSONAL         * 80, 29 L.P.R.A., S 185
CAPACITY                            *
                                    *
      Defendants                    *
*********************************

DEPOSITION OF MRS. IRMA HILERIO ARROYO

DATE        :    February 8th, 2017

TIME:       :    10:06 A.M.

CLIENT      :    ALDARONDO-GIRALD LAW PSC
                 Esquire Building
                 2 Vela Street
                 Suite 701
                 San Juan, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

      Ericson Sánchez Preks, Esq.

FOR DEFENDANTS:

      Enrique José Mendoza Méndez, Esq.

NOTARY PUBLIC:

      Ericson Sánchez Preks, Esq.

Crespo
Rodríguez, Inc.
Taquígrafos de Récord

PO Box 29002 San Juan, Puerto Rico 00929-0002
Tel. (787) 706-5930, Fax: (787) 706-8217, Cel. (787) 449-1965 (24 horas)
www.cresporodriguez.com ~ e-mail: crespoyrodriguez@hotmail.com

5

```
1    the breaks, and I now clearly state that Ms. Hilerio
2    should answer every question that I pose verbally.  So
3    you have to state it verbally.  You cannot make gestures
4    or signs to answer the questions, since gestures and
5    signs cannot be recorded.  Did you understand that?
6    THE DEPONENT:
7         Yes, I understand.
8    MR. SÁNCHEZ:
9         Perfect.
10                       DIRECT EXAMINATION
11   BY MR. SÁNCHEZ:
12        Q    Okay, Ms. Hilerio, I want you to state for the
13   record your full name again.
14        A    My name is Irma Hilerio Arroyo.
15        Q    Ms. Hilerio, have you taken any medication
16   during this day that can affect the comprehension or
17   understanding of the questions, or the answer that you
18   should provide?
19        A    No, I do not take medications.
20        Q    Okay.  I must understand that, at the present,
21   you are in full capacity to answer the questions.
22        A    I think so.
23        Q    Okay.  Ms. Hilerio, what is your age?
24        A    I am 64 years old.
25        Q    When were you born?
```



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel. (787) 449-1065 (24 horas)

78

```
 1              Yes, I did.
 2    MR. MENDOZA:
 3         Okay.
 4    BY MR. SÁNCHEZ:
 5         Q    Okay.  So, to the best of -- according to your
 6    answer, you were never told or informed that the
 7    transaction was a withdrawal from a credit line, and at
 8    the same time, it was deposited, the same amount, in the
 9    account, one of the accounts of the same client.  Just
10    to be sure.
11    MR. MENDOZA:
12         I have an objection to the translation--
13    MR. SÁNCHEZ:
14         Okay.
15    MR. MENDOZA:
16         --because you said that she was never informed,
17    that she has testified that she was never informed.  And
18    that was your question.  But the translation did not
19    mention that she never informed about that; the
20    translation was that she was not informed.  Which makes
21    a difference.
22    MR. SÁNCHEZ:
23         Okay.
24    MR. MENDOZA:
25         So what I suggest is--
```

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| WANDA E. DAUMONT COLÓN | * | CIVIL NO.: 15-3120(GAG-CVR) |
| | * | |
| Plaintiff | * | |
| | * | AGE DISCRIMINATION IN |
| vs. | * | EMPLOYMENT ACT (ADEA), |
| | * | PUERTO RICO LAW 100, 29 |
| COOPERATIVA DE AHORRO Y CRÉDITO | * | L.P.R.A., 146, LAW 80, 29 |
| DE CAGUAS; IRMA HILERIO ARROYO | * | L.P.R.A., 185 |
| AS OFFICER AND IN HER PERSONAL | * | |
| CAPACITY | * | JURY TRIAL REQUESTED |
| | * | |
| Defendants | * | |
| | * | |

----------------------------------

DEPOSITION OF MS. IRMA HILERIO ARROYO
(CONTINUATION)

DATE         :    July 26, 2017

TIME         :    9:42 a.m.

CLIENT       :    ALDARONDO-GIRALD LAW PSC

ADDRESS      :    2 Vela Street, Esquire Building
                  Seventh Floor, suite 701
                  San Juan, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

    Ericson Sánchez Preks, Esq.

FOR DEFENDANTS:

    Enrique José Mendoza Méndez, Esq.
    Otto Y. Müller Vázquez, Esq.

NOTARY PUBLIC:

    Ericson Sánchez Preks, Esq.

13

1    Coop?

2         A    Well, the Credit Union has about 17,000 clients.
3    I would hope that a manager would know at least those that
4    important, that come frequently, but I don't expect them
5    to know everybody, because it would be impossible.

6         Q    Okay.    In  the  case  of  Ms.  Wanda  Daumont
7    termination or discharge, was his (sic) case or his (sic)
8    dismissal, discharge, or termination, whatever you can
9    call that process, was referred to any superior process at
10   the administrative agency's level, meaning for example,
11   COSSEC?

12        A    No.

13        Q    So, I must understand from your answer that Ms.
14   Wanda Daumont's termination and obviously the reason the
15   Coop alleged she was terminated for, remain at your level?

16        A    That's correct.

17        Q    Okay.   And, going back to the two main reasons
18   for Ms. Wanda Daumont's termination, the transactions, the
19   two transactions that were related to her termination,
20   just to clarify, because I think that was not covered in
21   the last deposition.   To the best of your knowledge at the
22   present, the transaction related to Damar Development and
23   Management Corporation, which was related to the process
24   of several manager checks, was that transaction cause any
25   loss to the Coop?

1         A     Like I said the last time, when asked.  The main

2    reason of Mrs. Daumont's dismissal was having signed a

3    document with a name that wasn't hers.  Neither of the two

4    cases, neither Damar or this one, caused any monies to the

5    Credit Union.  The fact with Damar's case was that there

6    was a non-compliance with the procedures and that's what

7    brought to the dismissal.

8    MR. MENDOZA:

9         No, "...that was why it was included in the letter."

10   DEPONENT:

11        In the letter.

12   INTERPRETER:

13        Interpreter stands corrected.  "And, that's why it

14   was included in the letter."

15   MR. SÁNCHEZ:

16        Q     Okay, so... okay, therefore, as just stated,

17   there was no loss in any of the two situations for the

18   Coop?

19        A     No, it was a trust factor.

20        Q     Okay.  In addition to that, was any kind of

21   complaint from anyone filed against the Coop, because of

22   any of those two situations, those two events that you

23   just mentioned?

24        A     Well, there was complaint filed by Mrs. Daumont

25   in the Labor Department.

15

1       Q    Yes, that's correct, but what I was trying to
2    clarify is, whether there was any complaint from anyone
3    against the Coop, because the transactions in fact,
4    because she processed that, any of those two transactions?
5       A    Before me, I have not seen them.
6       Q    Okay.  Have you, anyone in the Coop or in the
7    Board of Directors has mentioned to you anything that,
8    some kind of complaint have arrived to the Coop against
9    the Coop, because Ms. Daumont processed any of those two
10   transactions, apart from Ms. Daumont's complaint?
11      A    No.
12      Q    Okay.  From those answer, the last and the
13   previous one, I must understand that the Credit Union has
14   suffered no damages from the events that led to Ms. Wanda
15   Daumont's termination.
16      A    If that would been the case, I would have
17   included it in her letter.
18      Q    Okay.  I don't have any other questions.
19                   CROSS EXAMINATION
20   BY MR. MENDOZA:
21      Q    Enrique José Mendoza Méndez, very briefly, the
22   decision to terminate Mrs. Daumont was yours?
23      A    Yes, it was mine after having met with my staff,
24   yes, it was mine.
25      Q    In what measure Mrs. Daumont's age was or not a

16

1    factor in your decision to terminate her?

2        A    Never can age be one, because I am older than

3    her.

4        Q    Okay, I have no further questions at this time,

5    Counselor.

6                    RE-DIRECT EXAMINATION

7    BY MR. SÁNCHEZ:

8        Q    Regarding that last answer you provided to

9    Attorney Mendoza, isn't it a fact that the day that Ms.

10   Wanda Daumont was terminated in the meeting you had with

11   her and which Mr. Ramón Adorno, I think is his name, was

12   present as a witness, isn't it a fact that Ms. Wanda

13   Daumont told you that she was being terminated, because of

14   her age?

15       A    No, she stood up with the letter in her hand,

16   and she mentioned that she knew from the beginning that I

17   was going to dismiss, but she did not mention anything

18   about her age.

19       Q    Okay, no further questions.

20   MR. MENDOZA:

21       Okay, we have no questions.

22   MR. SÁNCHEZ:

23       Therefore I think it's at 10:16 in the morning and

24   the deposition is concluded.  I want to thank Ms. Irma

25   Hilerio for taking the time to take, you take, or you took

# EXHIBIT 13

Exhibit 27



**COOPERATIVA DE AHORRO Y CREDITO DE CAGUAS**

*Solicitud de Instrumentos Monetarios*

| | | EXHIBIT |
|---|---|---|
| | | 4 |

01-30-15                Realizado por (Firma Cajero):    BYP

Cuenta: $ ▉▉▉▉    Efectivo: $ _____    Cheques: $ 18,795.43

e Instrumento: Cheque de Gerente ____ ✓    Giro ____

### PERSONA QUE REALIZA LA TRANSACCIONS EN LA COOPERATIA

re: Maria T. Ayala De Martinez    Número Cuenta: ▉▉▉▉

o Social o Id Extranjero: ▉▉▉▉    Núm. Telefono: 787-745-3333

ión Fisica: Valles del Lago Capriillas 1015 Caguas PR
00725

Nacimiento: 10-31-1949

le Identificación: Lic    Número Id: 1208804

a de Vencimiento: 10-31-2015    Pais de Emisión: PR

eo o Profesión: Administradora Agencia Seguros
Danny Martinez

### PERSONA O ENTIDAD PARA LA CUAL SE REALIZA LA TRANSACCION (Remitente)

re Damart Developmentand Management Corp    Número Cuenta: ▉▉▉▉

ro Social o id Extranjero ▉▉▉▉    Núm. Telefono: 787-745-3333

ción Fisica Urb. Valle Del Lago Capriilas 1015
Caguas PR, 00725

a Nacimiento _____    Empleo o Profesión: _____

### DESGLOSE DE LA TRANSACCION

| or de | Cantidad | Comision | Total | Sello Cajero |
|---|---|---|---|---|
| retariú De Hacienda | $ 2,670.58 | $ 8.00 | $ 2,678.58 | |
| retario De Hacienda | 418.06 | 8.00 | 426.06 | CAGUAS COOP |
| retariú De Hacienda | 6,700.36 | 8.00 | 6,708.36 | JAN 31 2015 |
| retariú De Hacienda | 2,670.58 | 8.00 | 2,678.58 | CAJERO 176 |
| retariú De Hacienda | 48.06 | 8.00 | 426.06 | |
| retariú De Hacienda | 5,876.79 | 8.00 | 5,877.79 | |
| | $ 18,747.48 | $ 48.00 | $ 18,795.43 | |

a del Comprador: _____    Autorizado por: _____

Revisado 11/12

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WANDA DAUMONT COLÓN            CIVIL NO.:  15-3120

        Plaintiff

            v.                 AGE DISCRIMINATION

COOPERATIVA DE AHORRO Y
CRÉDITO DE CAGUAS

        Defendants

TAKING OF DEPOSITION OF MR. DAMIAN D. MARTÍNEZ-VÁZQUEZ

DATE      :   April 27, 2017

TIME      :   2:38 p.m.

OFFICE    :   MENDOZA LAW OFFICES

ADDRESS   :   Centro de Seguros Building, Suite 312
              701 Ponce de Leon Avenue
              San Juan, Puerto Rico

APPEARANCES

ON BEHALF OF PLAINTIFFS:

        Erickson Sánchez-Preks, Esq.

ON BEHALF OF DEFENDANTS:

        Enrique J. Mendoza-Méndez, Esq.
        Otto Muller-Vázquez, Esq.

3

1      testifies through the Interpreter as follows:

2                    DIRECT EXAMINATION

3   BY MR. MENDOZA:

4      Q    Certainly you are married?

5   DEPONENT:

6      A    Yes.

7      Q    And you're married to Mrs. María Ayala de

8   Martínez?

9      A    Right.

10     Q    Okay. In general terms, what does Damart

11  Development Management, Corp. does? Just in general terms.

12     A    Is a family corporation where I have my

13  properties in that corporation.

14     Q    And is a company duly registered with the State

15  Department and authorized to do business in Puerto Rico?

16     A    Yes.

17     Q    Since when, more or less?

18     A    More or less fourteen years.

19     Q    Okay. I'm going to show you what has... what was

20  marked as Exhibit 1 for the deposition of Mrs. Ayala.

21  Please, examine the document and tell us when you have

22  done so.

23     A    Okay.

24     Q    That's the register of your authorized signature

25  as a representative of Damart Development and Management,

4

1    Corp. in the account of Caguas Coop. Correct?

2        A    Correct.

3        Q    Very well. I'm going to show you Exhibit 2. And

4    please let me know when you have examined the document.

5        A    Okay.

6        Q    And this is your signature in that document?

7        A    Yes.

8        Q    Okay. I'm showing you what was marked as Exhibit

9    3 of the deposition of Mrs. Ayala.

10       Please examine it, and the question will be whether

11   that is your signature?

12       A    Yes, that's my signature.

13       Q    Okay. And this document was marked as Exhibit 5

14   of Mrs. Ayala's deposition and I ask you to examine it and

15   tell me whether that is your signature?

16       A    Yes, that's my signature.

17       Q    Can you explain to us, please, the circumstances

18   in which you prepared that document which has been marked

19   as Exhibit 5?

20       A    Okay. I was having some transaction with my CPA,

21   because there was a "amnistía".

22       Q    Okay. We have been using amnesty.

23       A    Amnesty, okay.

24       Q    When the interpreter was here, so lets take it

25   for good.

5

1    A    Okay. It was the last day of Secretario de
2    Hacienda for an amnesty to retired, like, I was pay a less
3    amount of tax authorized by the law. And then I had to go
4    to the CPA, which was in Martínez Nadal.

5    I knew that it would take some time so I went to
6    Wanda Damount and I told her that I had urgency to do this
7    and I wanted her to know that if she could prepare a check
8    as soon as I called. She told me that she could not do it
9    because it was not authorized, that why she needed to...
10   that I had to sign a document authorizing my wife, María
11   Ayala, for her to obtain those, the checks. Just in case
12   I was late coming back from the CPA, because I knew it
13   would take some time. And, so I went to her and then I
14   filled out this document for her to know that just in case
15   I could not make it in time for her to prepare a check and
16   to take it to my wife. So that's what the purpose of this
17   document.

18   MR. SÁNCHEZ:

19   Just to be sure, the document that he has mentioned
20   is the one that we have been identified as Exhibit 5?

21   MR. MENDOZA:

22   Five. Yes, yes.

23   Q    The question was, what were the circumstances
24   for issuing that document. Was that document tendered by
25   you personally, was in fax, in mail, how you?

6

1    DEPONENT:

2        A    I went personally to her office and it was in

3    the hours of the morning before noon.

4        Q    Very well.

5        A    So, I went over there and then she told me that

6    I must sign this document.

7        Q    Oh. And the tax payer or tax payers who would

8    benefit from the amnesty, was it the corporation or

9    whether it was you and/or your wife in your personal

10   character as a tax payer?

11       A    A tax payer is, under my circumstances, person,

12   my, the retirement funds that I had.

13       Q    Okay. So, what I'm trying to get at, it was not

14   taxes related to Damart Development Management Corp., it

15   was taxes relate... taxes issues related to you as a

16   personal tax payer?

17       A    That's correct.

18       Q    Okay. I'm going to show what was marked as

19   Exhibit 6 of deposition.

20       This deposition it says a request or application for

21   an account, and my question would be, for you to examine,

22   to tell me when you have done so, and whether that's your

23   signature.

24       A    This is my signature. This is my signature.

25       Q    Okay, very well. And I'm going to show you what

7

1   has been marked as Exhibit 4. Please examine it, and when

2   you have done so, my question is, whether it is your

3   wife's signature at that document.

4        A    Yes.  That  is  my  wife's  signature  in  the

5   document. Yes.

6        Q    Okay. Aside from the authorization, or hand

7   written authorization, that you signed, which is Exhibit

8   5 of this deposition, was there a corporate resolution

9   issued by Damart Development and Management, Corp., for

10  this transactions related to the checks that were going to

11  be issued to the Secretary of the Treasury for the

12  amnesty?

13       A    No.

14  MR. MENDOZA:

15       Okay. Thank you Mr. Martínez. Those are my questions.

16  DEPONENT:

17       Okay.

18  MR. MENDOZA:

19       Counselor, do you have any questions?

20  MR. SÁNCHEZ:

21       Can we go off the record for a moment?

22  MR. MENDOZA:

23       Yes. No problem.

24                    OFF THE RECORD

25

# EXHIBIT 15

COOPERATIVO DE AHORRO Y CREDITO

**CAGUAS**

Cuenta Núm. [redacted]

Fecha ___12-1-13___

Exhibit 30

TARJETA
DE FIRMAS
- [ ] Cuenta Corriente
- [ ] Cuenta de Ahorros
- [ ] Certificados Ahorros
- [ ] X'mas Club
- [ ] Cuenta Corriente
- [ ] Ahorros Especiales
- [ ] Otras

ulo de la Cuenta ___Dimont Development And Management Corp___

Dirección Postal _____

La cuenta para la cual se suministra(n) la(s) firma(s) que sigue(n) queda, sujeta a todos los términos y condiciones cuales juegan en el Convenio de Cuenta vigente a la fecha de la apertura de la cuenta y otros que subsiguientemente se adopten por la Cooperativa. Acepto, además, que se me ha informado por un representante de la Cooperativa que copia íntegra de dicho convenio se encuentra fijada en el Tablón de Edictos y que, de así solicitarlo, se me entregará copia íntegra de dicho convenio.

Firmas
Requeridas  ☐

| NOMBRE (A MAQUINA O TIPO MOLDE) | FIRMA | S.V. |
|---|---|---|
| Damian Martinez Vazquez | | |
| | | |
| | | |
| | | |
| | | |

NUMERO DE FIRMAS REGISTRADAS ☐

Firma del Oficial de la Cooperativa

PENGAD 800-631-6989   EXHIBIT   1





## CONVENIO DE CUENTA CONJUNTA



Tipo de cuenta: ☐ Mancomunada (y): ☒ Solidaria (y/o):

Nombre de la Cuenta: CORR COMER          Número: ⬛⬛⬛⬛⬛

En consideración a la aceptación de parte de la Cooperativa de nuestra cuenta conjunta, según el tipo indicado anteriormente, y de la aceptación de cuando en cuando de los depósitos que hagamos a la misma, nosotros, los abajo suscribientes, por la presente convenimos:

1. Que nuestra intención es la de que la cuenta arriba indicada opere a nombre de todos nosotros de forma conjunta.

2. Que este convenio es suplementario a los reglamentos, al Convenio de Cuenta Corriente, y a todos los demás formularios y convenios que en relación con dicha cuenta sean suscritos con la Cooperativa.

3. Que todos los fondos que los suscribientes tengan o puedan tener en dicha cuenta serán de la propiedad de los suscribientes conjuntamente y podrán ser retirados de la siguiente forma:

    a. Por la firma de todos nosotros, si la cuenta es mancomunada, o
    b. Por la firma de cualquiera de nosotros, si la cuenta es solidaria

4. Que la Cooperativa puede honrar cualquier requerimiento de retiro o cualquier orden para el pago de los fondos en dicha cuenta, que esté liberada de acuerdo a lo dispuesto en este convenio.

5. Que la Cooperativa podrá acreditar a dicha cuenta cualquier instrumento negociable, giro, cheque y orden de pago, que sea depositada en dicha cuenta, siempre y cuando tal instrumento esté endosado a favor de cualquiera, o de todos los suscribientes.

6. Que cualquiera de los suscribientes pueden endosar para depósito y depositar en esta cuenta: cheques, giros, instrumentos negociables, y órdenes de pago, pertenecientes o pagaderos a cualquiera de los suscribientes, o a todos en conjunto; y los endosos para depósito se harán por escrito, por sello de goma, o en alguna otra forma sin indicar la persona que endosa.

7. Que la Cooperativa en la tramitación de las operaciones de esta cuenta, retiros, depósitos, endosos y cobros de partidas depositadas, actuará y honrará las instrucciones de los suscribientes de acuerdo a lo dispuesto en este convenio.

8. Que a la muerte de alguno de los depositantes, los depositantes que sobrevivan, no tratarán de hacer retiros de dicha cuenta, ni libramientos, excepto según lo disponen las leyes vigentes; y notificarán inmediatamente a la Cooperativa de tal fallecimiento.

Firmado hoy 11 de diciembre de 2013

POR LOS DEPOSITANTES:                    ACEPTADO POR LA COOPERATIVA:

*Damart Development and Management Corp*
_____                  _____
Firma del Socio                          Firma Oficial de la Cooperativa

_____
Firma Persona Autorizada

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WANDA DAUMONT COLÓN

Plaintiff

v.

COOPERATIVA DE AHORRO Y
CRÉDITO DE CAGUAS

Defendants

CIVIL NO.:  15-3120

AGE DISCRIMINATION

TAKING OF DEPOSITION OF MRS. MARÍA T. AYALA-TORRES

DATE        :   April 27, 2017

TIME        :   1:52 p.m.

OFFICE      :   MENDOZA LAW OFFICES

ADDRESS     :   Centro de Seguros Building, Suite 312
                701 Ponce de Leon Avenue
                San Juan, Puerto Rico

APPEARANCES

ON BEHALF OF PLAINTIFFS:

    Erickson Sánchez-Preks, Esq.

ON BEHALF OF DEFENDANTS:

    Enrique J. Mendoza-Méndez, Esq.
    Otto Muller-Vázquez, Esq.

7

1    MR. SÁNCHEZ:

2        Oh, you just said two.

3    MR. MENDOZA:

4        I stand corrected. Thank you.

5        Q    Please, examine the document and let me know

6    when you have done so.

7    DEPONENT:

8        A    Yes.

9        Q    Very well. Can you identify that document?

10       A    It's for an account at the Cooperativa Ahorro

11   and Crédito, the credit union.

12       Q    Whose signature is that?

13       A    My husband's, Damián Martínez Vázquez.

14       Q    Your signature is not authorized in Damart

15   Development and Management Corp. account, at Caguas Coop.

16       A    It's not authorized.

17       Q    Okay. Thank you. Do you know Mrs. Wanda Daumont?

18       A    Yes.

19       Q    Since when?

20       A    We've been members of the credit union for over

21   twenty years so ever since we've been... are members she's

22   been there, as an employee.

23       Q    Aside from your relationship with Mrs. Daumont,

24   because she... she was related to Caguas Coop and you are

25   a member there, do you share with her or meet with her

8

1    outside of the Caguas Coop scenario?

2        A    No, sir.

3        Q    Can you mark these documents as Exhibit 2? I'm

4    showing counsel and yourself what has been marked as

5    Exhibit 2 of this deposition. Please examine the document.

6    Let us know when you have done so. Very well. Can you

7    identify the document, please?

8        A    It's an agreement of a joint account.

9        Q    For Damart Development and Management Corp.

10   Correct?

11       A    Yes, sir.

12       Q    And where it says, "Signature of authorized

13   person", whose signature is that?

14       A    My husband, Damián Martínez.

15       Q    Okay. Thank you. Please, mark this as Exhibit 3

16   of this deposition.

17       I'm showing counsel or... and deponent what has been

18   marked as Exhibit 3 of this deposition. Please, examine

19   what has been marked as Exhibit 3 and let us know when you

20   have done so.  Very well. Can you identify the document,

21   please?

22       A    It's the people that are authorized for the

23   transactions on that account.

24       Q    That's the account of Damart Development and

25   Management, Corp. Correct?

9

1      A    Yes, sir.

2      Q    And whose signature is it there as authorized

3   person for Damart Development and Management Corp?

4      A    My husband, Damián Martínez Vázquez.

5   MR. SÁNCHEZ:

6      She said to the translation "My husband", I think.

7   INTERPRETER:

8      I thought I said "my husband", "mi esposo", my

9   husband", I think that I said it.

10  MR. MENDOZA:

11     That's okay. She said it and it's clarified now that

12  she did.

13     Q    As far as doing banking transactions in Caguas

14  Coop for the benefit of Damart Development and Management,

15  Corp., which are those that you do?

16  DEPONENT:

17     A    Me, none.

18     Q    Okay. I'm showing counsel and deponent what has

19  been marked as Exhibit 4 of this deposition.

20     Please, examine what has been marked as Exhibit 4 and

21  let us know when you have done so. Very well. Can you

22  identify the document, please?

23     A    It's an authorization to be able to make a

24  transaction to the account... on the account.

10

1    Q    And this is a transaction that was done in
2    January 31st, 2015. Correct?

3    A    That's correct.

4    Q    And the person who is identified in this
5    document as having done the transaction in the credit
6    union is who?

7    A    My signature is there, María Teresa Ayala.

8    Q    And this transaction was done on behalf of
9    Damart Development Management, Corp. Correct?

10   A    Yes, sir.

11   Q    Can you explain to us, what was the detail of
12   said transaction in that date?

13   A    Looking at the date that's January 31st, it's
14   the last... it was the last day in order to... be able to
15   getting amnesty.

16   Q    When you say the last day, for who to get the
17   benefit of the amnesty?

18   A    For us, my husband and I. It was the last day
19   that we could save a lot of money if we paid what the
20   accountant told us.

21   Q    I understand, Mrs. Ayala, that the transaction
22   was done in order to get the benefit of an amnesty.
23   Correct?

24   A    Yes, sir.

25   Q    And if you did that transaction within the time

# EXHIBIT 17


Exhibit 28

EXHIBIT
3
PENGAD 800-631-6989



CAGUAS COOP
¡Mejor servicio, más beneficios!

Nombre: <u>DAMART DEVELOPMENT AND MANGEMENT CORP</u>

Caguas Coop Central     ☒
Caguas Coop Pueblo      ☐

### Solicitud de Autorización de Personas a Realizar Transacciones

Yo,   <u>DAMART DEVELOPMENT AND MANGEMENT CORP</u>  autorizo a la siguiente(s) persona(s) en la cuenta

de | CHEQUES COMERCIAL |  con el número de cuenta [ ▓▓▓▓▓▓ ]  en el día de hoy 11 de diciembre de 2013.
Informo además, que de entender necesario el realizar algún cambio de firma(s) autorizada(s) tengo la obligación de visitar la Cooperativa de Caguas Coop para  enmendar nuevamente la autorización de firma o firmas en mi cuenta [ ▓▓▓▓▓ ].
Menciono que la(s) persona(s) autorizada(s) con dirección postal: <u>* PO BOX 386 CAGUAS PR 007250000</u> y la dirección física:  <u>VALLES DEL LAGO CALLE CAONILLA #1015 CAGUAS PR.PR 007260000</u> con el número de teléfono:<u>(787)-675-3333</u> y su identificación es el número: <u>492343</u> que corresponde a la identificación de: <u>Licencia</u>.

☒Autorizo a que se le provea información por teléfono del balance actual de la cuenta antes mencionada a la(s) persona(s) aqui autorizada(s). Esta autorización revoca el inciso (1) del documento Autorización para Proveer Información Financiera por Teléfono.

Firmando hoy <u>11 de diciembre de 2013</u> en Caguas Coop.

_____
DAMART DEVELOPMENT AND
MANGEMENT CORP
Firma Dueño Cuenta

DAMIAN MARTINEZ VAZQUEZ
Persona Autorizada

# EXHIBIT 18

Exhibit 26



# CAGUAS COOP



EXHIBIT
6

## SOLICITUD DE CUENTA-INGRESO

to a la disposiciones de las Cláusulas de Incorporación, al Reglamento y a las enmiendas a dichas Cláusulas y Reglamentos, de CAGUAS COOP,
to la apertura de la(s) siguiente(s) cuenta(s):

- [ ] cciones (socio)
- [ ] Certificado de Depósitos(CD)
- [ ] Vera Coop
- [ ] Planilla Coop
- [ ] DBA
- [ ] Depósito
- [ ] Cuenta Corriente (Cheques)
- [ ] Cuenta MIA
- [ ] Cuenta ESTILO
- [x] Cta. Corriente Com
- [ ] arjeta ATH (Llenar Convenio)
- [ ] Navi Coop
- [ ] No Socio
- [ ] Reingreso
- [ ] Sin Fines de Lucro

### Información del Solicitante

| | | | | |
|---|---|---|---|---|
| bre: | DAMART DEVELOPMENT AND MANGEMENT CORP | | | |
| : | Seg. Soc: | Estado Civil: | Dependientes: | 0 |
| a de Nacimiento: | ID: REGISTRO CORP | Emisión: PR | Fecha Expiración: | Distrito: 01 |
| cción Residencial: | 1015 CAONILLAS URB VALLE DEL LAGO CAGUAS 00725-0000 | Dirección Postal: | PO BOX 386 CAGUAS PR 00726-0000 | |
| fono: | | Tel. Cel: | (000)-000-0000 | |
| ar de Trabajo: | Ocupacion: CORPORACION | Teléfono de Trabajo: Ext: Supervisor: | | Ingreso: $.00 |

### Información de Persona Autorizada

| | | | | |
|---|---|---|---|---|
| bre: | DAMIAN MARTINEZ VAZQUEZ | Sexo: M | Seg. Soc: | Estado Civil: CASADO | Dependientes: 0 |
| e Nacido: 10/14/1949 | ID: Licencia | Emisión: PR | Expiración: 10/13/2014 | Relación con Solicitante: FIRMA AUTORIZADA |
| rección Residencial: ALLES DEL LAGO CALLE CAONILLA #1015 CAGUAS PR,PR 00726-0000 | | | Dirección Postal: * PO BOX 386 CAGUAS PR 00725-0000 | |
| léfono: (787)-675-3333 | | | Teléfono Celular:(787)-675-3333 | |
| ugar de Trabajo: SEGUROS DANNY MARTINEZ | Teléfono de Trabajo: | (787)-746-2333 | | Ingreso Mensual: $18,495.84 |
| cupación: Agente de Seguros | Ext: | Supervisor: | | |

Deseo autorizar a otras personas a realizar transacciones bajo esta cuenta:   ◯ Si (Llenar Anejo-A)   ⊙ No

| | | |
|---|---|---|
| Firma Solicitante | Firma Co-Solicitante | Numero de cuenta |
| 11 de diciembre de 2013 | 11 de diciembre de 2013 | |
| Fecha | Fecha | Número de cuenta de cheques |

### PARA USO DE LA COOPERATIVA

⊙

CUENTA NUEVA   Clasificación: H          SUCURSAL: 02     OFAC REVISADO POR: ___ (inicial)

D    TO INICIAL 25.000.00   [ ] CHEQUE   [ ] EFECTIVO   [x] OTRO: XFER 331983

BADO POR: MADELINE TORRES SANTOS              FECHA (dd-mm-aa): 11/DIC/2013

REVISADO POR: ___                              FECHA (dd-mm-aa): ___

H01

# EXHIBIT 19

4. 1er Cuento

Yo autorizo a Doña Waldo Daumont
a que efectue la transaccion de retiro
atraves Maria Ayala.

EXHIBIT
PENGAD 800-631-6989
5

Exhibit 25
ANEJO 25

# EXHIBIT 20

ANEJO 5
Exhibit 5



**CAGUAS COOP**
¡Mejor Servicio, más beneficios!

CAGUAS COOP CENTRAL
Ave. José Gautier Benítez ,
Carretera #1 Km 37.5,
Caguas, Puerto Rico
Tel. (787) 286-8500
Fax (787) 258-9550

CAGUAS COOP PUEBLO
Calle Lope Flores,
Esquina Avenida Muñoz Rivera,
Caguas, P.R.
Tel. (787) 746-9595
Fax (787) 744-3620

27 de junio de 2012

Sra. Wanda Daumont
Gerente de Sucursal

El pasado 16 de junio de 2012, usted autorizó el cambio del cheque número 1537021 por la cantidad de $5,229.74. El mencionado cheque fue emitido por AEELA a la orden de Viviana E. Sola Daumont. Este cheque fue autorizado por usted para cambio, sin tener los fondos necesarios para garantizar la cuantía del cheque y a la vez autorizó una excepción a la norma de retención de fondos.

La señora Viviana E. Sola Daumont es su hija. La Política del Area de Caja prohíbe que los empleados de la Cooperativa puedan autorizar transacciones de familiares; esto para evitar tan siquiera la apariencia de un conflicto de interés. Usted conoce esta política ya que usted trabajó en el diseño de la misma, por lo que se presume que conoce estas normas que se crean para salvaguardar la integridad de todos y para mantener un ambiente de trabajo confiable.

En la reunión que sostuvimos el día 20 de junio de 2012 con la Oficial de Cumplimiento, Jessybel A. Matos usted aceptó que autorizó el mencionado cheque y que acostumbra hacer lo mismo con los cheques de su esposo. Le apercibimos de que esta práctica debe ser suspendida inmediatamente y toda transacción de cualquier familiar que se salga de las normas generales y regulaciones no deben ser aprobadas por usted. Deberá inhibirse de realizar, autorizar u orientar a familiares a estos fines.

Se le apercibe que de ocurrir una situación similar a las descritas anteriormente y conforme a las facultades de imponer medidas disciplinarias, usted podría estar sujeta a medidas que pudieran llegar hasta el despido.

Irma Hilerio Arroyo
Presidenta Ejecutiva

Expediente de Personal

lrf

*Lo doy por leído no estoy de acuerdo.*
6/29/12

# EXHIBIT 21

Exhibit 7



**CAGUAS COOP**
*¡Mejor Servicio, más beneficios!*

CAGUAS COOP CENTRAL
Ave. José Gautier Benítez ,
Carretera #1 Km 37.5,
Caguas, Puerto
Tel. (787) 286-6
Fax (787) 258-9550

CAGUAS COOP PUEBLO
Calle Lope Flores,
Esquina Avenida Muñoz Rivera,
Caguas, P.R.
Tel. (787) 746-9595
Fax (787) 744-3620

31 de julio de 2012

Sra. Wanda E. Daumont Colón
Gerente Sucursal Pueblo

Estimada señora Daumont:

El día 10 de julio de 2012 me suscribió una carta, la cual recibí el 11de julio, en la que objeta el uso de la Política de Operación del Área de Caja en relación a la cita que hago de dicha Política en la carta suscrita a usted el 28 de junio de 2012 relacionada con que usted autorizó un cambio de cheques a su hija.

Le suscribo la presente comunicación con el único propósito de aclarar algunos puntos que entiendo hayan podido confundirse. En primer lugar, quisiera aclarar su alegación de que la política existente al momento de los hechos, ocurridos el 16 de junio de 2012, no prohibía el autorizar un cambio de cheque a un familiar, ya que la Política que lo prohíbe es la política enmendada por la Junta con fecha del 20 de junio de 2012.

Debo entonces aclarar que la Política de Operación del Área de Caja a la que hago referencia en la carta del 28 de junio de 2012, es la aprobada el 21 de noviembre de 2011. En el Artículo VI, inciso E, número 8, dice así: **"Toda transacción** relacionada con su cuenta personal o la de un familiar debe ser trabajada por otra persona, por lo tanto, se prohíbe hacer transacciones en su cuenta personal o de familiares, ya sea en las cuentas con la Cooperativa o externas, las cuales se procesan a través de nuestros sistemas mecanizados como son: AAA, AEE, tarjetas de crédito, líneas de crédito, venta de marbetes, venta de sellos de rentas internas o del Colegio de Ingenieros y celulares, entre otros." El simple hecho de indicar en la misma la palabra **"toda transacción"** incluye una autorización realizada por usted relacionada con la cuenta de un familiar. (énfasis nuestro)

Según se desprende de esa sección, todo empleado de la Cooperativa tiene la prohibición de participar en cualquier transacción en la que el socio o cliente sea uno de sus familiares. En dicha norma no existe una excepción que sí lo permita a ciertos empleados.

Otro punto que deseo aclarar es sobre el contenido del último párrafo de su carta. Como Gerente de Sucursal que usted ha sido por tantos años, debe tener claro que el vocabulario usado y que cita, es uno acostumbrado en todas estas comunicaciones para reafirmarle al empleado que aún cuando se espera que no ocurran nuevos incidentes; de ocurrir, la institución se reserva el derecho de aplicar las próximas medidas disciplinarias que

ANEJO 5B

correspondan según las faltas en que incurra el empleado. Me sorprende que esto le haya alarmado, cuando usted lleva muchos años supervisando y conoce los procesos.

Por último y no menos importante, nunca hemos dudado del compromiso que usted ha tenido y tiene con la Cooperativa. Solamente le exhortamos a que continúe comprometida con la Cooperativa y con la pureza de los procesos, por el bienestar de todos nuestros socios y que nos ayude en el proceso de cumplimiento con todas la políticas y regulaciones, tanto estatales como federales.

Cualquier duda puede solicitar reunirse conmigo para aclarar la misma. Usted sabe que siempre he estado disponible para hablar sobre esto o cualquier asunto que sea de su interés. La carta que usted suscribió relacionada a este asunto, será archivada en su expediente de personal junto a la comunicación original y con copia de esta carta.

Atentamente,

Sra. Irma Hilerio
Presidenta Ejecutiva

# EXHIBIT 22

ANEJO 5A

10 de julio de 2012

Sra. Irma Hilerio Arroyo
Presidenta Ejecutiva

Hago referencia a su comunicación fechada el 27 de junio de 2012. En lo relacionado con la reunión del día 20 de junio de 2012, según mencionado en el tercer párrafo de su carta, ésta fue celebrada con la Srta. Jessybel A. Matos y la Sra. Lourdes Rodríguez. Al nivel de la Presidenta Ejecutiva no se me ofreció la oportunidad de sostener una conversación previa al envío de su carta.

En cuanto a la transacción del cheque número 1537021, mi única intervención fue iniciar el cheque como bueno y conforme a la norma vigente al momento de la transacción. Ésta se realizó en presencia del Supervisor de Cajeros, José Lozada, y fue trabajada por la cajera Joany Torres, o sea, que hubo transparencia en el proceso. La transacción de cambio de cheque, no de depósito, fue clara y dentro de la norma y yo no trabajé ni realicé la transacción. La Política o Manual del Área de Caja, aplicable al momento de atender esta situación, no prohíbe iniciar cheques como buenos y dar fe del carácter y la identificación del socio en transacciones de familiares. Lo que prohíbe es realizar la transacción e indica además, que la transacción tiene que ser trabajada por otra persona.

Considerando lo antes expuesto, si hay alguna práctica que suspender sería únicamente la de iniciar un cheque como bueno que traiga un familiar y si esta es su instrucción la tomaré como una nueva norma, no como una violación. En lo sucesivo no iniciaremos los cheques de ningún familiar. Además, en fecha posterior a su carta, se me fue entregado el Manual de Área de Caja que se ha enmendado para prohibir el autorizar cheques para cambio a un familiar. Esto responde a que se me fue entregado el 6 de julio de 2012 cuando su carta tiene fecha de 27 de junio de 2012.

En todo momento, durante los pasados 30 años de servicio en Caguas Coop, he mantenido un ambiente de trabajo confiable, honesto, claro y respetando las políticas establecidas. Durante ese tiempo me he ganado el respeto, admiración y reconocimiento profesional tanto de los Socios, la Gerencia y la Junta de Directores. Las transacciones realizadas bajo mi gerencia han sido auditadas por auditores externos durante más de 30 años y nunca me han hecho señalamientos de falta de integridad o confiabilidad. Siempre he ofrecido y continuaré ofreciendo un excelente servicio al cliente y a Caguas Coop dentro de las normas establecidas.

Lamento esta situación y de echo me sorprende; que se mencione el imponerme medidas disciplinarias pudiendo estar sujeta a medidas que "pudieran llegar hasta el despido" sin ofrecerme la oportunidad de una conversación con usted previa al envío de la carta.

Wanda E. Baumont Colón
Gerente Sucursal Pueblo

C:      Expediente de Personal

# EXHIBIT 23

ANEJO 4



**CAGUAS COOP**
*¡Mejor Servicio, más beneficios!*

CAGUAS COOP CENTRAL
Ave. José Gautier Benítez,
Carretera #1 Km 37.5,
Caguas, Puerto Rico
Tel. (787) 286-8500
Fax (787) 258-8550

CAGUAS COOP PUEBLO
Calle Lope Flores,
Esquina Avenida Muñoz Rivera,
Caguas, P.R.
Tel. (787) 746-9595
Fax (787) 744-3620

10 de marzo de 2015

Sra. Wanda Daumont
Gerente de Sucursal Central
Caguas Coop
Caguas, Puerto Rico

Estimada Sra. Daumont:

El pasado 20 de febrero de 2015, uno de los cajeros que se encuentran bajo su supervisión, tramitó un desembolso de la línea de crédito del socio ▓▓▓▓ a petición suya. Debido a que el socio mismo no tramitó en persona su solicitud, nuestras normas requieren que un Oficial de la Cooperativa lo haya aprobado. Usted obvió dicho paso, e indicándole al cajero que lo tramitara sin dicha autorización, ya que no había ningún oficial en ese momento en la institución. El socio, a quien se le extendió la línea de crédito resulta ser su esposo.

Al usted instruir a uno de sus supervisados que tramitara el desembolso sin la firma autorizada, requerida en ese caso, usted violentó las siguientes normas de conducta:

"No realizar transacciones, favores o concesiones que estén fuera de las normas que regulan la sana administración a ningún socio, cliente, patrocinador, depositante, proveedor, consultor, etc." (Pág. 5 Código de Normas de Conducta y Disciplina Progresiva)

"Violar o instigar a otros empleados a violar los métodos de operación establecidos, las normas y/o políticas de la Cooperativa o las instrucciones verbales o escritas de la supervisión." (Tabla 4 - Actos constitutivos de Violación contra las Políticas Institucionales)

"Ofrecer información falsa en cualquier solicitud o documento mediante el cual se cree, transfiera, termine o afecte cualquier, derecho, obligación o interés o intencionalmente. dar información falsa en cualquier solicitud de crédito, pagaré u otro documento. (Tabla 1: Actos Constitutivos de Violación Contra la Honestidad) Al usted firmar como si fuera su esposo y sin estar autorizada con su firma a hacerlo, usted ofreció información falsa en un documento oficial de la Cooperativa y de gran importancia para mantener la pureza de las transacciones que se realizan en el mundo comercial del cual, como Cooperativa somos parte.

Aún cuando usted no realizó la transacción directamente, indujo a uno de sus subordinados a incumplir con nuestras normas, por lo cual, incumplió con las disposiciones de nuestra Política de Conflicto de Intereses que requieren que:

"El empleado no permitirá que sus intereses personales conflijan, o aparenten conflígir con los intereses de la Cooperativa. "

"El empleado no participará, efectuará, aprobará o realizará transacción alguna en la Cooperativa, en la cual algún familiar o pariente de cualquier grado de consanguinidad o afinidad, sea parte."

Como consecuencia de este incidente sostuvimos una reunión con usted, en la misma, no solo usted nos informó que acostumbraba a realizar ese tipo de transacción por su esposo, sino, que nos indujo a error al indicarnos que usted era firma autorizada en esa línea de crédito expedida a su esposo. Al revisar el expediente de dicha línea de crédito encontramos que usted no es persona autorizada dentro de esa línea de crédito. También advinimos a conocimiento que usted firmó por su esposo, por lo cual la firma que aparece en el documento, aún cuando tiene el nombre de su esposo, no tiene su firma. Usted falsificó la firma de éste. De la investigación que se ha realizado al momento encontramos que usted firmó Hojas de Desembolso en dicha línea de crédito en 7 ocasiones desde el 10 de julio de 2014 al presente. Con este acto, usted incurrió en la falta grave dispuesta en la Tabla 1 de nuestras Normas de Conducta sobre Actos Constitutivos de Violación Contra la Honestidad, la cual dispone:

"Ofrecer información falsa en cualquier solicitud o documento mediante el cual se cree, transfiera, termine o afecte cualquier, derecho, obligación o interés o intencionalmente dar información falsa en cualquier solicitud de crédito, pagaré u otro documento."

El usted falsificar la firma de su esposo y socio de esta Cooperativa, también constituyó una violación a la Norma de Conducta contenida en la Tabla 7: Actos Constitutivos de Fraude a la Cooperativa, la cual consiste en:

"Alterar, falsificar, ocultar o destruir cualquier cuenta o documento que se relacione con los fondos de la Cooperativa."

Otro acto de violación grave a nuestras Políticas Institucionales cometido por usted de naturaleza grave, fue el cometido el día 30 de enero de 2015, al usted autorizar que una persona que no es firma autorizada en una cuenta corriente comercial realizara un retiro de dicha cuenta por la suma de $18,795.43.

Los actos aquí mencionados son violaciones crasas a nuestras Políticas Institucionales. La Cooperativa es sumamente celosa con el manejo de las cuentas y haberes de sus socios y clientes. Este celo ayuda y ha ayudado a esta institución a ganarse un sitial de respeto dentro de la comunidad cagüeña y pueblos limítrofes.

Tanto en nuestro Manual de Empleados, en el Código de Ética, como en el Código de Normas de Conducta y Disciplina Progresiva se establece que la Cooperativa espera que todos sus empleados "observen una conducta adecuada que contribuya a la imagen de excelencia", también se dispone la responsabilidad que tienen todos los empleados de desempeñar sus deberes diligentemente, con

3

lealtad y eficiencia debida. De forma específica en el Código de Ética se indica que los empleados tienen que desempeñar sus funciones con el más grado de ética, honestidad, integridad e imparcialidad y con la diligencia y atención necesaria.

Aún cuando la cuenta en la cual firmó haciéndose pasar por otra persona, es relacionada con su esposo, no hay justificación alguna para ello, máxime que usted por ocupar una posición de supervisión y gerencia viene llamada a ser ejemplo.

Los actos cometidos por usted son de naturaleza grave y no podemos permitir que los mismos se continúen repitiendo. Por lo cual, luego de un análisis profundo y de evaluar la naturaleza y gravedad de sus faltas, las cuales, según nuestras normas de conducta conllevan el despido en la primera ofensa, damos por terminada su relación de empleo con esta Cooperativa efectivo al día de hoy.

Usted recibirá próximamente la liquidación del balance acumulado, si alguno, por concepto de vacaciones y le estamos entregando la debida comunicación en relación a la Ley COBRA para que pueda, bajo las disposiciones de dicha ley, mantener el plan médico que tiene con la Cooperativa.

Sinceramente,

Irma Hilerio
Presidenta Ejecutiva

Cc: Lourdes Rodríguez, VP Finanzas y Recursos Humanos
     Ramón Adorno, VP Operaciones

# EXHIBIT 24



**CAGUAS COOP**
Mejor servicio, más beneficios

# Código de Normas de Conducta y Disciplina Progresiva
## Supervisión

Mayo 2013

## Tabla 1: Actos Constitutivos de Violación Contra la Honestidad

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| Ser convicto por cualquier delito que conlleve depravación moral. | Despido | | | |
| Ofrecer información falsa en la Solicitud de Empleo o en otro documento de empleo o beneficios oficial de La Cooperativa. | Despido | | | |
| Recibir honorarios, regalos, comisiones o prendas de cualquier persona, firma o corporación por conseguir o tratar de conseguir un préstamo o la compra o descuento de cualquier documento, instrumento negociable, pagaré, cheque, giro o letra de cambio de La Cooperativa. | Suspensión de empleo y sueldo por 5 días laborables | Despido | | |
| Recibir cualquier beneficio por la prestación de cualquier servicio que de ordinario prestaría La Cooperativa a la persona si cumple con los requisitos estipulados. | Reprimenda Escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido | |
| Ofrecer información falsa en cualquier solicitud o documento mediante el cual se cree, transfiera, termine o afecte cualquier derecho, obligación o interés, o intencionalmente dar información falsa en cualquier solicitud de crédito, pagaré, u otro documento. | Despido | | | |
| Violación a la Ley de Hostigamiento Sexual, Ley 17 del 22 de abril de 1986, según enmendada, y a la política establecida en la Cooperativa al respecto. | Despido | | | |

Revisado 05/2013

11

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| Brindar información falsa en cualquier investigación o audotoría, interna o externa, con previo conocimiento de la falsedad. | Despido | | | |
| Leer, revisar, fotocopiar, fotografiar o divulgar el contenido de documentos u otra información no relacionada a sus funciones sin previa autorización. | Despido | | | |
| Sin autoridad legal, apropiarse de fondos de La Cooperativa, en todo o en parte, para su beneficio o el de otra persona. | Despido | | | |
| Sustraer o hacer una aplicación idebida de dinero, fondos o cr'editos de La Cooperativa o de valores existentes. | Despido | | | |
| Apropiarse de forma indebida, desmedida y sin autorización de los medicamentos disponibles en el botiquín de primeros auxilios. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |

## Tabla 2: Actos Constitutivos de Violación Contra la Integridad

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| Falta de cortesía en el trato a compañeros, supervisores, clientes, socios, depositantes, proveedores o visitantes. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Juegos de manos, juegos de azar y/o apuestas dentro de los predios de La Cooperativa durante o fuera de horas laborables. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |

Revisado 05/2013

12

## Tabla 4: Actos Constitutivos de Violación contra las Política Institucionales

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| Trabajar deficientemente o no conforme a las normas de calidad y las instrucciones operacionales establecidas por la Cooperativa. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Ineficiencia, descuido, negligencia, falta de interés o irresponsabilidad en el desempeño de sus funciones. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Violar o instigar a otros empleados a violar los métodos de operación establecidos, las normas y/o políticas de La Cooperativa o las instrucciones verbales o escritas de la supervisión. | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido | |
| Trabajar tiempo extra sin la debida autorización. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Poseer o introducir bebidas alcohólicas a los predios de La Cooperativa sin autorización. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Trabajar bajo los efectos de alcohol o drogas.* <br><br> * Se podrá requerir la participación del empleado en un programa de rehabilitación para el uso de sustancias que alteren el estado mental. | Suspensión de empleo y sueldo por 5 días laborables | Despido | | |

Revisado 05/2013

14

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| No mantener una buena apariencia personal, vestimenta adecuada o utilización el uniforme según requerido para su puesto y funciones. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Violación a las reglas, prácticas o políticas de salud y seguridad ocupacional. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Ausentarse del lugar de trabajo durante horas laborables sin autorización de la supervisión inmediata. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Ausentarse del trabajo por tres días consecutivos sin notificación a la supervisión inmediata ni justificación. | Despido | | | |
| Fumar en los predios de La Cooperativa, excepto en áreas designadas para ello. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Faltar a sus obligaciones financieras con La Cooperativa, incurriendo en atrasos o sobregiros no autorizados. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Recibir visitas personales durante horas laborables. Si fuere un caso de emergencia el empleado deberá notificar a la supervisión y solicitar su autorización. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |

Revisado 05/2013

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| Usar el programa de "Internet" y/o cualquier otra red de comunicación para labores no relacionadas con el trabajo sin antes haber recibido la debida autorización. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Usar los programas de computadora en las computadoras de La Cooperativa sin una licencia o sin haber recibido la autorización de acuerdo con las prácticas de La Cooperativa. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Usar el programa de "Internet" y/o cualquier otra red de comunicación para adquirir programas en violación a las leyes de derecho de autor o para obtener material considerado ofensivo por otros. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Rehusarse a cooperar en la investigación de una posible violación a leyes, prácticas o políticas que rigen La Cooperativa. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Ausentismo excesivo, por sobre los parámetros establecidos, incluyendo tardanzas. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |

Revisado 05/2013

16

## Tabla 6: Actos Constitutivos de Violación a la Integridad Corporal

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| Provocar o instigar riñas o peleas durante horas laborables en los predios de La Cooperativa o durante actividades oficiales auspiciadas por La Cooperativa. | Despido* | | | |
| Agredir físicamente a compañeros de trabajo, clientes, socios, depositantes, proveedores, visitantes, etc. durante horas laborables en los predios de La Cooperativa o durante actividades oficiales auspiciadas por La Cooperativa o reaccionar a una agresión. | Despido* | | | |

*En caso de que haya más de un empleado involucrado todos serán sometidos a la misma acción disciplinaria. Cada caso será evaluado individualmente y en sus meritos para verificar si la agresión fue debido a un acto de defensa propia debido a un temor real a la seguridad o la vida.

## Tabla 7: Actos Constitutivos de Fraude a La Cooperativa

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| Cambiar o convertir los fondos de La Cooperativa bien en efectivo, en papel u otra moneda corriente o instrumento negociable sin autoridad legal para ello. | Despido | | | |
| Descuidar, dejar de guardar o desembolsar los fondos de La Cooperativa en violación a lo dispuesto por Ley, en los reglamentos o en las políticas internas. | Despido | | | |

Revisado 05/2013

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| Alterar, falsificar, ocultar o destruir cualquier cuenta o documento que se relacione con los fondos de La Cooperativa. | Despido | | | |
| Falsificar o alterar informes o documentos de La Cooperativa o sus clientes, socios o depositantes. | Despido | | | |
| Prestar los fondos de La Cooperativa, en todo o en parte, especular con ellos o utilizarlos para cualquier objeto no autorizado por ley o reglamento institucional. | Despido | | | |
| Depositar ilegalmente fondos de La Cooperativa, todos o parte de ellos, en alguna cooperativa, banco, o institución financiera, o en poder de otra persona. | Despido | | | |
| Llevar alguna cuenta falsa o que haga un asiento falso de fondos de La Cooperativa o que se relacione con los mismos. | Despido | | | |
| Ocasionar el desembolso de fondos de La Cooperativa por omisión, descuido o negligencia en violación de las normas prestatarias de La Cooperativa. | Despido | | | |

| Ofensa | Primera Infracción | Segunda Infracción | Tercera Infracción | Cuarta Infracción |
|---|---|---|---|---|
| Emitir o expedir cualquier certificado de depósito, orden o letra de cambio, transferir cualquier pagaré, bono, giro, letra de cambio, aceptar hacer asiento falso en cualquier libro, informe o estado financiero de La Cooperativa sin estar autorizado o con intención de defraudar a cualquier persona natural o jurídica o de engañar al Inspector de Cooperativas, a cualquier entidad que asegure los depósitos de La Cooperativa o a cualquier otro funcionario, ejecutivo o persona nombrada para auditar, examinar o investigar los asuntos de La Cooperativa. | Despido | | | |
| Intencionalmente registrar incorrectamente o dejar de registrar su asistencia. | Reprimenda verbal | Reprimenda escrita | Suspensión de empleo y sueldo por 5 días laborables | Despido |
| Registrar la asistencia de otro empleado. | Reprimenda verbal a ambos | Reprimenda escrita a ambos | Suspensión de empleo y sueldo por 5 días laborables a ambos | Despido a ambos |
| Registrar falsamente la tarjeta de otro empleado que esté ausente. | Despido a ambos | | | |

# EXHIBIT 25



CAGUAS COOP
Mayor servicio más bienestar

# Código de Ética

septiembre 2012

**Cuerpos Directivos** - Significa la Junta de Directores, comité de crédito, el comité de supervisión, el comité de educación, cualquier comité que desempeñe funciones delegadas por la Junta de Directores y cualquier cuerpo permanente de elección debidamente instituido por ley, reglamento o por el reglamento general de la cooperativa.

**Extensión de crédito** – Préstamo o refinanciamiento de un préstamo con o sin garantía inmueble o mueble, línea de crédito rotativa o línea de crédito simple, sobregiros, etc.

**Unidad familiar** – Incluye el cónyuge de un integrante de un cuerpo directivo o de un empleado así como los parientes hasta el segundo grado de afinidad o hasta el cuarto grado de consanguinidad o aquella(s) persona(s) que comparta con éste su residencia legal, sin importar el grado de consanguinidad o afinidad, o cualquier persona, sin importar el grado de consanguinidad o afinidad, cuyos asuntos financieros estén bajo su control legal como tutor, fiduciario, albacea, etc.

**Buen padre de familia** – Grado de diligencia, cuidado y destreza que demostraría una persona ordinariamente prudente en el manejo de sus negocios personales bajo el estándar de un hombre prudente y razonable y el cuidado requerido en diversos tipos de actividades, industrias o profesiones.



**Parte relacionada** – Incluye, respecto a todo integrante de un cuerpo directivo, oficial o empleado de La Cooperativa, su cónyuge, integrante de la unidad familiar, cualquier socio y cualquier entidad jurídica en la cual la persona en cuestión mantiene directa o indirectamente algún control o interés.

B. **Deber de Diligencia y Cuidado**

1. Los cuerpos directivos y oficiales ocupan sus respectivos cargos las veinticuatro (24) horas del día y por ende en todo momento están sujetos a las normas de La Cooperativa y de éste Código.

2. Los cuerpos directivos y oficiales desempeñarán sus deberes diligentemente, con lealtad, fidelidad y eficiencia, bajo el concepto de buen padre de familia, según definido.

3. Todo integrante de un cuerpo directivo, funcionario ejecutivo, oficial o empleado deberá cumplir con la legislación y reglamentación aplicable tanto en el aspecto operacional como en el administrativo.

4. Todo integrante de un cuerpo directivo, oficial o empleado se abstendrá de llevar a cabo actividades o acciones que resulten o creen la apariencia de:

   a) Que está obteniendo algún beneficio personal de los bienes de La Cooperativa;

   b) Que está brindando trato preferencial o trato especial no contemplado en la políticas a ciertos socios, clientes, depositantes y/o terceros;

c) Que está tomando decisiones sin seguir los procedimientos establecidos u obtener la autorización requerida para ello;

d) Que afecten la confianza de los socios, clientes, depositantes y/o terceros.

5.      Todo integrante de un cuerpo directivo, oficial o empleado cumplirá con los deberes asignados dentro del término requerido.

6.      Los integrantes de los cuerpos directivos asistirán a las reuniones que les correspondan con la regularidad y puntualidad que sean citadas.  No se ausentarán a las reuniones sin antes proveer una excusa razonable y haber sido debidamente excusados.

7.      Todo integrante de un cuerpo directivo, oficial o empleado deberá asistir a los seminarios que le corresponda así como a las actividades patrocinadas por La Cooperativa, a no ser que provea una excusa razonable.

8.      Todo integrante de un cuerpo directivo, oficial o empleado tomará las medidas necesarias que garanticen el cumplimento continuo con la reglamentación aplicable.

## Estándar Mínimo de Conducta

Todo integrante de un cuerpo directivo, oficial o empleado observará un alto nivel de comportamiento ético y un estado mental saludable, que le permita llevar a cabo sus labores eficientemente y proyectar una buena imagen de La Cooperativa.

Evitará en todo momento cualquier estado de intoxicación o embriaguez, mientras participe en actividades o reuniones o represente a La Cooperativa en las mismas.

## C.     Informaciones Lesivas

Todo integrante de un cuerpo directivo, oficial o empleado se expresará positivamente de La Cooperativa con el propósito de preservar el prestigio y la confianza que tienen los socios, clientes y depositantes en la Institución.

Todo integrante de un cuerpo directivo, oficial o empleado se abstendrá de hacer, manifestar o transmitir cualquier rumor, o indicación verbal o escrita que redunde o pueda redundar, directa o indirectamente, en el descrédito o que afecte la solvencia de La Cooperativa o que aconseje, ayude, procure o induzca a otra persona o entidad a que origine, transmita o circule cualquier manifestación o rumor de tal naturaleza.



## V.   Compensación y Reembolso de Gastos

### A.   Compensación

Los integrantes de los cuerpos directivos y los de cualquier otro comité debidamente electo, no recibirán compensación o remuneración alguna por el desempeño de sus funciones, excepto el pago de dieta por asistencia a reuniones oficiales según lo establezca el Reglamento para Asuntos de Dieta y Millaje de Cuerpos Directivos de La Cooperativa.

### B.   Reembolso de gastos razonables

Los integrantes de los cuerpos directivos y los de cualquier otro comité debidamente electo, podrán recibir el reembolso de los gastos razonables en los que incurran en el desempeño de sus funciones de acuerdo al reglamento aprobado por La Cooperativa. Dicho reembolso no incluirá los gastos incurridos por el cónyuge o familiares dentro del segundo grado de afinidad o el cuarto grado de consanguinidad o "parte relacionada" de dichos directores o integrantes de los cuerpos directivos o comités.

El reembolso se efectuará de conformidad con el Reglamento de Reembolso de Gastos que haya adoptado La Cooperativa.

## VI.   Procedimientos Disciplinarios

### A.   Violaciones al Código de Ética

Conforme a la Ley 255 del 28 de octubre de 2002 conocida como la Ley de Sociedades Cooperativas de Ahorro y Crédito de 2002, según enmendada, cualquier violación a las normas del Código de Ética constituirá una práctica inadecuada en la administración y operación de La Cooperativa por parte del infractor.

### B.   Sanciones y penalidades en el caso de oficiales y empleados

1.     Cualquier violación a las normas del Código de Ética por parte de un oficial(es) o empleado(s) conllevará la imposición de sanciones y/o acciones disciplinarias que podrán incluir reprimenda verbal, reprimenda escrita, suspensión temporera o permanente del cargo, suspensión de empleo y sueldo o despido dependiendo de la gravedad de la violación y la frecuencia en que se llevó a cabo la misma.

Dependiendo de la violación(es) la sanción y/o acción disciplinaria podrá conllevar referir el asunto a la atención de las agencias reguladoras para la acción administrativa o judicial pertinente. En la imposición de sanciones y/o acciones disciplinarias a oficiales y empleados por violación al Código de Ética se tomará en consideración como agravante o atenuante, según sea el caso, además de la falta cometida, el cargo que ocupa el infractor, el riesgo de pérdida o daño a La Cooperativa y la existencia de faltas anteriores.

# EXHIBIT 26



# CAGUAS COOP
## Tu Centro Financiero.

# MANUAL DE SERVICIOS AL SOCIO & POLITICA DE SERVICIOS

del individuo que realiza las transacciones.

(b)   Bajo esta forma de negocio, el individuo continúa siendo personalmente responsable ante reclamaciones entabladas contra su comercio.

### 2.1.3.2   Documentos Requeridos para Apertura de la Cuenta Comercial:

#### 2.1.3.2.1  Cláusulas de Incorporación:

(a)   Documento acreditativo del registro de la corporación ante el Departamento de Estado.

#### 2.1.3.2.2  Resolución Corporativa:

(a)   Aquélla corporación que tenga constituida una Junta Directiva, se le requerirá un acuerdo de los miembros directivos autorizando a las personas que comparecen a la Cooperativa a realizar transacciones, firmar las mismas en representación de la Corporación.

#### 2.1.3.2.3  Patente Municipal:

(a)   Establecimientos comerciales ubicados en el municipio requieren de una patente municipal para operar en esa localidad. La patente tiene que ser extendida al negocio que se opera. Ej "El Colmado del Pueblo" o "El Fogón de **Caguas**".

#### 2.1.3.2.4  Certificado de Buena Pro

(a)   El Certificado de Buena Pro tiene el propósito de expresar que la entidad ha cumplido con todos los requisitos del Departamento de Estado.

© Derechos de Autor Reservados. 2003. Prohibida la reproducción sin autorización de los autores. Este Manual de Servicios al Socio es solamente un resumen, para su conocimiento y referencia rápida. NO constituye contestación u opinión legal de los autores. Para atender consultas en su Cooperativa, deberá referirse al texto íntegro de la ley o disposición legal correspondiente.

# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WANDA DAUMONT COLÓN

    Plaintiff

        V.

COOPERATIVA DE AHORRO Y
CRÉDITO DE CAGUAS

    Defendant

CIVIL NO.:  15-3120

AGE DISCRIMINATION

CONTINUATION OF TAKING OF DEPOSITION
OF MRS. WANDA DAUMONT-COLÓN

DATE        :   January 26, 2017

TIME        :   9:20 a.m.

OFFICE      :   MENDOZA LAW OFFICES

ADDRESS     :   Centro de Seguros Building, Suite 312
                701 Ponce de Leon Avenue
                San Juan, Puerto Rico

APPEARANCES

ON BEHALF OF PLAINTIFF:

    Erickson Sánchez-Preks, Esq.

ON BEHALF OF DEFENDANT:

    Enrique J. Mendoza-Méndez, Esq.
    Otto Muller, Esq.

NOTARY PUBLIC:

    Otto Muller, Esq.

9

1        A    Mr. José A. Lozada.

2        Q    Let's go to Exhibit 4G. And this is a

3    transaction of July the 10th, 2014. Correct?

4        A    Correct.

5        Q    Who authorized this transaction?

6        A    Mr. José A. Lozada.

7    MR. MENDOZA:

8        Can the following document be marked as the next

9    exhibit, please?

10       I'm showing you, and your counsel, what has been done

11   as Exhibit 10. And we're going to go off the record so you

12   have the opportunity to examine it.

13                  OFF THE RECORD

14   MR. MENDOZA:

15       Q    Very well, can you identify the document that

16   had to be marked as Exhibit 10, please?

17   DEPONENT:

18       A    Yes.

19       Q    Please, do so.

20       A    It is a Code of Conduct or Norms of Conduct and

21   Discipline for Progressive Employees.

22       Q    And it is dated?

23       A    May 2013.

24       Q    Okay. Is it a fact that on the first page, you

25   signed as having received it?

1      A     Correct.

2      Q     Can you state the date when you signed... the

3  received?

4      A     July 29th, 2013.

5      Q     And this is an official document from Caguas

6  Coop?

7      A     Correct. Yes.

8      Q     And it's a document that you know and use in the

9  usual course of business, when you worked at Caguas Coop.

10     A     Correct.

11 MR. MENDOZA:

12     Okay. Thank you. Can the following exhibit be marked

13 as the next one in this deposition, please? I'm showing,

14 counsel and deponent, what has been marked as Exhibit 11

15 of this deposition.

16     We're going to go off the record to allow them time

17 to examine it, please.

18                    OFF THE RECORD

19 MR. MENDOZA:

20     Q     Can you identify what has been marked as Exhibit

21 11 of this deposition?

22 DEPONENT:

23     A     We have marked the Employee Manual.

24     Q     Of what date?

25     A     April 2012.

11

1          Q     On the first page, can you describe what it is?

2          A     A receipt request.

3          Q     It is signed by you crediting that you received

4     said manual.

5          A     Correct.

6          Q     And what is the date of your receipt?

7          A     May 19th, 2012.

8          Q     And this is an official document of Caguas Coop.

9     Correct?

10         A     Correct.

11         Q     And this is a document that you used to use as

12    part of the usual course of business while you worked at

13    Caguas Coop.

14         A     Correct.

15    MR. MENDOZA:

16         Please, let's mark this document as the following

17    exhibit in this deposition. Please.

18         Let me show you what has been marked as Exhibit 12 of

19    this deposition, for examination by you and your counsel.

20         Let's go off the record to do that.

21                         OFF THE RECORD

22    MR. MENDOZA:

23         The document that I handed to the court reporter

24    consisted of a certification of receipt and a code of

25    ethic. The certification of receipt is going to be marked

12

1    as Exhibit 12 and the code of ethic is going to be marked

2    as Exhibit 13 and we will handle them separately.

3        With this clarification, we're going to then show

4    them again to counselor and deponent for examination.

5    Have you examined both documents?

6    MR. SÁNCHEZ:

7        No.

8    MR. MENDOZA:

9        Okay. Are we on record?

10   COURT REPORTER:

11       Yes.

12   MR. MENDOZA:

13       Okay. Let's go off the record to allow them time to

14   examine the document.

15                    OFF THE RECORD

16   MR. MENDOZA:

17       Q    Please, we're going to work at this moment only

18   with Exhibit 12.

19   DEPONENT:

20       A    Correct.

21       Q    Can you identify what that document is?

22       A    It's a certification.

23       Q    And bears what date?

24       A    February 2nd, 1996.

25       Q    And who signs it?

1        A    Myself.

2        Q    And what does it certify?

3        A    Well, it certifies, for that time, an ethics

4 code. I'd have to look in my files to see what code of

5 ethics, because they change.

6        Q    Very well. So, based on that certification, it

7 is fair to conclude that by virtue of that document, you

8 certify having received and having discussed a certain

9 code of ethics in a meeting held on February 2nd, 1996.

10       A    Yes. And I reiterate that I would have to look

11 back at my files for the 1996 code of ethics.

12       Q    Very well. Can you read out loud the

13 certification for the record, please?

14       A    I hereby certify that I received a copy of the

15 code of ethics that was discussed at a meeting held on

16 February 2nd, 1996.

17       Q    Okay. Please, tell me yes or no. Do you admit

18 that in a meeting held on February 2nd, 1996, you received

19 a copy of the code of ethics?

20       A    For it to be in 1996...

21       Q    Please, answer yes or no.

22       A    Can you repeat the question?

23       Q    Yes. Do you admit that on February 2nd, 1996 you

24 received a copy of a code of ethic?  Yes or no?

25       A    It's that I don't recall.

14

1      Q    Okay. The signature in this document is yours.
2    Correct?
3      A    Correct.
4      Q    Do you have any evidence in your possession to
5    challenge that what this document says is false?
6      A    If I have any documentation?
7      Q    I'll make the question again.
8      A    Okay.
9      Q    What this document states, is it true or false?
10     A    It's true.
11     Q    Okay. Thank you. Now, can you explain...? Can
12   you identify to us what has been marked as Exhibit 13.
13     A    Code of Ethics.
14     Q    And what date it has?
15     A    September, 2012.
16     Q    Is this a document that you use in the usual
17   course of business while you worked as Caguas Coop, yes or
18   no?
19     A    Correct.
20     Q    Okay. And this is an official document of Caguas
21   Coop?
22     A    Correct.
23     Q    Okay. Thank you. Please mark the following
24   exhibit as the next one in this deposition.
25          I'm handing to counsel and deponent what has been

15

1    marked as Exhibit 14 of this deposition and we're going to

2    go off the record to allow them time to examine it. And

3    please, indicate when you have done so.

4                    OFF THE RECORD

5    MR. MENDOZA:

6        Q    Please, can you identify what has been marked as

7    Exhibit 14 of this deposition, please?

8    DEPONENT:

9        A    Well, it says "Caguas Coop, your financial

10   center" and this is a manual of services and policies for

11   the... policies... manual of services to the member and

12   policies of their services.

13       Q    Is this an official document of Caguas Coop?

14       A    Correct.

15       Q    Is this the document that you used during the

16   usual course of business while you worked with Caguas

17   Coop?

18       A    Correct.

19   MR. MENDOZA:

20       Very well. Thank you. Can the following document be

21   marked as the next exhibit, please?

22       I'm going to be handing counsel and deponent what has

23   been marked as Exhibit 15. And we're going to go off the

24   record to allow them time to examine it. And please, tell

25   me when you have done so.

18

1    COSSEC guides are?

2         A    The COSSEC guides?

3         Q    Yes.

4         A    Yes, with an explanation.

5         Q    How these guides were available to you?

6         A    When they were... we were informed of them or

7    when we received pamphlets from the cooperative.

8         Q    Very well. Let's mark this document as the

9    following Exhibit.

10        Well, we'll be showing counsel and deponent what has

11   been marked as Exhibit 16 of the deposition. And we're

12   going off the record to allow both to examine it.

13                      OFF THE RECORD

14   MR. MENDOZA:

15        Q    Can you examine what has been marked as

16   Exhibit... Excuse me. Can you identify what has been

17   marked as Exhibit 16 of this deposition?

18   DEPONENT:

19        A    The operational policy of the teller area.

20        Q    Is this an official document from Caguas Coop?

21        A    Correct.

22        Q    And what date it has?

23        A    Approval date of November 21st, 2011.

24        Q    Is this a document that you used in the usual

25   course of business while you worked at Caguas Coop?

19

1        A    Correct.

2        Q    Okay. Very well. Thank you. Let's mark the

3    following document as the next Exhibit in this deposition.

4    We are handing it to counsel and deponent and going off

5    the record to allow them time to examine it.

6                        OFF THE RECORD

7    MR. MENDOZA:

8        Q    Can you identify what has been marked as Exhibit

9    17 of this deposition?

10   DEPONENT:

11       A    Teller area operations policy.

12       Q    Can you state the date of it?

13       A    This one was approved June 20th, 2012.

14       Q    Is this an official document of Caguas Coop?

15       A    Correct.

16       Q    Is this a document that you used in the usual

17   course of business while you worked at Caguas Coop?

18       A    Correct.

19       Q    And the last page is your certification of

20   having received it. Correct?

21       A    Correct.

22       Q    Okay. Thank you. Let's mark this document as the

23   next Exhibit.

24       We are handing to counselor and deponent what has

25   been marked as Exhibit 18 of this deposition. And we're

1     going off the record to allow them time to examine it.

2                         OFF THE RECORD

3     MR. MENDOZA:

4          Q    Can you identify what has been marked as Exhibit

5     18 of this deposition?

6     DEPONENT:

7          A    Teller area operation policy.

8          Q    Can you tell me the date it has?

9          A    Approval date, September 4th, 2013.

10         Q    And this is an official document of Caguas Coop.

11         A    Correct.

12         Q    And this is a document that you used to use as

13    part of your functions while you worked at Caguas Coop.

14         A    Correct.

15    MR. MENDOZA:

16         Okay.  Thank you.  You may mark the following three

17    documents  in  the  next  consecutive  exhibits  of  this

18    deposition. They'll be Exhibit 19, Exhibit 20, and Exhibit

19    21.   And we're going to be handing them to counselor and

20    deponent for examination off the record.  Let's go off the

21    record.

22                         OFF THE RECORD

23    MR. MENDOZA:

24         Q    Can  you  please  identify  Exhibit  19  of  this

25    deposition?